IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

THOMAS E. PEREZ, Secretary of
the United States Department of Labor                                    PLAINTIFF

v.                                              CIVIL ACTION NO. 3:13cv1001-DPJ-FKB

HERBERT C. BRUISTER, et al.                                             DEFENDANTS

consolidated with

JOEL D. RADER and VINCENT SEALY                                        PLAINTIFFS

v.                                              CIVIL ACTION NO. 3:13cv1081-DPJ-FKB

HERBERT C. BRUISTER, et al.                                             DEFENDANTS


ORDER

This ERISA dispute is before the Court for judgment following a 19-day bench trial.  For

the reasons that follow, the Court concludes that judgment should be entered for Plaintiffs.

Given the breadth of the record and the dispute, the Court will provide general findings of fact

and procedural history before turning to more specific issues.

I.       General Findings of Fact and Procedural Overview

The primary dispute is whether individual Defendants breached fiduciary duties under

ERISA when acting as trustees for an Employee Stock Ownership Trust ("ESOT") that

purchased company stock for an Employee Stock Ownership Plan ("ESOP").  Plaintiffs claim

Defendants paid too much for the stock.

The transactions followed a somewhat familiar pattern, as described by the Fifth Circuit

in *Donovan v. Cunningham*:

> An employer desiring to set up an ESOP will execute a written document to define the terms of the plan and the rights of beneficiaries under it.  29 U.S.C. § 1102(a) (1976).  The plan document must provide for one or more named fiduciaries "to control and manage the operation and administration of the plan." *Id.*, § 1102(a)(1).  A trust will be established to hold the assets of the ESOP.  *Id.*, § 1103(a).  The employer may then make tax-deductible contributions to the plan in the form of its own stock or cash.  If cash is contributed, the ESOP then purchases stock in the sponsoring company, either from the company itself or from existing shareholders.  Unlike other ERISA-covered plans, an ESOP may also borrow in order to invest in the employer's stock.  In that event, the employer's cash contributions to the ESOP would be used to retire the debt.

716 F.2d 1455, 1459 (5th Cir. 1983).

This is essentially what happened in this case.  Employer Bruister and Associates, Inc. ("BAI"), was a Mississippi-based Home Service Provider ("HSP") that installed and serviced satellite-television equipment for its sole client DirecTV ("DTV").  In a three-year period from 2002 to 2005, BAI's owner Herbert C. Bruister sold 100% of BAI's shares to its employees through a series of transactions with the BAI ESOP and an Eligible Individual Account Plan ("EIAP").[1]  In the initial transactions, Bruister owned the stock he sold, but by the time the subject transactions occurred, he had transferred ownership in the outstanding BAI stock to the Bruister Family LLC ("BFLLC")—which he and his wife controlled.

In all, five transactions occurred, the first two of which fell outside the applicable statute of repose and are no longer in dispute.  The final three transactions closed December 21, 2004, September 13, 2005, and December 13, 2005.  In each instance, the Plan acquired BAI stock through an ESOT, for which Defendants Bruister, Amy O. Smith, and Jonda C. Henry served as

---

[1] Like the parties, the Court will generically refer to both plans as ESOPs unless otherwise indicated.

named trustees. Bruister owned BAI and ran it, Smith worked for BAI, and Henry was BAI's outside CPA. The BFLLC was an interested party and is a named Defendant.

The Subject Transactions included a combination of cash-payment closings and closings with Transaction Loans. In basic terms, the December 2004 Transaction included cash plus a Transaction Loan from BFLLC to the ESOT for the purchase of Pledged Stock. Pledged Stock that was subject to the loan was held by BAI (not the owner BFLLC) in a suspense account. As BAI made Employer Contributions into the ESOT, those funds were used to make payments on the principal and interest, and at year's end BAI would release a proportional amount of Pledged Stock from suspension.

The December 2004 loan was refinanced the following year to reflect a "mirror" loan whereby BAI was substituted for BFLLC as creditor with a duty to repay BFLLC as BAI received payments from the ESOT. The September 2005 closing was all cash, and the December 2005 closing was another mirror loan with no cash. The following table summarizes the amounts:

| Transaction | Total Price | Cash Payment at Closing from ESOT | ESOT Loan Amount | Amount of Principal/Interest ESOT Paid from Employer Contributions |
|---|---|---|---|---|
| 12/21/04<br><br>ESOT acquired 100,000 shares of BAI common stock (20% | $6.7 million | $730,000 | $5,970,000; originally owed to BFLLC but outstanding amount restructured into mirror loan on 12/12/05. BFLLC issued | $6,815,876.95 |

| Transaction | Total Price | Cash Payment at Closing from ESOT | ESOT Loan Amount | Amount of Principal/Interest ESOT Paid from Employer Contributions |
|---|---|---|---|---|
| of issued and outstanding stock) at $67.00 per share | | | note to BAI, BAI issued note to ESOT. | |
| 9/13/05 ESOT acquired 15,789.47 shares of BAI common stock (3.16% of issued and outstanding) at $76.00 per share | $1,199,999,72 | $1,199,999,72 | None | $1,199,999.72 |
| 12/13/05 ESOT acquired 134,710.53 shares of BAI common stock (26.94% of issued and outstanding) at $78.00 per share | $10,507,421.34 | None | $10,507,421.34 mirror loan whereby BFLLC issued note to BAI, and BAI issued note to ESOT. | $761,823.63 |

The trustees based the purchase price on valuations of BAI's fair market value ("FMV")

performed by Matthew Donnelly.  Donnelly was retained to serve as independent appraiser and

4

financial advisor to the ESOT.  The parties dispute whether he was truly independent and whether the trustees' reliance on Donnelly was reasonably justified.  In sum, Plaintiffs claim the valuations were inflated, causing the ESOP to pay too much, and Defendants claim the price paid was adequate.

On April 29, 2010, the Secretary of the Department of Labor filed suit in Civil Action No. 4:10cv77-DPJ-FKB, raising claims for breach of fiduciary duty under ERISA §§ 404(a)(1)(A), (B), and (D); for failure to monitor under ERISA §§ 404(a)(1)(A) and (B); and for engaging in prohibited transactions under ERISA §§ 406(a)(1)(A) and 406(b)(1) and (2).  A separate suit was later filed by two plan participants, Joel D. Rader and Vincent Sealy.  That suit (Civil Action No. 4:10cv95-DPJ-FKB) proceeded on a separate discovery track but was consolidated for trial on December 31, 2013.[2]  The *Rader* Plaintiffs raise generally the same claims as the Secretary and seek relief on behalf of the ESOP as a whole.  The Court tried the matter without a jury from August 4 through August 28, 2014.  Over fifty deposition transcripts were also submitted for the record.  At the conclusion of trial, limited briefing followed, and the Court is now prepared to rule.

II.    Analysis

Under Rule 52 of the Federal Rules of Civil Procedure, the Court normally provides separate findings of fact and conclusions of law.  But this is not a normal case.  It involves an enormous record and a large number of factual and legal disputes.  Rather than provide an

---

[2]The cases were transferred to the Northern Division of this District and assigned case numbers 3:13cv1001-DPJ-FKB and 3:13cv1081-DPJ-FKB pursuant to the Realignment Act on December 26, 2013.

exhaustive list of factual findings without context followed by an equally long list of legal conclusions, the legal conclusions and factual findings will be organized by issue.

A.     Procedural and Preliminary Questions

The Court entered numerous orders before trial, and those findings are incorporated herein by reference.  *See* Orders [562, 573, 574, 601, 602].  The following issues were deferred, and the Court is now prepared to rule on them:

1.     Experts

Both sides challenged the other's experts in pretrial *Daubert* motions.  Having now heard the qualifications-based challenges, the Court finds that all testifying experts possessed sufficient knowledge, skill, experience, training, or education to give their testimony consistent with Federal Rule of Evidence 702.

As for other challenges, "[a trial judge] enjoy[s] wide latitude in determining the admissibility of expert testimony."  *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 988 (5th Cir. 1997).  This is especially true with respect to bench trials where "the importance of the trial court's gatekeeper role is significantly diminished."  *Whitehouse Hotel Ltd. P'ship v. Comm'r*, 615 F.3d 321, 330 (5th Cir. 2010) (citing *Gibbs v. Gibbs*, 210 F.3d 491, 500 (5th Cir. 2000)).  "It is settled law that the weight to be accorded expert opinion evidence is solely within the discretion of the judge sitting without a jury."  *Pittman v. Gilmore*, 556 F.2d 1259, 1261 (5th Cir. 1977).  Thus, "the district court is not obligated to accept or credit expert witness testimony."  *Garcia v. Kerry*, 557 F. App'x 304, 309 (5th Cir. 2014) (per curiam) (citing *Albany Ins. Co. v. Anh Thi Kieu*, 927 F.2d 882, 894 (5th Cir. 1991)).

In the present case, the parties utilized two categories of experts—valuation experts and experts on the individual Defendants' prudence while acting as fiduciaries.  The valuation experts were subject to criticism on cross-examination related to their methods and certain alleged errors in their methodologies.  This was especially true with respect to the Secretary's expert Dana Messina and Defendants' expert Gregory Range.  But even in a jury trial—and especially in a bench trial—*Daubert* considerations should not supplant trial on the merits. "'[V]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'"  *Mathis v. Exxon Corp.*, 302 F.3d 448, 461 (5th Cir. 2002) (alteration in original) (quoting *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 250 (5th Cir. 2002)).  All experts were vigorously cross-examined for several days regarding their alleged deficiencies, and they provided adequate explanations to allow their testimony to remain in evidence for the Court to weigh.

On the prudence issue, Defendants called Jared Kaplan, and the Secretary rebutted with Samuel Halpern.  Though they approached the issues from differing perspectives, both experts were credible in their own way.  The bigger issue, however, is whether their opinions assist the trier of fact.

Kaplan is a highly experienced and knowledgeable lawyer in the ESOP community. Based on that knowledge, he was reluctant to offer legal opinions or opinions on whether Defendants breached fiduciary duties.  His reluctance was well founded.  In *Askanase v. Fatjo*, the Fifth Circuit affirmed the exclusion of an expert witness who was prepared to testify whether certain "'officers and directors fulfilled their fiduciary duties.'"  130 F.3d 657, 673 (5th Cir.

1997) (quoting expert report).  The Fifth Circuit observed that "[w]hether the officers and directors breached their fiduciary duties is an issue for the trier of fact to decide."  *Id*.  That said, there is no *per se* prohibition against lawyer testimony.  The question is whether the expert "is testifying to purely legal matters or legal matters that involve questions of fact."  *Id*.

Kaplan therefore stopped short of testifying whether Defendants fulfilled their fiduciary duty to act prudently and instead judged their conduct based on how it compared to similarly situated trustees he has witnessed in his legal practice.  He then graded the performance on a letter-grade scale.  Thus, Kaplan's testimony regarding the Defendants' actions was not tethered to an objective prudence standard; and, as the Secretary noted, just because most fiduciaries do something wrong does not mean that they satisfy the standard of care.  Kaplan himself conceded that he would not necessarily equate some of the grades he gave Defendants to prudence, and he often noted that Defendants' conduct fell short of what he would recommend.

The Court concludes the experts' testimony was in some ways related to underlying questions of fact and was helpful.  Both offered a perspective on the structure of ESOP transactions and related fiduciary duties that assisted the trier of fact.  While Kaplan's testimony about community norms does not necessarily link to findings of prudence, it at least provided context.  Accordingly, the Court will not strike the testimony.  That said, the Court has not placed much weight on these experts unless it is specifically noted below.

2.    Statute of Limitations

The Secretary and Defendants entered into a tolling agreement on December 30, 2008, that preserved any statute-of-limitations defenses that existed as of that date.  In a prior ruling, the Court misconstrued one of Defendants' statute-of-limitations arguments, concluding that the

tolling agreement waived the defense.  The Court noted this mistake during the pretrial conference, and the parties agreed that the issue would be preserved for trial.  The question now is whether the defense existed when the tolling agreement was signed.

a.      Conclusions of Law

ERISA provides a three-year statute of limitations from the date the plaintiff obtains "actual knowledge" of the alleged breach.  29 U.S.C. § 1113.[3]  The Fifth Circuit defines "actual knowledge" as requiring "'that a plaintiff have actual knowledge of all material facts necessary to understand that some claim exists, which facts could include necessary opinions of experts, knowledge of a transaction's harmful consequences, or even actual harm.'"  *Reich v. Lancaster*, 55 F.3d 1034, 1057 (5th Cir. 1995) (quoting *Gluck v. Unisys Corp.*, 960 F.2d 1168, 1177 (3d Cir. 1992)); *see also Kling v. Fid. Mgmt. Trust Co.*, 323 F. Supp. 2d 132, 136–37 (D. Mass. 2004) (noting circuit split).

This test further "'requires a showing that plaintiffs actually knew not only of the events that occurred which constitute the breach or violation but also that those events supported a claim for breach of fiduciary duty or violation under ERISA.'"  *Maher v. Strachan Shipping Co.*, 68

---

[3]ERISA § 413 provides in part:

No action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the earlier of—

> (1) six years after (A) the date of the last action which constituted a part of the breach or violation, . . . or

> (2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation . . . .

29 U.S.C. § 1113.

F.3d 951, 954 (5th Cir. 1995) (quoting *Int'l Union of Elec., Electric, Salaried, Mach. &*

*Furniture Workers, AFL-CIO v. Murata Erie N. Am., Inc.*, 980 F.2d 889, 900 (3d Cir. 1992).

Defendants offer two general arguments, one legal and one factual.  First, they contend

that the actual-knowledge requirement for a claim under ERISA § 406 dealing with prohibited

transactions is triggered with mere knowledge that a prohibited transaction has occurred.  There

is no apparent authority for this position, which appears contrary to the Fifth Circuit's otherwise

"narrow interpretation" of ERISA's actual-knowledge requirement.  *Midgley v. Rayrock Mines,*

*Inc.*, 374 F. Supp. 2d 1039, 1045 (D.N.M. 2005) (describing circuit split on statute-of-limitations

interpretation).  Instead, the Court believes the Fifth Circuit would follow the recent decision

from the Seventh Circuit in which the court focused on the plaintiff's "actual knowledge of the

procedures used or not used by the fiduciary" in the context of "a process-based claim under

§ 1104, § 1106(a), or both."  *Fish v. GreatBanc Trust Co.*, 749 F.3d 671, 681 (7th Cir. 2014); *cf.*

*Maher*, 68 F.3d at 956 ("We also reject Strachan's argument that knowledge of the transaction,

*i.e.* the purchase of Executive Life Annuities, is enough by itself to trigger the three-year statute

of limitations.").  The Court concludes that "the three-year limit is not triggered by knowledge of

the transaction terms alone."  *Fish*, 749 F.3d at 681.

### b.      Findings of Fact

Defendants contend that the Department of Labor ("DOL") learned at some point that

Matthew Donnelly had a felony conviction for fraud and that his appraisals were not credible.

According to Defendants, this led DOL to consider Donnelly *per se* unfit to serve as an appraiser,

and thus DOL had actual knowledge of its BAI-related claims as soon as it learned that Donnelly

was working with BAI.  All of this, they say, occurred before December 2005, so their statute-of-limitations defense was preserved in the December 30, 2008 tolling agreement.

Defendants have failed to support this contention.  While the Secretary may have had concerns about Donnelly's valuation practice as early as 2005, that knowledge, standing alone, fails to establish sufficient notice of its BAI-related claims by December of that year.  In reaching this conclusion, the Court credits the testimony of DOL investigator Jennifer Del Nero, who investigated the BAI ESOP.  Her investigation eventually provided sufficient notice to trigger accrual, but that occurred well after the relevant date.

Defendants' witnesses also fall short of establishing earlier actual knowledge. Defendants first called DOL employee Holly Holman, who investigated ESOP plans unrelated to BAI for which Donnelly was the appraiser.  But she was not aware of Donnelly's felony conviction until well after 2005.  Holman Dep. [C-8] at 165–67.  Defendants next called another HSP owner, Basil Mattingly, who attended a meeting in June or July 2005 with DOL investigator Theresa Schlecht.  Mattingly testified that Schlecht asked about Donnelly, and Mattingly inferred that DOL was aware of Donnelly's work for BAI.  Schlecht confirmed as much in the portions of her deposition Defendants read at trial, but she was not involved in the BAI investigation and never investigated Donnelly's background.  And though she had concerns about his valuations in her case, she did not immediately review his documents.  *See* Schlecht Dep. [C-9] at 124–27, 143–46, 245.  In fact, she did not subpoena documents from Donnelly or interview him until 2006, and her investigation continued through 2007.  *Id.* at 116, 166–68, 192.

Even assuming the Secretary at some point considered Donnelly *per se* unemployable—something the Secretary denies—Defendants failed in their burden of showing

that DOL had actual knowledge of its BAI-related claims by December 30, 2005, which is just

days after the final transaction.  Defendants have not established a statute-of-limitations defense.

The record also fails to support a statute-of-limitations defense as to the *Rader* Plaintiffs.

   3.  Whether the *Rader* Plaintiffs Have Standing

  Rader and Sealy claim that as "participants" in the ESOP, they have standing to bring suit

on behalf of the Plan as a whole.  Defendants argue that neither Rader nor Sealy ever vested

under the ESOP and therefore neither meet the statutory definition of "participant."  Absent

participant status, they have no standing.[4]

    a.  Conclusions of Law

  ERISA permits "a participant" to seek relief on behalf of an ERISA plan.  29 U.S.C.

§ 1132(a)(2), (3); *see Yancy v. Am. Petrofina, Inc.*, 768 F.2d 707, 708 (5th Cir. 1985) (per

curiam).  The question is whether Rader or Sealy was a "participant" as defined in the statute.  As

the Fifth Circuit has frequently noted, "[w]here Congress has defined the parties who may bring a

civil action founded on ERISA, we are loathe to ignore the legislature's specificity.  Moreover,

our previous decisions have hewed to a literal construction of § 1132(a)."  *Coleman v. Champion*

*Int'l Corp./Champion Forest Prods.*, 992 F.2d 530, 534 (5th Cir. 1993) (footnote and internal

quotation marks omitted).

  That construction begins with the plain text of ERISA, which defines "participant" to

include "any . . . former employee of an employer . . . who is or may become *eligible* to receive a

benefit of any type from an employee benefit plan."  29 U.S.C. § 1002(7) (emphasis added).

---

   [4]There was little attention paid to the standing issue until after the parties rested.  Indeed, the issue was not mentioned until Plaintiffs' closing argument, which prompted the Court to ask for post-trial briefs.

Former employees like Rader and Sealy are not "eligible" to receive benefits—*i.e.*, are not "participants"—unless they have either "a reasonable expectation of returning to covered employment or a colorable claim to vested benefits." *Firestone Tire & Rubber Co. v Bruch*, 489 U.S. 101, 117 (1989). Absent one of these, the former employee "simply does not fit within the [phrase] 'may become eligible.'" *Id.* at 118 (alteration in original) (internal quotation marks omitted).

In this case, neither Rader nor Sealy can expect to regain covered employment. So the question is whether they have "colorable claim[s] to vested benefits." *Id.*; *see also Yancy*, 768 F.2d at 709 ("The term 'participant' encompasses only those former employees who are owed vested benefits."). And absent proof of a vested interest under the ESOP, Radar and Sealy lack standing. *Yancy*, 768 F.2d at 709.

Whether standing exists "under ERISA is assessed as of the time the complaint is filed." *Hansen v. Harper Excavating, Inc.*, 641 F.3d 1216, 1225 (10th Cir. 2011); *accord Washington v. Occidental Chem. Corp.*, 24 F. Supp. 2d 713, 729 n.15 (S.D. Tex. 1998). And contrary to Plaintiffs' arguments, it is their burden to meet. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) ("Since [the standing requirements] are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation.").

Finally, Plaintiffs cannot contend that Defendants waived standing because "standing to bring an action founded on ERISA is a 'jurisdictional' matter." *Cobb v. Cent. States, Sw. & Se. Areas Pension Fund*, 461 F.3d 632, 635 (5th Cir. 2006) (vacating judgment for lack of standing

and raising issue *sua sponte* on appeal); *see also Gilbert v. Donahoe*, 751 F.3d 303, 307 (5th Cir. 2014) ("[P]arties may not agree to confer subject matter jurisdiction that Congress has withheld."). And while it is conceivable that a stipulation of underlying facts could have established a vested benefit, Defendants' answer contained no such admissions. More to the point, the Pretrial Order preserved a question of fact as to whether the *Rader* Plaintiffs had vested.

So the question is whether Rader or Sealy vested under the ESOP, which handles vesting in different ways. An employee can vest during the life of the Plan or when the Plan terminates. At termination, the basis for vesting depends on whether the Participant was a current employee at that time. Both avenues for vesting raise factual questions in this case and will be treated separately. In addition, there are a few legal questions imbedded in this discussion.

i.       Vesting Before Plan Termination

Whether Rader or Sealy vested before the ESOP terminated turns on the Plan language and several amendments to it. To vest in ESOP benefits, an employee must first become a "Participant" as defined by the ESOP.[5] The BAI ESOP defines "Participant" as "[a]ny Employee or former Employee who has met the applicable eligibility requirements of Section 3 [of the ESOP] and who has not yet received a complete distribution of his Capital Accumulation [*i.e.*, vested benefits]." J-120 at 22, 25.

As originally drafted, the eligibility requirements of the ESOP's Section 3.(a) stated that for employees hired in or after 2003—like Rader and Sealy—"each Employee who has

---

[5]"A 'Participant' as defined by the ERISA statute, 29 U.S.C. § 1002(7), is not necessarily the same as a 'Participant' as defined by a plan document." *Clayton v. ConocoPhillips Co.*, 722 F.3d 279, 298 (5th Cir. 2013).

completed one full year of Service (in which he is credited with at least 1,000 Hours of Service)

. . . shall become a Participant on the January 1st of the Plan Year in which he satisfies these

requirements." *Id.* at 26.  Section 3.(b) then allowed a Participant to "*share* in the *allocation* of

Employer Contributions . . . for each Plan Year in which he is credited with at least 1,000 Hours

of Service and is an Employee." *Id.* at 27 (emphasis added).  Thus, an employee could "share" in

allocations upon becoming an eligible Participant but would not then vest.

Vesting under the ESOP occurred pursuant to Section 10.(a), which originally called for

incremental or graduated vesting as the Participant acquired "Credited Service."  Credited

Service is "[t]he number of Plan Years in which an Employee is credited with at least 1,000

Hours of Service." J-120 at 23.  The original version of Section 10.(a) provided that "[a]

Participant shall become vested and nonforfeitable in his Accounts" under the following

schedule:

| Credited Service | Nonforfeitable Portion |
|---|---|
| Less than one year | 0% |
| One Year | 20% |
| Two Years | 40% |
| Three Years | 60% |
| Four Years | 80% |
| Five Years or More | 100% |

*Id.* at 46.

Plaintiffs argue that they worked sufficient hours to vest under this schedule and now

reference "records obtained from ADP." Pls.' Mem. [605] Ex. 3.  But they never offered those

records at trial and failed to attach the actual records to their post-trial briefing.  There was no motion to reopen the case, so the Court will not consider this late evidence.[6]

Plaintiffs hope to overcome this deficiency in the record evidence by pointing to Amendments 2004-2 and 2008-1 to the ESOP, both of which impact Plan participation and vesting.  But to understand those amendments, it is necessary to first review Amendment 2004-1.  That amendment, adopted June 30, 2004, changed the original graduated vesting in Section 10.(a) to cliff vesting, whereby the Participant fully vested after five years Credited Service.  J-120 at 5.  Amendment 2004-1 was given a January 1, 2004 effective date, and there is no record evidence that either Rader or Sealy vested before this amendment took effect.

About two months later, on September 15, 2004, Amendment 2004-2 was adopted, amending Section 3., again with a January 1, 2004 effective date.  *Id*. at 7.  It first amended Section 3.(a) by adding the following sentence:  "For Plan Year 2003, each Employee shall become a Participant upon completion of at least one (1) Hour of Service."  *Id*. at 7.  It then amended Section 3.(b) by adding:  "For Plan Year 2003, a Participant is entitled to share in the allocation of Employer Contributions and Forfeitures in the event that he is credited with at least one (1) Hour of Service."  *Id*.

Plaintiffs argue that Amendment 2004-2 applied to Sealy, who was hired in 2003.  They further argue that "[t]his amendment gave Plaintiff Sealy vesting credit for one full year in 2003 *under the original Plan*."  Pls.' Mem. [605] at 4 (emphasis added).  They then contend that

---

[6]The only exhibits directly addressing Rader's or Sealy's vested interests in the ESOP are Rader's participation statements for December 31, 2004, through December 31, 2005.  *See* D-158–60.  Each document states that Rader received allocations but that he had zero "Total Amount Vested (Capital Accumulation)."  *Id*.  These statements are not conclusive but certainly do not show Rader vested.  There are no statements for Sealy in this record.

because he vested in 2003, ERISA's anti-cutback provision prevented Amendment 2004-1's

cliff-vesting procedure because that amendment removed vested benefits.  Pls.' Mem. [605] at 6

(citing ERISA § 203(c)).[7]

The problem is that Amendment 2004-1 came first, so the *original* graduated vesting

table was no longer in place when Amendment 2004-2 made Sealy eligible for participation in

2003.  In other words, by the time Amendment 2004-2 made Sealy eligible for 2003, cliff vesting

was already in place, and he needed five years of Credited Service to vest.  And because there is

no proof Rader or Sealy vested under the original table—that is, before Amendment 2004-

1—that amendment did not violate ERISA's anti-cutback provision.  There is, likewise, no

record evidence that either Rader or Sealy eventually vested under cliff vesting.[8]

Plaintiffs alternatively argue that they vested under the final Plan amendment.  On

January 24, 2008, the Plan again altered Section 10.(a)'s vesting table by adopting Amendment

2008-1.  J-120 at 12.  That amendment provided two alternative tables that applied depending on

---

[7]ERISA § 203(c)(1)(A) states in relevant part as follows:

A plan amendment changing any vesting schedule under the plan shall be treated
as not satisfying the requirements of subsection (a)(2) of this section if the
nonforfeitable percentage of the accrued benefit derived from employer
contributions (determined as of the later of the date such amendment is adopted,
or the date such amendment becomes effective) of any employee who is a
participant in the plan is less than such nonforfeitable percentage computed under
the plan without regard to such amendment.

29 U.S.C. § 1053(c)(1)(A).

[8]Amendment 2004-2 clearly triggered eligibility as a Participant, but it is less clear that it
created Credited Service for 2003 as Plaintiffs' argue, because the amendment did not change the
definition of "Credited Service."  J-120 at 7, 23.  Thus, even if the original graduated-vesting
table applied, it is not clear Amendment 2004-2 gave Sealy enough Credited Service to vest.

a factual contingency the parties dispute. One table was graduated, and one table retained cliff

vesting. According to Rader and Sealy, the graduated table applies, and under that table they

would vest with as little as two years of Credited Service. But even assuming the graduated table

applies and Sealy obtained one year of Credited Service due to Amendment 2004-2, there is still

no record evidence of a second Credited Service year during which he worked at least 1,000

hours. Accordingly, based on the lack of record evidence, the Court finds that neither Rader nor

Sealy vested before the plan terminated.

ii.  Vesting Upon Termination of the Plan

Rader and Sealy alternatively argue that if they did not vest before the ESOP terminated,

they vested when it did. Section 19. of the Plan states:

> If the Plan is terminated (or partially terminated), participation of Participants
> affected by the termination will end. If Employer Contributions are not replaced
> by contributions to a comparable plan which meets the requirements of Section
> 401(a) of the Code, the Account of only those Participants who are Employees on
> the effective date of the termination will become nonforfeitable as of that date. *A
> complete discontinuance of Employer Contributions shall be deemed to be a
> termination of the Plan for this purpose.* The Capital Accumulation of those
> Participants whose Service terminated prior to the effective date of the Plan's
> termination will continue to be determined pursuant to Section 10.(a); and, to the
> extent that such Participants are not vested, the non-vested balance in their
> Accounts will be Forfeitures . . . .

J-120 at 66 (emphasis added). In other words, if there is a "complete discontinuance" of

contributions, non-vested current employees will immediately vest, whereas former employees

must look to the vesting table in Section 10.(a). These provisions raise two factual disputes: (1)

when did the Plan terminate; and (2) was either Rader or Sealy an employee at that time.

The final Employer Contribution occurred September 28, 2006. *See* D-183. But

Defendants contend that this was a mere suspension of contributions and not a "complete

18

discontinuance." Though ERISA does not define these terms, the Treasury Department has

provided guidance:

> **General rule.** For purposes of this section, a complete discontinuance of
> contributions under the plan is contrasted with a suspension of contributions under
> the plan which is merely a temporary cessation of contributions by the employer.
> A complete discontinuance of contributions may occur although some amounts
> are contributed by the employer under the plan if such amounts are not substantial
> enough to reflect the intent on the part of the employer to continue to maintain the
> plan. The determination of whether a complete discontinuance of contributions
> under the plan has occurred will be made with regard to all the facts and
> circumstances in the particular case, and without regard to the amount of any
> contributions made under the plan by employees. Among the factors to be
> considered in determining whether a suspension constitutes a discontinuance are:
>
> > (i) Whether the employer may merely be calling an actual discontinuance
> > of contributions a suspension of such contributions in order to avoid the
> > requirement of full vesting as in the case of a discontinuance, or for any
> > other reason;
> >
> > (ii) Whether contributions are recurring and substantial; and
> >
> > (iii) Whether there is any reasonable probability that the lack of
> > contributions will continue indefinitely.

26 C.F.R. § 1.411-2(d)(1).

Thus, based on the totality of the circumstances, the Court must make a factual finding

whether BAI intended a complete discontinuance of contributions. *Id.*; *see also Leigh v. Engle*,

669 F. Supp. 1390, 1411 (N.D. Ill. 1987) ("Whether a suspension of contributions constitutes a

complete discontinuance sufficient to trigger a distribution of benefits turns on the employer's

intent . . . ."). And the more precise question, as framed by the parties, is whether there was a

complete discontinuance of contributions while Rader or Sealy was still a BAI employee. If not,

then the analysis reverts to Section 10.(a), under which neither has established vesting.

Rader's termination date is not clear (the parties did not designate that portion of his deposition).  As for Sealy, it appears that his employment ended in June or July 2008.  Sealy Dep. [C-11] at 39.  According to Defendants, BAI had no intent to completely discontinue employer contributions before that time.  They note, for example, that though BAI's business was suffering, BAI still held some hope of recovery after the final contribution.  Defs.' Mem. [609] at 6.  Defendants also argue that BAI did not formally cease operations until August 2008 and terminated the ESOP in October 2008—both of which occurred after Sealy was terminated from employment.  *Id.* at 7.[9]

BAI did cease operations in August 2008, but the Court considers "all the facts and circumstances," 26 C.F.R. § 1.411-2(d)(1).  And as of June or July 2008—when Sealy was still employed—BAI was moribund.  At that point, BAI had already defaulted on a $16.5 million loan from MB Financial and was headed toward foreclosure.  D-189.  In addition, BAI had substantially negotiated a deal that would allow DTV to assume BAI's debt and take over the operations after DTV acquired BAI's assets in a foreclosure sale.  *Id.*; Landenberger Dep. [C-33] at 30, 37–39;  P-201.  And those agreements with DTV made no reference to continuing the ESOP once BAI ceased to exist.  *See* 26 C.F.R. § 1.401-6(b)(1) (noting that a plan is "not terminated merely because the employer sells or otherwise disposes of his trade or business *if* the acquiring employer continues the plan as a separate and distinct plan of its own, or consolidates or replaces that plan with a comparable plan" (emphasis added)).

---

[9]During trial, Defendants objected to the relevance of evidence regarding these events in 2008.  Because it was a bench trial, the Court received the evidence but reserved judgment whether it would be considered.  This issue makes the evidence relevant.

The first agreement between BAI and DTV was signed July 25, 2008, and reflects that on July 21, the parties tentatively agreed to the proposed transaction. D-189. Thus, assuming Sealy lost his job in July 2008, an agreement may have already been reached that would end BAI without any mention of preserving the ESOP. Even assuming Sealy's employment ended a month earlier in June 2008, BAI had every intention to end its business before the July 2008 agreement. Keith Landenberger with DTV testified that the company performed two months of due diligence before the deal was concluded. Landenberger Dep. [C-33] at 8. BAI counsel David Johanson testified that he was involved in the negotiations with DTV and BAI's creditor MB Financial and that the discussions took place over a period of months. Tellingly, Johanson also testified that he knew during those negotiations—*i.e.*, before Sealy lost his job—that BAI would not continue.

Also by 2008, BAI had stopped responding to inquiries from Plan Participants. Former BAI employee Jimmy Corely testified that he had concerns about the ESOP's viability and received information after making a request in late 2005. But after that—up to 2008—he was unable to obtain information from BAI about the status of his account. This testimony is consistent with Sealy's statement that he could not get a response from BAI in June or July 2008 when he attempted to sell his stock after losing his job. Sealy Dep. [C-11] at 196.

Of course BAI made no contributions of any size after September 2006, whereas its contributions prior to that date were "recurring and substantial." 26 C.F.R. § 1.411-2(d)(1)(ii). From July 25, 2003, through September 28, 2006, BAI contributed monthly to the ESOT. D-182, 183, and 222. The last seven contributions were each for $159,647.07, and the one before

21

those was $4.1 million.  D-183.  But nothing more was contributed in the two years before the

company ceased to exist in August 2008.

It may have been true in September 2006 that BAI hoped to someday resume

contributions.  But that never occurred and was not intended when Sealy left in June or July

2008.  By then, there existed a "reasonable probability that the lack of contributions [would]

continue indefinitely." 26 C.F.R. § 1.411-2(d)(1)(iii).[10]  The Court finds there was a complete

discontinuance of contributions, triggering Section 19.  And because Sealy was a Participant at

that time based at least on his service in 2003, Sealy vested and has standing to sue.  Whether

Rader also established standing is immaterial.

4.      *Rader* Plaintiffs' Ability to Sue on Behalf of Plan under § 502(a)(2)

Defendants claim that Rader and Sealy cannot serve as representatives for the Plan.  As a

factual matter, the Court observes that neither took steps to notify or engage other Plan

Participants.  Nevertheless, having considered the legal issues, the Court concludes that they are

appropriate representatives.

ERISA § 409 imposes liability on fiduciaries who breach their duties under

ERISA and provides in part:

> Any person who is a fiduciary with respect to a plan who breaches any of the
> responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter
> shall be personally liable to make good to such plan any losses to the plan
> resulting from each such breach, and to restore to such plan any profits of such
> fiduciary which have been made through use of assets of the plan by the fiduciary,
> and shall be subject to such other equitable or remedial relief as the court may
> deem appropriate, including removal of such fiduciary.

---

[10]The record is not sufficient to address 26 C.F.R. § 1.411-2(d)(1)(i).

29 U.S.C. § 1109(a).  For violations of this section, ERISA § 502(a)(2) provides that "[a] civil

action may be brought . . . by the Secretary, or by a participant . . . for appropriate relief under

section 1109 of this title."  *Id.* § 1132(a)(2).  It has been traditionally held that § 502(a)(2) claims

were brought on behalf of the plan as a whole.  *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134,

140 (1985).  But in *LaRue v. DeWolff, Boberg & Associates, Inc.*, the Court explained that

*Russell* was decided in light of a defined-benefits plan.  552 U.S. 248, 255 (2008).  In the

defined-contribution-plan context, the Court held that a participant proceeding under § 502(a)(2)

could "recover[] for fiduciary breaches that impair the value of plan assets in a participant's

individual account."  *Id.* at 256.

This Court agrees with others that "[*LaRue*] broadens, rather than limits, the relief

available under § 502(a)(2) . . . .  [The] contention that *LaRue* establishes that there are no 'plan

claims' in the defined contribution context is incorrect."  *In re Schering Plough Corp. ERISA

Litig.*, 589 F.3d 585, 595 n.9 (3d Cir. 2009); *see also LaRue*, 552 U.S. at 262–63 (Thomas, J.,

concurring in the judgment) ("[W]hen a participant sustains losses to his individual account as a

result of a fiduciary breach, the plan's aggregate assets are likewise diminished by the same

amount, and § 502(a)(2) permits that participant to recover such losses on behalf of the plan.");

*Cook v. Campbell*, No. 2:01cv1245-ID, 2008 WL 2039501, at *4 (M.D. Ala. May 12, 2008).

Aside from their interpretation of *LaRue*, Defendants point to the Second Circuit's

opinion in *Coan v. Kaufman*, 457 F.3d 250 (2d Cir. 2006), and contend that Plaintiffs' claims for

relief should be limited to losses on their individual accounts because they have failed to act in a

representative capacity.

23

In *Coan*, a plan participant brought suit "individually and on behalf of [the] plan," alleging plan fiduciaries breached their duties with imprudent investments. 457 F.3d at 254. On appeal from a grant of summary judgment, the court of appeals reasoned that it was "neither necessary nor helpful to delineate minimum procedural safeguards that section 502(a)(2) requires in all cases." *Id.* at 261. A participant must, however, "take adequate steps under the circumstances properly to act in a 'representative capacity on behalf of the plan.'" *Id.* (quoting *Russell*, 473 U.S. at 142 n.9). The Second Circuit therefore affirmed the district court's conclusion that "Coan's failure to do *anything* to demonstrate that her action actually was intended to benefit former plan participants other than [herself] . . . rendered specious [her] claim to be acting on behalf of others." *Id.* at 257 (second and third alterations in original) (internal quotation marks omitted) (observing that Coan could settle her claims for her own benefit, the district court would have trouble ensuring any proceeds were allocated to the plan, and Coan's suit could preclude subsequent litigation). The court concluded:

> Because Coan has not taken any steps to permit the court to safeguard the interests of others or the court's proceedings under the circumstances, . . . she has failed to represent adequately the interest of other plan participants and has therefore not properly proceeded in a representative capacity as required by section 502(a)(2).

*Id.* at 262.

*Coan* has received mixed reviews both before and after *LaRue*. *Compare Abbott v. Lockheed Martin Corp.*, No. 06-cv-0701-MJR, 2010 WL 547172, at *4 (S.D. Ill. Feb. 10, 2010) (refusing to permit case to proceed absent procedural safeguards because of "antagonistic and irreconcilable" interests and a concern for redundant suits), *and Fish v. Greatbanc Trust Co.*, 667 F. Supp. 2d 949, 952 (N.D. Ill. 2009) (holding on motion to proceed without class certification

that *some* procedural safeguards were required), *with Blankenship v. Chamberlain*, 695 F. Supp. 2d 966, 973–74 (E.D. Mo. 2010) (reasoning that participants adequately represented plan by naming multiple plaintiffs, those plaintiffs conceded they could only recover for the plan, and preclusion issues were not presently before the court), *In re AEP ERISA Litig.*, No. C2-03-67, 2009 WL 3854943, at *1 (S.D. Ohio Nov. 17, 2009) (noting participant sought but was denied class certification), *and Waldron v. Dugan*, No. 07 C 286, 2007 WL 4365358, at *6–7 (N.D. Ill. Dec. 13, 2007) (declining to impose class- or derivative-action requirement on § 502(a)(2)).

The most recent case to address *Coan* is *Huizinga v. Genzink Steel Supply & Welding Co.*, where the court found no textual basis for the *Coan* holding. No. 1:10-CV-223, 2013 WL 4511291, at *8 (W.D. Mich. Aug. 23, 2013) (holding that plaintiff "is a Plan participant, and he is seeking to recover for the Plan as a whole. These are the only requirements on the face of the statute, itself"), *appeal dismissed*, No. 13-2273 (6th Cir. Jan. 14, 2014). The court then concluded that Huizing had "done an adequate job of demonstrating losses, not just to his account, but across the entire Plan." *Id.* Finally, the court observed that none of the concerns addressed in *Coan* were present. *Id.*

*Huizinga* is persuasive. First, there is no textual support for Defendants' arguments. Second, the *Coan* plaintiff sought relief individually and on behalf of the plan. 457 F.3d at 254. Here, Rader and Sealy have consistently advanced the interests of the Plan as a whole and make no claim for individual recovery. *See* Second Am. Compl. [343] ¶ 10 (bringing claims "on behalf of the ESOP as a whole"); *id.* at 27–28. Throughout this litigation, including trial, they advanced the ESOP's general interests over their own, and there is no concern as in *Coan* that they lacked intent to benefit former Plan participants. *See Coan*, 457 F.3d at 257.

This holding is doubly true given the Secretary's companion case that undeniably protected the interests of all participants over any individual.  Rader and Sealy expressly represented that their claims were coterminous with the Secretary's.  Pretrial Order [604] at 3.  This fact also eliminated the threat of a self-serving settlement by Rader and Sealy.  And the Secretary's suit addresses concerns regarding disbursement and issue preclusion.  In sum, the participants' interests were safeguarded under the circumstances and well represented.  *See Coan*, 457 F.3d at 262.  Therefore, Rader and Sealy may serve as representatives.

B.     Liability Under ERISA

Stated succinctly, Plaintiffs assert that Defendants breached their fiduciary duties while acting as ESOT trustees.  As noted above, ERISA § 409 imposes liability on "[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter."  29 U.S.C. § 1109.  Thus, the threshold question is which Defendants were fiduciaries.

1.     Who Is a Fiduciary

It is undisputed that Defendants Amy Smith and Jonda Henry were fiduciaries for purposes of Plaintiffs' claims.  The dispute is whether Defendant Herb Bruister was an ESOT fiduciary for purposes of the Subject Transactions and therefore is liable.

a.     Conclusions of Law

Section 1002 of Title 29 defines several terms under ERISA and states:

[A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice . . ., or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

26

29 U.S.C. § 1002(21)(A).  And in Part 4, which addresses fiduciary responsibility, ERISA

requires that each plan "provide for one or more *named fiduciaries* who jointly or severally shall

have authority to control and manage the operation and administration of the plan."  *Id.*

§ 1102(a)(1) (emphasis added).  A named fiduciary is "a fiduciary who is named in the plan

instrument, or who, pursuant to a procedure specified in the plan, is identified as a fiduciary."  *Id.*

§ 1102(a)(2).

In this case, Bruister was a named fiduciary, but he claims to have abstained from all

votes.  When that happens, the Court applies the so-called "two-hats" doctrine, "which

acknowledges that the employer is subject to fiduciary duties under ERISA only 'to the extent'

that it performs three specific functions identified by Congress" in § 1002(21)(A).  *Martinez v.*

*Schlumberger, Ltd.*, 338 F.3d 407, 412 (5th Cir. 2003).  And, as stated above, that section

classifies one as a fiduciary only to the extent he or she *exercises* certain authority or control over

plan management or assets; *renders* investment advice; or *possesses* discretionary authority or

responsibility in plan administration.  *See* 29 U.S.C. § 1002(21)(A).

> In every case charging breach of ERISA fiduciary duty, then, the threshold
> question is not whether the actions of some person employed to provide services
> under a plan adversely affected a plan beneficiary's interest, but whether that
> person was acting as a fiduciary (that is, was performing a fiduciary function)
> when taking the action subject to complaint.

*Pegram v. Herdrich*, 530 U.S. 211, 226 (2000); *see also Sommers Drug Stores Co. Emp. Profit*

*Sharing Trust v. Corrigan Enters., Inc.*, 793 F.2d 1456, 1459–60 (5th Cir. 1986).

So the question is whether Bruister "exercise[d] any authority or control respecting

management or disposition of [the plan's] assets."  29 U.S.C. § 1002(21)(A); *see Schloegel v.*

*Boswell*, 994 F.2d 266, 271–72 (5th Cir. 1993) ("To satisfy the 'authority or control' element

27

under subsection (i), the Plaintiffs must demonstrate that [an advisor] caused [the trustee] to relinquish his independent discretion in investing the plan's funds and follow the course prescribed by [the advisor]." (citing *Sommers*, 793 F.2d at 1460)); *see also Pegram*, 530 U.S. at 226; *Hatteberg v. Red Adair Co. Inc. Emp.'s Profit Sharing Plan & Its Related Trust*, 79 F. App'x 709, 716 (5th Cir. 2003) (per curiam) (indicating conduct is more important than titles for determining fiduciary status); *Landry v. Air Line Pilots Ass'n Int'l AFL-CIO*, 901 F.2d 404, 418 (5th Cir. 1990) ("Thus, it will be the task of the court on remand to determine precisely the extent, as a factual matter, of *actual* fiduciary authority *possessed* or *exercised* by ALPA, Huttinger, and TACA with respect to the wrongs alleged by the pilots.").

        b.     Findings of Fact[11]

Bruister acted as a fiduciary. To begin with, Bruister was involved in the initial meetings with appraiser Matthew Donnelly. While it seems that Bruister's good friend and former ESOT trustee Michael Bruce recommended Donnelly, Bruister at least gave his blessing. *See* Jan. 23, 2009 Bruce Dep. [C-1] at 37; Oct. 20, 2011 Donnelly Dep. [C-30] at 715.

Once Donnelly began his work for the ESOT, Bruister apparently learned that he could not vote with respect to the Subject Transactions, but the evidence—including Bruister's prior statements—reveals that he nevertheless participated, at least to some extent. Bruister attended many of the trustee meetings and closings and participated in what he referred to as "informal

---

[11]In the decade since the Subject Transactions, memories have faded and witnesses appear to have reconstructed their perceptions of the events. For this reason, the Court has placed greater emphasis on documents and sworn deposition testimony, which occurred several years before trial. This exercise emphasizes why Congress had the wisdom to adopt the statute of repose that led to dismissal of claims related to the first two transactions in 2002 and 2003.

meetings" with the other trustees.  He explained his role further during sworn testimony at an administrative hearing (as read at trial):

> I'm not sure if abstaining is the proper word.  Abstain seems to imply to me that you had absolutely no input, no—it's like—abstain is like you walked out of the room.  I never walked out of the room . . . .  What I was saying to the other trustees is because of my position as the seller, that I think the weight of your—I think your—this decision should be more highly weighted by your input than possibly mine.  That doesn't mean that I might not give you my opinion.  But ultimately I wanted them to be really, really comfortable with the [purchases].

Smith, Henry, and Donnelly were aware of Bruister's preferences.  It is important to note that Bruister was the driving force behind BAI.  He founded it, owned it, and ran it.  It also appears that Bruister was by all accounts a good boss and a highly respected figure who was admired by his employees, clients, and even competitors.  But these attributes also created influence.  Smith worked directly for Bruister—as did her husband—and she was clearly devoted to him.  Smith testified, for example, that even when acting as an ESOT trustee, she still considered Bruister's interests and those of BAI.  Henry likewise testified that as a trustee she remained concerned about Bruister's interests (though they were subordinate to the ESOT's concerns).  Henry considered Bruister a friend, and he was a major client of her CPA firm.  At a minimum, Henry confirmed general discussions with Bruister regarding the transactions.  And it appears that she and Smith were aware of his preferences.

Bruister's role as a trustee must also be viewed in light of his attorney's actions regarding the Subject Transactions.  David Johanson was clearly the driving force behind the ESOP and each transaction, and he became deeply involved with Bruister's personal finances and various business interests.  He and/or his law firms served as counsel for BAI, provided tax-and-estate planning to Bruister, advised the BAI shareholders (*i.e.*, Bruister) regarding "appropriate

ownership transition," P-69 ¶ 1, defended Bruister in a variety of lawsuits and various audits, advised Bruister regarding investment strategies, set up and then served as general counsel for Bruister's business entities including but not limited to BFLLC and Bruister Investment LLC, drafted lease agreements for Bruister and BAI, and contemplated becoming business partners with Bruister in one failed transaction.

At trial, Johanson was careful to draw lines regarding the scope of his representation.  He stated that neither he nor his firm ever represented Bruister individually with respect to the ESOT, but other evidence indicates that Johanson acted with apparent—if not actual—authority as Bruister's agent regarding the Subject Transactions.  For example, it is clear from Johanson's emails and Bruister's testimony that both viewed him as Bruister's attorney.  In an email just before the first ESOT Transaction in December 2002, Johanson wrote his legal team, "We represent the seller, Herb Bruister, in this deal."  P-166.  That statement matches Bruister's trial testimony that he generally viewed Johanson as his attorney.  It also coincides with Donnelly's testimony that he viewed Johanson as attorney for BAI and Bruister.  June 2, 2011 Donnelly Dep. [C-29] at 662.[12]

During argument, Bruister's counsel suggested that Bruister never gave Johanson authority to act on his behalf regarding the Subject Transactions.  While Bruister did testify that he was not aware of Johanson's efforts to affect valuations, the record evidence is undisputed that Johanson copied Bruister on emails to Donnelly and others in which Johanson advanced Bruister's personal interests.  *See, e.g.*, J-82.  Johanson was clothed with authority to act on

---

[12]Following a break in this deposition, Donnelly asked for permission to modify an earlier response and then volunteered that Johanson's representation was limited to BAI.  P-224.  But Johanson had coached Donnelly during the break, and the Court credits the initial answer.

Bruister's behalf regarding ESOT matters, and—as discussed later—his actions provide the strongest evidence that Bruister exercised fiduciary authority.  In sum, Smith, Henry, and Bruister were fiduciaries for purposes of Plaintiffs' claims.[13]

        2.      Direct-Liability Claims

Plaintiffs assert direct-liability claims under ERISA § 404, which imposes liability when a fiduciary breaches the duties of care, prudence, or loyalty.  *Cunningham*, 716 F.2d at 1464. They also bring claims under § 406, which prohibits fiduciaries from authorizing certain prohibited transactions.  "The object of Section 406 was to make illegal *per se* the types of transactions that experience had shown to entail a high potential for abuse."  *Id*. at 1464–65. Both sections include a similar analysis regarding the prudence duty.  But the loyalty inquiry is unique to § 404.  Therefore, the Court will first focus on the loyalty side of the § 404 claim and then turn to prudence under §§ 404 and 406.

        a.      Breach of Fiduciary Duty of Loyalty

        i.      Conclusions of Law

Plaintiffs claim that Defendants breached their duty of loyalty.  That duty springs from ERISA § 404.[14]  To comply with ERISA's loyalty duty, a fiduciary must make decisions "'with

---

    [13]Despite Johanson's heavy involvement in every ESOP transaction, he also represented all Defendants as lead trial counsel.  Both the magistrate judge and the undersigned raised this issue, but the conflict was voluntarily waived.  As such, Johanson was both a material witness and lead counsel.  The Court's factual findings are limited to his sworn testimony, though the Court must necessarily address some of his legal arguments made while serving as counsel.

    [14]The section provides in part:

    [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—
        (A) for the exclusive purpose of:

an eye single to the interests of the participants and beneficiaries.'"  *Bussian v. RJR Nabisco,*

*Inc.*, 223 F.3d 286, 298 (5th Cir. 2000) (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 271 (2d

Cir. 1982)).  Thus, an ERISA fiduciary must avoid conflicts of interest.  *Mertens v. Hewitt*

*Assocs.*, 508 U.S. 248, 251–52 (1993).

"The presence of conflicting interests imposes on fiduciaries the obligation to take

precautions to ensure that their duty of loyalty is not compromised."  *Bussian*, 223 F.3d at 299.

"The level of precaution necessary to relieve a fiduciary of the taint of a potential conflict should

depend on the circumstances of the case and the magnitude of the potential conflict."  *Id.*

(alteration deleted) (quoting *Metzler v. Graham*, 112 F.3d 207, 213 (5th Cir. 1997) (internal

quotation marks omitted).  Finally, "[t]o ensure that actions are in the best interests of plan

participants and beneficiaries, fiduciaries under certain circumstances may have to 'at a

minimum' undertake an 'intensive and scrupulous independent investigation of [the fiduciary's]

options.'"  *Id.*, at 299 (alteration in original) (citing *Leigh v. Engle* (*Leigh I*), 727 F.2d 113,

125–26 (7th Cir. 1984)).

### ii.      Factual Findings

The duty of loyalty was breached from start to finish.  The initial structure of the ESOT

provided three trustees—Bruister and two individuals loyal to him.  There were no independent

or professional fiduciaries.  The ESOT did, however, retain independent counsel and Donnelly as

an independent appraiser and financial advisor.  Though it was wise to retain counsel and an

---

(i) providing benefits to participants and their
beneficiaries; and
(ii) defraying reasonable expenses of administering the plan . . . .
29 U.S.C. § 1104(a); *see also Kopp v. Klein*, 722 F.3d 327, 334 (5th Cir. 2013) (discussing duties
of prudence and loyalty in ESOP context), *vacated on other grounds*, 134 S. Ct. 2900 (2014).

appraiser, the fiduciaries' actions with respect to these individuals and the transactions reveal split loyalties.

Steven Lifson was the original ESOT counsel, and his services were paid for by BAI.  But Lifson proved too thorough and expensive, prompting complaints from Bruister, who wrote, "If I had known he was going to be that expensive, the trustees could have found their own lawyer." P-73-A.  Johanson apologized, promised to "never use Steve again in another ESOT transaction," and offered to pay a portion of Lifson's fees out of his own pocket.  *Id*.  Johanson then emailed Lifson and terminated his engagement on behalf of the ESOT.  *Id*.  Thus, the seller—acting through an agent—terminated the buyer's independent counsel.  Lifson was then replaced with William Campbell, one of Johanson's former law partners.  As partners, Campbell and Johanson did not work in the same office, but Johanson was Campbell's primary referral source for ESOT counsel engagements.  Aug. 10, 2011 Campbell Dep. [C-17] at 148–51.  Campbell's role in the transactions was far more limited than Lifson's and generally involved a few hours of work immediately before each closing.  As discussed later, he did not appear to question aspects of the transactions that should have caused him concern.

Bruister (usually through Johanson) also had undue influence over Donnelly.  There is no dispute that Donnelly was purportedly the ESOT's independent appraiser and financial advisor. His duties flowed to the ESOT, not the seller, as Johanson said at trial.  All of Donnelly's fairness opinions make this point:  "You have retained The Business Appraisal Institute . . . in your capacity as the Board of Trustees of the Bruister & Associates Employee Stock Ownership Plan and Trust . . . ."  *See, e.g.*, D-1 at 1.  The letter concluded by noting that "[t]he Opinions are solely for the use and benefit of the Board of Trustees of the ESOP in making its decision."  *Id.*

33

at 3.  Defendants' expert, Jared Kaplan, agreed that the independent appraiser works for the ESOT and should not be motivated to help the seller.

Despite the presumed loyalty to the ESOT, Donnelly was clearly more loyal to Bruister and Johanson.[15]  Indeed, those relationships were cemented from the beginning.  Before Donnelly was retained, he offered to cut his fee for serving as the independent appraiser for the ESOT if given the chance to do a feasibility study for Bruister.  *See* P-170.  While it is not clear how much effort Donnelly put into the study, he did provide an opinion.  *See* P-65-A; *see also* Jan. 23, 2009 Bruce Dep. [C-1] at 71; Mar. 1, 2011 Donnelly Dep. [C-26] at 144.  Thus, Donnelly began his involvement in the ESOT by working directly for the seller—Bruister.  Kaplan explained that such an arrangement would impact the appraiser's independence.

Donnelly's lack of independence was also evidenced in his communications with Bruister.  On October 23, 2002, Donnelly wrote Bruister the following email:  "I look forward to working *with you* as you extract millions from your company tax free.  That's my idea of fun."  P-23 (emphasis added).  Bruister responded, "Sounds good to me.  I just hope it works out that way. . . .  I trust you and Johanson.  I pray we are going down the right path."  *Id*.  Donnelly concluded the conversation by noting:

> Thanks for your trust.  Both Dave and I will see that your trust has not been misplaced. . . .  [I]t almost feels too good to be true.  But it has been done thousands of times and millions of employee owners are enjoying the benefits.  You have done a great job building a profitable business and now you can cash in on those years of risk and hard work.

---

[15]Donnelly's loyalty is perhaps a tangential issue because he is not a defendant charged with breaching this duty.  But his allegiance to Bruister and Johanson creates loyalty and prudence issues for the Defendants who were aware that he lacked independence.

*Id*.  In correspondence from 2004, Donnelly echoed this same theme, writing Bruister, "[i]sn't this a great way to get tax free dollars."  P-26.  He copied Johanson rather than ESOT counsel. *Id*.

Donnelly also seemed eager to please David Johanson.  *See, e.g.*, P-67 (Donnelly email to Johanson stating "My aim is to get you one good ESOP project every month, for the next 20–30 years.").  And he turned to Johanson when discussing valuation issues—often to the exclusion of the ESOT trustees or counsel.  *See* P-80 (Donnelly email without copies to ESOT counsel or trustees stating, "I have made the changes Dave requested"); P-24 (email to Johanson regarding problems with financial statements); J-24 (email from ESOT counsel stating that he received a "marked-up" copy of the valuation from David Johanson).  Donnelly even emailed draft valuations directly to Bruister and Johanson before the trustees or ESOT counsel had seen them. *See* P-167 (Donnelly email providing preliminary valuation to Johanson's associate and stating "*I am not yet ready to provide this figure to anyone else*" (emphasis added)); P-101; J-116 (email attaching draft); J-82 (same).

Thus, the ESOT's independent appraiser and financial advisor was sending valuation drafts to the seller *before* sending them to the buyers to whom he owed his sole allegiance. Defendants' expert Jared Kaplan explained that merely providing the final numbers might evidence coercion.  Dealing directly with the seller to the exclusion of the buyer is an obvious breach, and fiduciaries acting in the best interest of the ESOP would not have countenanced this procedure.

And while providing drafts is questionable enough, Johanson attempted to influence the valuations in Bruister's favor.  During his trial testimony, Johanson suggested that he neither

35

attempted to influence appraisals nor had any impact on them.  He stated instead that he received the valuations in advance so he could plug the numbers into the closing documents he prepared. This testimony is not supported.[16]  And though it is somewhat tedious, a micro-level examination of the conversations best displays the extent to which Johanson affected independent appraisals for Bruister's benefit.

In 2002 for example, Donnelly prepared the valuation for the first ESOP transaction.  But before providing a final report, he shared his preliminary findings with Johanson's associate at Johanson Berenson, revealing a valuation south of $8 million.  That prompted Johanson to send the following email to his team:

> Please ask Wanda to contact Matt Donnelly and obtain the Bruister & Associates [fair market value] FMV report from him ASAP. . . .  Herb [Bruister] *was expecting* a FMV of around $10.0M.  The preliminary came in around $12.0M. Matt's new FMV may be around $8.0M.  Wanda's task is to work with Matt Donnelly and the ESOT's counsel, Steve Lifson, TODAY and agree upon an acceptable valuation for the transaction that is scheduled to close in Atlanta on Tuesday.  Again, Johanson Berenson LLP represents the seller, so *we are looking for the highest FMV possible within reason*.

P-166 (emphasis added).

Through an associate, Johanson then communicated with Donnelly suggesting that the two "go over your report before releasing this figure to Herb."  P-167.  At this point, Donnelly had not released the figures to the ESOT.  Donnelly responded that it was unfortunate that an earlier valuation by another appraiser came in too high and asked, "Is $8 million some magic number?"  *Id*.  Johanson responded "no," but that "Herb would prefer that the deal size be approximately $3.0M based upon a $10.0M FMV."  *Id*.  Donnelly then explained how he arrived

---

[16]His denials of any influence were more categorical when arguing as counsel.

at $7.6 million using "optimistic future projections." *Id*. Then—in perhaps the most revealing

portion of the exchange—Donnelly concluded by stating, "I do not want to give anyone except

you and [your associate] my preliminary conclusion." *Id*. Two weeks later, the final valuation

was provided to the ESOT trustees; the value had risen to $8.717 million.

That pattern continued into the Subject Transactions. *See, e.g.*, D-116. For example,

according to Donnelly, he discovered what he believed to be a roughly $6 million error

overestimating the value in the December 2004 valuation. J-68. When he did, he discussed the

issue, post closing, with Johanson first. Oct. 20, 2011 Donnelly Dep. [C-30] at 933.

But the most compelling evidence that Johanson influenced Donnelly to increase a

valuation to benefit Bruister occurred in December 2005, just before the final ESOP Transaction.

To put the issue in better context, the Court takes a few steps back. Donnelly lacked knowledge

of some fairly standard valuation issues. So he employed California-based Business Equity

Appraisal Reports, Inc. ("BEAR"), to assist. Donnelly would send BEAR certain data, then

BEAR would plug the information into a computer program and generate the results and a report.

Rosie White was Donnelly's chief contact at BEAR.

In early December 2005, Donnelly and White worked on the valuation for the final ESOT

purchase, which was set to close December 13. Significantly, this was the last transaction, after

which the employees would own 100% of BAI and Bruister would have no further opportunity to

sell stock. On December 2, Donnelly got things started by providing data to White, including a

17% capitalization rate (a key variable that helps determine value). D-19.

Based on that information, White provided a "basic draft" on December 7, 2005. J-79

(email without attached report). White's comments reflect a significant drop from the previous

valuation; she explained that BAI now had a "negative net worth" and that things "[s]ure looked better in July." *Id.* The email did not provide the actual value. Donnelly responded later that afternoon, writing:

> The company incurred lots more debt between the two appraisal dates. Let's weight the years 2003 at 1, 2004 at 3 and 2005 at 3, and see what happens. Believe it or not someone [Anderton Family Enterprises, LLC] is buying the business for 50 million, and ***the owner needs to get his fair share or the ESOP will get it all.*** Let's see what the average net turns out to be with these weightings. For Discounted Future Earnings the net used is way down. And let's reduce the cap rate to 16.1. Run it this way, and then send me a copy as soon as you can . . . .

*Id.* (emphasis added).

The changes Donnelly requested reflect two judgment calls that would affect value. First, Donnelly's valuation methods looked at BAI's yearly historical financial statements, assigning weights to the selected years based on Donnelly's judgment about their relevance to the current value. A heavier weight in a profitable year would increase value. Second, reducing the capitalization rate from 17% to 16.1% would increase the ultimate value.

There are other troubling aspects of this email. First, the added debt should have raised questions, but Donnelly appears to simply minimize the impact by changing other variables. Second, Donnelly's comment about Bruister getting "his fair share" illustrates Donnelly's conflict and suggests that someone in Bruister's camp was lobbying Donnelly to protect Bruister's final chance to cash out.

A few minutes after asking White to run new numbers, Donnelly passed the bad news to Johanson about the initial report without copying ESOT counsel or the trustees. J-93. He then reassured Johanson, stating, "I am working on it to see what I can tweak." *Id.* Once informed

about the lower value, Johanson immediately admonished Donnelly, in large-font, bolded letters, to remember the potential Anderton sale for $50 million.  J-93.  Donnelly responded that he could not justify a valuation that high but then flipped, promising to "continue to work on the report," and noting that perhaps the Anderton offer did reflect FMV.  *Id.*; *see also* J-82.

The next morning, White provided a new valuation draft.  She wrote, "Try this one on for size—rounds to 30 million.  Guess he's not planning to show this to the person who offered him 50 mil."  D-22.  Donnelly quickly responded, reverting to his earlier position that the $50 million offer was not relevant:  "The offer of $50,000,000 was 10% down and the balance over 10 years.  Doesn't have anything to do with this valuation.  However the principal shareholder wants to sell all of his remaining shares to the ESOT prior to selling the business."  *Id.*  Donnelly's knowledge of Bruister's desires again reflects improper communications between Donnelly and Bruister or Johanson.[17]

A few minutes later, Donnelly sent Johanson the first draft of the $30-million valuation without copying anyone associated with the ESOT.  J-82.  Johanson was dissatisfied, so later that evening he sent a response marked "Importance: High" in which he stated in large-font, bolded letters, "**There has to be an adjustment for the one-time Katrina effect.  Furthermore, please detail the debt for us.**"  *Id.*  Hours later, at 2:21 a.m. on December 9, 2005, Johanson pressed harder.  J-117.  This time he copied Smith and Henry, among others, and listed three considerations that affected BAI's value in December 2005:  (1) BAI purchased a substantial number of vehicles; (2) BAI was engaged in union election battles; and (3) Hurricane Katrina.

---

[17]The Court agrees with Donnelly regarding Anderton.  The structure of the offer—even assuming it was firm—was not comparable to BAI's FMV because of the low cash payment and structure of the balance.

He concluded that "[g]iven these circumstances, it is a wonder that Bruister has made anything this year" and described the year "as a bit of an aberration." *Id.* He then directed Donnelly to "prepare an adjusted EBITDA analysis based upon my above comments." *Id.*

EBITDA stands for earnings before interest, taxes, depreciation, and amortization and is generally a shorthand for a company's operating profits. It is a significant consideration when determining a company's FMV because higher EBITDA and EBITDA margins generally translate into higher value. That said, the numbers are sometimes adjusted when determining FMV if, for example, aberrant conditions have created a temporary effect on the financial data. In this way, appraisers attempt to normalize the numbers. Here, Johanson's email directs the ESOT's independent appraiser to favorably adjust the EBITDA numbers to account for the obstacles BAI faced in 2005. The result would be a higher FMV and a higher transaction price for the ESOP to pay.

Having been copied on Johanson's late-night email, Smith responded directly to Johanson, stating that BAI purchased only a couple of used vehicles. *Id.* But she informed Johanson that BAI had been leasing vehicles and offered to provide details if needed. *Id.* This distinction is somewhat critical. Had the vehicles been a one-time purchase as Johanson stated, it *might* justify an adjusted EBITDA. But an ongoing lease requirement would hurt EBITDA margins and presumably decrease the valuation.

Johanson forwarded Smith's response to Donnelly early on December 9, and Donnelly responded midmorning with copies to Bruister, Henry, and Smith. In his response, Donnelly expressed skepticism that Hurricane Katrina deflated his initial draft but then reassured Johanson that he would still "consider it." He then brushed off the "vehicle situation," apparently

misinterpreting the issue, before concluding, "I will do my best to take all of these into consideration." *Id*.

And again he did.  That morning, Donnelly sent White another email making further changes in the variables he had already "tweaked" the day before.  J-96.  Among other changes, he dramatically reduced the weight given to the 2005 numbers (dropping it from a multiple of 3 to a 1) and again dropped the capitalization rate to 16%.  *Id*.  Though he previously questioned the impact of Hurricane Katrina, he explained to White that the changes in weight were Katrina driven.  *Id*.  Later, Donnelly sent White a separate fax directing her to include an explanation of the Hurricane Katrina effect on the valuation methods.  J-101.

By this point, Johanson had included ESOT counsel in the email exchanges, and Campbell responded by observing that he had never received the draft valuation Johanson and Donnelly were actively discussing.  J-82.  Though counsel asked for a copy, Donnelly responded, "As soon as it is ready, you, Bob, Herb and Dave will get a copy." *Id.*  So while Donnelly had already provided drafts to Johanson and attempted to incorporate Johanson's value-increasing recommendations, he declined to provide the drafts *to ESOT counsel*, promising instead to provide one at the same time he sent it to the seller.  Donnelly's conduct contradicted his representation in each report that "[t]he Opinions are solely for the use and benefit of the Board of Trustees of the ESOP in making its decision."  D-1 at 1.

On December 9, 2005, White completed her work and sent a draft to Donnelly that incorporated his final tweaks.  She noted, "[i]t just keeps getting better and better."  D-23.  And later that day, Donnelly signed his December 2005 valuation, reflecting a $39-million

value—more than $9 million above his initial number and higher than any previous BAI valuation.

There is no legitimate reason this appraisal was higher than the previous appraisals. Every expert, including Defendants' expert Gregory Range, opined that the value dropped between September and December 2005. And Donnelly had actually explained why it should drop in his discussions with White. D-137. Yet it rose, showing that Donnelly followed through with his stated intent to help Bruister in his final opportunity to sell stock. J-79.

This history rebuts Johanson's suggestion that he did not interfere with Donnelly's valuations and raises doubts as to each of the Subject Transactions. It likewise demonstrates that Donnelly was more than willing to please Johanson and Bruister and that he saw no problem working with them to the exclusion of the ESOT's representatives. And the fact that Bruister, Henry, and Smith were copied later in the day yet failed to speak up for the ESOP Participants demonstrates their divided loyalties. It also demonstrates, as discussed later, that it was unreasonable for them to rely on an appraiser who so obviously lacked independence.

Finally, on the loyalty issue, it is worth noting that both Smith and Henry testified that they were always concerned about Bruister's interests. Smith actually said that when making decisions as a trustee for the ESOT, she tried to determine what was best for everyone, including Bruister. Henry at least said that the ESOT came first, though she shared Smith's concern for Bruister's interests.

In sum, these were not arms-length transactions. The Court finds as a matter of fact that the Plan Participants suffered losses in these three transactions and that Defendants failed to

discharge their "duties with respect to a plan solely in the interest of the participants and beneficiaries."  29 U.S.C. § 1104(a).

> b.  Prohibited Transactions

> i.  Conclusions of Law

ERISA § 406 prohibits a fiduciary from "caus[ing] the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—(A) sale or exchange, or leasing, of any property between the plan and a party in interest."  29 U.S.C. § 1106(a)(1).  There has been no dispute that the Subject Transactions involved interested parties.  But a transaction will be exempt from this prohibition under § 408(e) if the plan is an eligible plan, no commission is charged in the transaction, and the transaction is for "adequate consideration."  *See id.* § 1108(e).  This is an affirmative defense the fiduciaries must prove. *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 601 (8th Cir. 2009) ("[T]he statutory exemptions established by § 1108 are defenses which must be proven by the defendant.").

"Section 408(e) has been interpreted to allow [a]n ESOP [to] acquire employer securities in circumstances that would otherwise violate Section 406 if the purchase is made for 'adequate consideration.'"  *Matassarin v. Lynch*, 174 F.3d 549, 567 n.19 (5th Cir. 1999) (alterations in original) (internal quotation marks omitted).  "[I]n the case of an asset other than a security for which there is a generally recognized market," as is the case here, ERISA defines "adequate consideration" as "the fair market value of the asset as determined in good faith by the trustee or named fiduciary pursuant to the terms of the plan and in accordance with regulations promulgated by the Secretary."  29 U.S.C. § 1002(18).

For whatever reason, the Secretary has never formally promulgated such regulations despite pressure from courts to do so.  It has, however, proposed regulations requiring a fiduciary to show both the payment of fair market value and that the fair market value was determined in good faith.  Proposed Regulation Relating to the Definition of Adequate Consideration, 53 F. Reg. 17,632, 17,633 (proposed May 17, 1988) (to be codified at 29 C.F.R. pt. 2510); *Henry v. Champlain Enters., Inc.*, 445 F.3d 610, 618–20 (2d Cir. 2006).  And though never adopted, this policy represents the majority position among the federal circuit courts of appeals.  *See Henry*, 445 F.3d at 619 (collecting cases and noting "numerous circuit courts have adopted the DOL's proposed definition of adequate consideration"); *Keach v. U.S. Trust Co.*, 419 F.3d 626, 636 n.5 (7th Cir. 2005) (explaining that the DOL's test found in the proposed regulations is consistent with the commonly-employed judicial test).  *But see Herman v. Mercantile Bank, N.A.*, 143 F.3d 419, 421 (8th Cir. 1998) (stating prohibited transaction may be exempt absent good faith if hypothetical prudent trustee would have nonetheless engaged in transaction).[18]

"The role of courts in reviewing the adequacy of consideration in an ERISA case is to determine whether the fiduciary can show that the price paid represented a good faith determination of the fair market value of the asset, 'not to redetermine the appropriate amount for itself *de novo*.'"  *Henry*, 445 F.3d at 619 (quoting *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 437 (6th Cir. 2002)).  "In establishing that there has been compliance with the statutory mandate,

---

[18]Although the Fifth Circuit has applied the hypothetical-prudent-person, or objective-reasonableness, standard to a § 404 claim, it has not done so in the related prohibited-transactions context.  *Bussian*, 223 F.3d at 300.  Nor does its application of that standard to those types of claims suggest that standard should apply in the § 408(e) context because adequate consideration is specifically defined to include an element of good faith.  29 U.S.C. § 1002(18).

'[t]he degree to which a fiduciary makes an independent inquiry is critical.'" *Keach*, 419 F.3d at

636 (alteration in original) (quoting *Eyler v. Comm'r*, 88 F.3d 445, 456 (7th Cir. 1996)).

Crucial to this case, fiduciaries may point to an expert's guidance as evidence of a good-

faith investigation. *See Bussian*, 223 F.3d at 300–01. But fiduciaries may not blindly rely on an

expert's advice and "'must (1) investigate the expert's qualifications, (2) provide the expert with

complete and accurate information, and (3) make certain that reliance on the expert's advice is

reasonably justified under the circumstances'"—the *Bussian* factors. *Id.* at 301 (quoting *Howard*

*v. Shay*, 100 F.3d 1484, 1489 (9th Cir. 1996)); *see also Gregg v. Transp. Workers of Am. Int'l*,

343 F.3d 833, 841 (6th Cir. 2003) ("A fiduciary's effort to obtain an independent assessment

serves as evidence that the fiduciary undertook a thorough investigation."); *Cunningham*, 716

F.2d at 1474 ("An independent appraisal is not a magic wand that fiduciaries may simply wave

over a transaction to ensure that their responsibilities are fulfilled. It is a tool and, like all tools,

is useful only if used properly.").

Whether reliance on an expert is justified "is informed by many factors, including the

expert's reputation and experience, the extensiveness and thoroughness of the expert's

investigation, whether the expert's opinion is supported by relevant material, and whether the

expert's methods and assumptions are appropriate to the decision at hand." *Bussian*, 223 F.3d at

301. Finally, the valuation of closely-held stock is a highly fact-intensive process. *See*

*Cunningham*, 716 F.2d at 1473 ("Appraisal of closely-held stock is a very inexact science; given

the level of uncertainty inherent in the process and the variety of potential fact patterns, we do

not think a court should require fiduciaries to follow a specific valuation approach as a matter of

law under Section 3(18)."); *Sommers*, 793 F.2d at 1462 (similar).

ii.     Findings of Fact

Defendants' counsel accurately observed during closing that there are few bright-line rules due to the DOL's longstanding failure to fulfill the statutory directive to promulgate regulations.  The Court generally agrees with that sentiment and has not viewed any one fact as dispositive.  Instead, the Court has viewed the cumulative impact of discrete facts.  And in that light, the Court concludes that the fiduciaries failed to establish their § 408(e) defense following the three *Bussian* factors.

a.     First Factor—Investigation

Bruister and his good friend Mike Bruce essentially decided to hire Donnelly.  Bruce had encouraged Bruister to develop an exit strategy from BAI and had unsuccessfully attempted to find a buyer around 2000.  He then discovered the ESOP possibility.  Jan. 23, 2009 Bruce Dep. [C-1] at 27, 29–30, 31.  About this time, Bruce encountered Donnelly at an appraiser's association meeting and asked around a bit about his reputation.  *Id.* at 31–32, 40–41, 47.  Bruce also heard Johanson's name from a few sources and decided to arrange a meeting with himself and some of the BAI principals.  *Id.* at 31, 42.  Bruce conducted no background check, assuming that Donnelly had been cleared by the appraiser's association to which they both belonged.  *Id.* at 40–41.  Bruce asked Bruister to give Donnelly a shot at the appraisal work, and he was ultimately retained.  *Id.* at 37, 39.

Smith testified that once she became a trustee, she relied on Bruce's work and did nothing else to determine Donnelly's qualifications.  When Henry later replaced Bruce as a trustee, she too deferred to prior decisions.  Both Smith and Henry testified that Donnelly's performance in 2002 and 2003, and the ease with which the ESOT paid off prior loans, influenced their decisions

46

to use Donnelly again in 2004 and 2005.  But it is not apparent that this issue was given any real thought after he was first hired.

Had a thorough investigation occurred, the trustees would have learned that Donnelly had performed over a thousand valuations, many of which included ESOPs.  But they would have likewise learned that he lacked a college degree—something that may or may not have influenced them.  A reasonable amount of probing would have also revealed that Donnelly relied heavily on BEAR.  That alone is not necessarily a deal breaker, but it does raise an issue.  Donnelly testified that BEAR made some of the substantive valuation decisions.  *See, e.g.*, May 11, 2011 Donnelly Dep. [C-22] at 258.  But an interview with BEAR's Rosie White may have uncovered that she disagreed with Donnelly's description and had concerns about him.  *See* July 14, 2011 White Dep. [C-42] at 130–36 (noting, among other things, that Donnelly did not seem to invest sufficient time into the valuations); Feb. 23, 2012 White Dep. [C-39] at 78 (noting that she did not necessarily take pride in her work with Donnelly).  Finally, further investigation may have uncovered Donnelly's prior felony conviction for fraud and the fact that he was operating under an assumed name.

Regarding Plaintiffs' claim that Defendants should have conducted a background check, the Court is not willing to say that one is always necessary.  But appropriate questioning seems reasonable, and it may have revealed Donnelly's prior felony conviction and assumed name—though it is conceivable he would have continued to conceal it.  According to the ESOT's second attorney, William Campbell, he probably would not have recommended using a convicted felon.  Jan. 16, 2012 Campbell Dep. [C-19] at 64.  Finally on this point, had the fiduciaries asked

47

general questions before each retention, they may have discovered by 2005 that Donnelly was beginning to attract attention from DOL.

Another concern is Donnelly's pre-ESOT work for Bruister and his post-ESOT coziness with Johanson.  According to first ESOT counsel Steve Lifson, he would have recommended obtaining a new appraiser had he known Donnelly performed preliminary work for Bruister. Aug. 15, 2011 Lifson Dep. [C-5] at 22–23.

Balancing all of this leaves a tricky issue because Donnelly was hired prior to the now-dismissed transactions in 2002 and 2003, and, as a factual matter, the due diligence required for subsequent retention is not the same.  Further, the Court is not willing to say that Donnelly is *per se* unqualified to appraise any company.  But the combination of his background and split loyalty raises concerns that should have been discussed.  Instead, the fiduciaries were not focused on this issue.  It is a close call, but the Court finds that a proper investigation was lacking, especially as to the final transaction when all three trustees saw emails in which Donnelly and Johanson were obviously working together to increase the value.  This ruling simply adds weight because the next factor of the affirmative defense is clearly lacking.

b.      Second Factor—Appropriate Information

This factor goes to the heart of the case.  As ESOT trustees, Defendants were required to provide the expert with complete and accurate information.  *Cf. Hall Holding*, 285 F.3d at 430–31 (noting fiduciary failed to provide expert with complete and accurate information when expert was not told valuation was for an ESOP and testified it would have altered the results). They failed in this regard.

48

Donnelly obtained information primarily from Smith and Bruister.  Smith provided financial data and information on revenue expectations and executive compensation.  Bruister provided financial information early on, but he also provided information regarding BAI's relationship with DTV and the company's long-term prospects.

Starting with the financial data, there is a threshold problem regarding the reliability of BAI's financial statements.  Donnelly began the criticism when he sought help "decipher[ing] Bruister's balance sheet," writing that some of the entries were "mysterious" and unlike anything he had seen in his sixteen years valuing companies.  P-24 (also concluding that Amy Smith, who helped prepared them, was "probably over her head").  Defendants' written responses to DOL during administrative proceedings also acknowledge significant issues with the accounting.  *See* D-199.

Aside from the errors, the methods were not reliable.  Each Stock Purchase Agreement ("SPA") stated that the financial statements used to determine BAI's FMV complied with Generally Accepted Accounting Principles ("GAAP").  They did not.  This is not merely an issue of Monday-morning nitpicking.  Even Defendants' expert Gregory Range stated in his report as follows:

> It should be noted that results presented for the historical period should be viewed with caution.  The internal financial results provided by management have known accounting inaccuracies and divergences from generally accepted accounting principles in the U.S.  As such, the financial statements presented in this section . . . are meant to provide context, and not necessarily actual economic results.

J-52 at 12.  And as the Secretary's expert, Dana Messina, explained, GAAP compliance assures investors that the company's value has been determined in light of consistent accounting

standards.  In other words, it says the numbers are reliable and have been compiled in the same way as those from the other companies the appraisers may use as comparators.

The Court does not take the GAAP-compliance issue as far as the Plaintiffs may hope, but in terms of the duty to provide accurate information to the appraiser, it is at least notable that Defendants signed SPAs stating that the financial statements were GAAP compliant when they knew they were not.  The information they provided Donnelly was not what the SPAs represented.  And though Range worked around it, even he noted this departure and counseled caution.  J-52 at 12.

Other problems existed with respect to the information Donnelly received.  For example, Bruister consistently informed Donnelly that BAI was one of DTV's best and favorite HSPs and that Bruister had received numerous awards.  This much was certainly true.  DTV's witnesses, and the testimony of other HSP owners, clearly show that BAI was a great HSP.  *See, e.g.*, Crawford Dep. [C-20] at 131–33; Beaudreau Dep. [C-15] at 49–51, 53–54; Jan. 24, 2012 Halsted Dep. [C-3] at 14.  But Bruister did not share all of the available information.  He did not, for example, tell Donnelly that BAI's performance on DTV's report cards showed a large number of categories for which the company failed to meet targets.  Oct. 21, 2011 Donnelly Dep. [C-31] at 1095.  And, at the time of the Subject Transactions, Bruister was already experiencing problems that would lead to the loss of certain territories in 2006.

So while BAI was a favorite son, it was not immune from risk.  Many of those risks flowed from BAI's singular reliance on DTV as basically its only client and the lopsided leverage DTV enjoyed.  DTV's contract allowed unilateral termination without cause and promised BAI no express exclusivity of the service areas.  This right of cancellation made it difficult for Mike

Bruce to find a willing buyer for BAI before the ESOP was launched.  Jan. 23, 2009 Bruce Dep.

[C-1] at 33–34.

Donnelly was generally unaware of DTV's contractual rights and never read the DTV

contract.  May 10, 2011 Donnelly Dep. [C-21] at 25–26.  He instead relied heavily, and

apparently exclusively, on Bruister's description of the DTV relationship.  As a result,

Donnelly's reports consistently concluded that barriers to competition remained high, which

factored into a lower-risk discount and higher FMV.

Donnelly concluded that it would be hard for a competitor to take BAI's market.  And

while that observation may have been somewhat true for a start-up competitor, it was untrue as to

existing HSPs given that DTV could unilaterally award some or all of BAI's territory to one of

them.  *See* Jan. 24, 2012 Halsted Dep. [C-3] at 34–35.  And as fellow HSP owner Jose Mas

testified, there were "always rumors" that DTV would take over the HSPs.  Mas Dep. [C-7] at

18–19.  In any event, Donnelly should have been given a complete picture.

These issues regarding BAI's standing with DTV are not alone sufficient to cast doubt on

Donnelly's valuations because the Court agrees that BAI was one of DTV's better HSPs.  But

those issues must be viewed in context with Donnelly's sketchy knowledge about other BAI risk

factors:  (1) DTV had announced plans to reduce the rates it would pay HSPs; (2) DTV changed

the way HSPs accounted for inventory; (3) DTV required HSPs to lease or purchase company

vehicles in 2005; and (4) BAI was experiencing cash-flow issues.  The trustees failed to

adequately advise Donnelly about any of these concerns.

Starting with the rates, DTV announced in 2004 that it would reduce the rates it paid

HSPs for Standard Professional Installations ("SPIs").  DTV had the exclusive right to reduce the

51

SPI rates, and it began doing so in 2004.  The following reductions occurred before the final

ESOP transaction:

| Effective Date | Standard Professional Installation (SPI) |
|---|---|
| 12/29/2000 | 150.00 |
| 01/29/2002 | 150.00 |
| 03/01/2003 | 150.00 |
| 10/06/2003 | 178.00 |
| 01/29/2004 | 175.00 |
| 06/29/2004 | 135.00 |
| 03/01/2005 | 135.00 |
| 06/01/2005 | 125.00 |

J-10 (also showing further cuts in 2006).

Defendants contend that the rates were not a significant issue because BAI derived

revenue from other sources; the total revenues continued to climb through 2005 despite the

decreased rates; and DTV's executives, including Scott Brown, pledged to help.  Some of those

contentions may be somewhat true, but there can be no real dispute that SPIs accounted for the

heavy majority of BAI's revenues and that, despite increasing volume, the margins were

dropping, sending panic through the HSP network.

The trustees should have informed Donnelly about those changes, yet he denied specific

knowledge about them.  Oct. 21, 2011 Donnelly Dep. [C-31] at 1081.  In fact, Donnelly seemed

unaware of the basis upon which DTV paid BAI or whether the rates were negotiable.  May 11,

2011 Donnelly Dep. [C-22] at 207–09.  Indeed, he was not aware that DTV had the unilateral

right to change rates.  June 1, 2011 Donnelly Dep. [C-28] at 510–11.  And though he suggested

that the information was not relevant, he also testified that he would want to know because it

might affect EBITDA margins.  *Compare* Oct. 21, 2011 Donnelly Dep. [C-31] 1066–67, *with*

June 1, 2011 Donnelly Dep. [C-28] at 524–28.

It seems patently obvious that a legitimate appraiser would want to know that the

company's sole client had begun slashing rates on the bulk of the company's services with the

promise of more to come.  The rate-reduction policy would necessarily impact BAI's company-

specific risk and projected EBITDA margins and should have been considered.

While the rate changes would presumably reduce revenues over time, DTV also made

other changes that increased BAI's expenses, thereby reducing EBITDA margins.  For example,

DTV had previously allowed HSPs to receive equipment on consignment but changed that policy

during the relevant time to require HSPs to purchase inventory.  Donnelly denied knowledge of

this change, Oct. 21, 2011 Donnelly Dep. [C-31] at 1082, though it would necessarily affect

profit margins, if not the basic accounting upon which Donnelly relied.

Similarly, in 2004 DTV announced a new policy requiring its HSPs to own or lease all

vehicles used on customer calls.  *See* J-1.  DTV began phasing in the policy in March 2005, and

it had a dramatic impact on BAI.  First, BAI incurred the obvious expenses associated with gas,

leases, maintenance, and insurance on just under 1000 vehicles.  Bruister testified that the added

cost of gas alone might approach $25,000 a day and could spike to $40,000 a day when prices

rose.  Even at $25,000 per work day, the added gas expense surpassed $7 million annually.

Second, the change altered the way BAI paid its employees.  When BAI moved to a

Company Owned Vehicle ("COV") model, it also switched from a piece-rate pay system to

hourly pay.  The parties dispute whether this shift would increase or decrease costs, but it was at least a short-term increase that was fairly dramatic.  The change was also riskier for the business. Jan. 24, 2012 Halsted Dep. [C-3] at 136–37.  In the Court's view, the additional lease-related expenses were substantial and permanent.  *See* Mas Dep. [C-7] at 25–26 (stating that costs were "very substantial").

Defendants assert that despite the additional costs, there were potential gains because the new vehicles would be good advertising and DTV might try to offset the expenses somehow. While expectations of *some* additional business may have been reasonable, expecting to offset the massive costs was not.  And there is little evidence that DTV offered any concrete relief sufficient to justify keeping this information from Donnelly.

Simply put, the vehicle policy was a game changer that the trustees should have explained to Donnelly.  Indeed the policy led HSPs to believe DTV was trying to "squeeze" as much profit out of them as possible.  Mas Dep. [C-7] at 128; *see also id.* at 133 (stating that DTV "squeezed and squeezed and squeezed until they realized that it was effecting [sic] service"); Jan. 24, 2012 Halsted Dep. [C-3] at 50 (describing policy as "extreme economic challenge"); *id*. at 51–52 (noting that change did not increase revenues or profit); *id.* at 119 (noting that industry was reeling); Mar. 2, 2012 Halsted Dep. [C-4] at 47 (noting that HSPs were frustrated because economics could not work); Mar. 2, 2012 Halsted Dep. [C-4] at 168 (testifying that DTV executive Scott Brown had false assumptions about HSPs).  HSP owner Mas may have been the only owner to like the policy, but he already owned vehicles and thought the plan gave him a competitive advantage because it would be "very challenging" for other HSPs.  Mas Dep. [C-7] at 44, 106–07.

Even those associated with Bruister were concerned.  According to Mike Bruce, DTV "turned bad in a hurry" and was vicious.  Apr. 29, 2011 Bruce Dep. [C-2] at 54.  Bruister himself stated during an administrative hearing that DTV was squeezing to the point that HSPs could only make a "sustenance living."  While there is some dispute about when the squeeze was felt the hardest, there is no dispute that BAI and others knew about the potential for decreased rates and increased expenses in 2004, saw them happen in 2005, and were already complaining before the Subject Transactions.

These moves by DTV are not without explanation.  During this time period, DTV posted enormous losses reaching over $1 billion.  There is certainly evidence to find that DTV was well positioned and highly regarded by the markets, but the company was squeezing the HSPs as hard as it could to mitigate its losses.

Donnelly was generally oblivious to these dramatic shifts.  He seemed to have some awareness that something was happening with vehicles, but he never saw the policy, Oct. 21, 2011 Donnelly Dep. [C-31] at 1087, did not know the specifics, *id*. at 1088, had no information regarding the impact on BAI's future expenses and EBITDA margins, *id*. at 1089, and generally did not seem to understand it, *id*. at 1069–70.  More significantly, he made no attempt to account for these changes in developing his projections.  Instead, Donnelly assumed that these expenses would be reflected in the financial statements after they had been incurred.  *Id.* at 1089–90.

Again though, this response merely demonstrates the lack of quality information Defendants provided.  The 2005 financial statements would show only a partial year of partial implementation of the vehicle policy.  A proper valuation would have included full disclosure of the pluses and minuses associated with this major shift in BAI's business model so Donnelly

could fully account for it in his future projections. Donnelly was not provided adequate information to perform that analysis, which could have had a dramatic impact on projected EBITDA margins and company-specific risk.[19]

Perhaps as a result of the decreasing margins, BAI was experiencing cash-flow issues in 2004 and 2005, though the parties dispute whether the issues were a problem. Smith and Henry, for example, testified that while Bruister was personally loaning millions to the company on a regular basis to make payroll or pay other expenses, the company was always able to repay him almost immediately. Both attributed this problem to the timing of receivables from DTV. The financial records do confirm that through September 2005, Bruister was always repaid in a matter of days, though the absence of GAAP-required cash-flow analysis makes it more difficult to evaluate these records. Regardless, the ability to repay the loans changed after Hurricane Katrina. After that, the ESOT restructured its debt on the 2004 Transaction and then refinanced the December 2005 Transaction as a mirror loan to presumably make it easier for BAI to borrow from institutional lenders. Other evidence also suggests that BAI's ability to repay Bruister was compromised.

As for the storm's impact on the final two appraisals, that issue remains unclear. On the one hand, BAI informed DTV that BAI lost approximately $4 million, and Johanson informed

---

[19]Though Donnelly did not know about the vehicle policy change, he was told by Johanson in December 2005 that vehicles were *purchased*. Had that information been correct, it would not have reduced the valuation for reasons already stated. Amy Smith corrected Johanson, informing him that BAI incurred $300,000 leasing vehicles in 2005. J-117. And while that information was forwarded to Donnelly, it hardly covers the massive expenses related to the new vehicle policy for gas, maintenance, insurance, training, and other items that would add millions to BAI's yearly expenses once the program was fully implemented. Neither Smith nor anyone else ever followed up with Donnelly on this point.

Donnelly that the hurricane depressed operations, thereby justifying a value-increasing adjustment. *See, e.g.*, J-117. But Defendants also claim that Hurricane Katrina created opportunities and was viewed as a net plus (thereby justifying continued optimism).

The Court suspects that Hurricane Katrina's impact was somewhere in the middle. While the storm caused an interruption in business, those losses were at least partially offset by additional work. Notably, the final financial numbers for 2005 were about the same as projections made before the storm. But to the extent Defendants knew there would be a lingering effect on debt repayment, it should have reduced the value of the company in 2005. In any event, it is not apparent that this issue was adequately explored with Donnelly.

Despite these challenges, Defendants claim that they remained optimistic about BAI's future, in part because revenues continued to grow. Indeed the growth was breathtaking and well beyond the trustees' prior revenue-growth projections. But that growth was due largely to BAI's acquisition of another HSP, Apex, that allowed BAI to add significant territory in the first half of the decade. Bruister acknowledged that similar growth would require new territory and that the past growth would be hard to replicate. Indeed, BAI was already having issues that would lead to territory contraction. And, as discussed above, BAI was not without competition from other HSPs for the territorial expansion necessary to continue its growth.

Finally, and most significantly, the picture Defendants painted for Donnelly (and again at trial) conflicted with their internal emails and communications in December 2005. For example, just before they provided information to Donnelly for his December 2005 valuation, Smith emailed Bruister regarding concerns she and Henry had discussed about the final ESOP sale and the company's cash-flow issues. P-30. A more dramatic exchange occurred six days after the

December 2005 closing, in which Bruister, Smith, and Henry discussed various problems facing

the company as it considered the Anderton asset-purchase proposal.  In the exchange, Smith

asked Bruister, "If the profits were high, cash flow was stable and you still had all your money in

the bank, would you still consider this?  I wouldn't."  P-112.  Bruister then responded:

> You are probably right—If the profits were high (which they are not), the cash
> flow was stable (which they are not) and I had all my money back in the bank
> (which I do not and don't know when or if I ever will), I would probably not
> consider this.  And it looks like once again we might have to struggle to get
> through this month (we have already put almost $4 million back into the company
> in a very short period of time just to keep it afloat—$3.3 million from me and
> $450k from Merrill Lynch).  I am just wondering how much longer we can borrow
> money to try to give Direct TV what they want and on top of that they are trying
> to cut prices by 15% or more.
> . . .
> From where you sit do you see things getting better anytime soon?  Do you
> thing [sic] we will return to profitability soon and do you see our cash flow getting
> better soon.

*Id*.  Smith's response was not encouraging.  *Id*.  And a similar exchange occurred between

Bruister and Henry the following day, in which Bruister noted the loans he had advanced "to

keep the ship afloat."  J-110.  He stated that "there is obviously not an inexhaustible supply of

money from this source (me)."  And "now that the ESOP owns a 100%, it is probably not

appropriate for me to continue to loan money to the company."  *Id*.  He then mentions factors

causing the downturn—including Hurricane Katrina—and states that:

> [W]e are hoping that all three of these (and there are probably more) can be
> brought under control and we will once again be profitable.  This may not happen
> over night (probably won't).  We could conceivably have more months ahead of
> us with negative cash flow.  If that happens I'm not sure who we turn to for
> working capital.
> . . . I'm not sure this is [a] situation that banks would be anxious to step in and
> help with.

*Id*.

About a week later, on December 28, 2005, DTV notified HSPs that it would implement further rate reductions.  P-16.  Johanson forwarded the email to Defendants, noting that it gave "Herb and me great pause!!" and "provide[d] a great impetus to seriously consider" the proposed Anderton asset purchase.  P-16.  Johanson's tone underscores the stress the rate reductions were having on BAI, and though DTV sent this particular notice shortly after the December 2005 closing, the trustees already knew more rate reductions were coming.

It is certainly possible that Hurricane Katrina had some impact on Defendants' spirits in December 2005, which may account for the tone of these emails.  But the Court cannot reconcile Defendants' written statements in December 2005 with the information they provided Donnelly during this same month or with the trial testimony they gave based on faded memories of decisions made a decade earlier.

But even assuming Defendants truly believed in 2005 that BAI would overcome all of these obstacles, that does not justify keeping the information from Donnelly.  Simply stated, it was not their decision to make.  They knew these risk factors, openly discussed them among themselves, and had an obligation to make full disclosures to the independent appraiser so *he* could determine whether they would affect FMV.  Instead, the trustees continued to paint a rosy picture and stood by silently as Johanson coaxed Donnelly to the highest-ever valuation.  The Court concludes that Bruister, Henry, and Smith failed to provide complete and accurate information to Donnelly.

c.     Third Factor—Reasonable Reliance

Defendants were not reasonable in relying on Donnelly's report because they did little to confirm it and otherwise possessed knowledge that it was not accurate.  Before each closing,

59

counsel advised Smith and Henry that they were required to "[c]onduct a thorough and impartial investigation of the proposed transaction to determine in good faith [w]hether the purchase price to be paid by the ESOT for the Stock does not exceed the fair market value of the Stock."  J-26. But Smith and Henry failed to do so.

It would be unfair to suggest that Smith and Henry conducted no investigation at all. Once they received the reports—usually on the eve of closing—they discussed them.  And there were times when one or the other asked questions.  But even assuming they were more probing than the record reveals, the Court cannot objectively find that the trustees were reasonably justified in relying on Donnelly's advice when they knew he had not been informed about dramatic changes in BAI's business model that threatened its very existence.

All three Defendants knew the problems facing BAI in 2004 and saw them materialize in 2005, yet they did not fully disclose these problems to Donnelly or ask whether he had accounted for them.  Absent Donnelly's full appreciation of these issues, Defendants should have known that his conclusions were suspect.

> [I]t was not enough for fiduciaries simply to rely on their generalized notions that the company's prospects were good.  The appraisal represented a quantitative analysis of specific facts and assumptions.  Prudent fiduciaries would have sought to analyze the effect of obvious changes in those facts and assumptions—either by their own efforts or with the help of advisors.

*Cunningham*, 716 F.2d at 1474.

Of equal concern is Defendants' knowledge that Johanson was communicating directly with Donnelly in an effort to increase the valuations.  At least as of December 9, 2005, Bruister, Henry, and Smith were copied on emails in which Johanson communicated directly with Donnelly for the very purpose of increasing the valuation, and Donnelly seemed more than

60

willing to oblige.  *See* J-117.  That alone would prevent a reasonable trustee from relying on this valuation.

There is also evidence that Smith and Henry abdicated their responsibilities and deferred to Johanson regarding Donnelly.  *See, e.g.*, P-29 (Smith email to Johanson, with copy to Henry, asking Johanson why Donnelly had not yet sent a request for financial data to support September 2005 transaction); P-101 (Donnelly email to Bruister attaching appraisal without copy to ESOT counsel or trustees, which Bruister then forwards to Smith).

To the extent Smith and Henry did assert themselves, they were simply ill equipped to exert independent judgment, and at least Smith was aware of this deficiency.  While a trustee need not become an expert, Smith and Henry lacked the background to question the valuations to the degree a reasonable buyer would.  Smith never viewed herself as qualified to serve as a trustee and candidly wrote in 2002, "I have some concerns about my qualifications of becoming one of the Trustees for our ESOP."  P-146.  Even after the final ESOP Transaction, she still wrote Johanson that she did not think she was "qualified . . . to challenge[] Matt's valuation."  P-121.  Her trial testimony confirmed that she remains unable to understand Donnelly's valuation reports.

In general, Smith provided the financial information Donnelly requested and then checked to see whether he properly inserted it.  She did not undertake any significant review of the reports beyond that, relying instead on ESOT counsel to tell her whether the valuations were correct.  She even admitted that before 2006, she thought her only duty was to provide accurate information to Donnelly.  In her words, she spent "very little time" reviewing the reports she

received just before closing, and her prior testimony suggests that she may have thought she was obligated to go forward with the transactions at Donnelly's price.

Henry is a CPA and holds an MBA, and her understanding of the task was stronger. That said, she too lacked an understanding of Donnelly's valuation methods sufficient to probe his decisions and reach an independent determination of value. And though her memory is sketchy on this point, it seems that Henry also relied to some extent on ESOT counsel's review of all documentation, which she seemed to think included review of the valuations. The problem is that ESOT counsel, William Campbell, denied any responsibility for checking the valuations. He further denied providing any opinions on valuation. Apparently, neither Smith nor Henry asked enough questions to learn that their attorney was not offering the opinion upon which they claim to have relied.

When Smith and Henry did ask questions, they often turned to the seller for guidance rather than Donnelly or ESOT counsel. *See, e.g.*, P-30 (email string between Defendants and Johanson regarding ESOP-related questions, among others); P-34 (emails between Smith and Johanson with copies to Bruister); J-112 (Henry email referencing conversation with Johanson regarding accounting adjustments made for "valuation purposes"); J-115 (emails among Smith, Bruister, and Johanson seeking Johanson's advice on ESOP-related questions).[20]

---

[20]The Court feels compelled to say that Defendants seem like decent people; they are certainly likable. But the ESOP and ESOT were structured in a way that offered little protection for participants. The ESOT board was comprised of the seller and two lay trustees who worked for and were personally loyal to him. None had sufficient knowledge about business valuation, and there was no independent fiduciary (something Defendants' expert Kaplan said he would have recommended). Help could have come from ESOT counsel, but the seller terminated the ESOT's first attorney and replaced him with another who was given a limited role. This is best reflected by his failure in J-117 to question why the seller's attorney had instructed the ESOT's independent appraiser to adjust EBITDA in a draft report that was never shared with the ESOT.

Another fiduciary responsibility brought to Smith's and Henry's attention was the duty to determine whether BAI's representations and warranties in connection with the ESOT's purchase of the stock were reasonably accurate.  There is no serious dispute that the financial statements were not GAAP compliant, that union activity existed, or that BAI faced litigation.  Yet false representations regarding these issues appeared in the SPAs Smith and Henry signed and verified.

Other evidence suggests that Defendants' reliance on Donnelly fell below the standard of care.  Neither Smith nor Henry suggested changes in the valuations.  And while they lacked knowledge of the valuation process, they both understood accounting and the company well enough to at least spot a few glaring mistakes.  For example, neither trustee caught a $6-million mistake in the December 2004 valuation when Donnelly errantly added instead of subtracted roughly $3 million.  That mistake may have lead to a substantial overpayment in that valuation and was not caught.[21]

Other questionable calculations occurred, like Donnelly's adjustment to the "projection risk" between 2003 and 2004.  Donnelly defined projection risk as "our estimate of the risk that the projections may not be realized."  *See, e.g.*, J-123 at 36.  In 2003, the projection risk was 8%.

---

And ESOT counsel should have challenged Donnelly's refusal to provide the draft he and Johanson had been discussing until it was given to the seller.  The result was an ESOT with trustees having little capacity to make an independent assessment and protect the participants.

[21]After closing, Donnelly eventually brought the issue to the trustees' attention and then fixed the mistake in a new report that achieved the same FMV previously used to set the price. The Court has considerable suspicion that this post-closing fix could occur without manipulating the numbers.  In fairness, there is evidence from BEAR principal Hans Schroeder suggesting that the appraisal was legitimate, but the trustees seemed insufficiently inquisitive regarding these developments.

63

*Id*. at 35.  The following year the risk was 3%.  J-39 at 34.  But Henry could not recall any reason

it would have dropped.  By 2005, Donnelly had dropped the projection risk to 2.5%.  J-102 at 35.

If anything, BAI's projection risk should have increased with the obstacles it faced in 2004 and

2005.

These are just small examples; the bigger picture is that the purchase price was always

Donnelly's number.  Unlike Johanson, neither Smith nor Henry appear to have ever asked any

questions or made any suggestions that changed Donnelly's valuations.  And they never

negotiated.  Indeed, Smith's deposition testimony (as read at trial) leads to the conclusion that

she did not realize she could.  While the Court does not take a position on whether negotiation is

always necessary, Donnelly's reports were never sufficiently probed.

Adding to the shortfall, it appears that few communications occurred before the Subject

Transactions.  The trustees and their counsel rarely saw any valuation before the eve of closing.

*See* J-24 (Donnelly email day before December 2004 closing noting that report had not been

delivered); J-113 (email from ESOT counsel asking for report on eve of September 2005

closing).  And, as stated, Smith testified that she spent very little time reviewing the documents.

Whatever conversations occurred with ESOT counsel, they were short.  Despite a duty to

memorialize the discussions, the trustees documented only one of the telephonic meetings with

Campbell.  It occurred December 2004, and the minutes reveal that the parties were still waiting

for the final documents from Donnelly.  J-19.  During the call, Campbell apparently addressed a

wide variety of potentially weighty issues, but the entire dialogue lasted just 17 minutes.  *Id*.

Campbell's billing statements further confirm that very little communication occurred before

each closing.

As noted previously, no one fact determines this outcome.  But the factual picture as a whole leaves little doubt that the trustees were not reasonably justified in their reliance on Donnelly.  Accordingly, the Court finds that Defendants Bruister, Henry, and Smith failed to establish any of the three factors necessary to trigger the protections of ERISA § 408(e).[22]

### 3.    Derivative-Liability Claims

Plaintiffs also assert claims that Bruister and Smith, as BAI directors, breached their duty to monitor the fiduciaries and that Defendants are liable as co-fiduciaries.  Claims for breach of the duty to monitor and for co-fiduciary liability are derivative claims necessitating first some breach of fiduciary duty.  *In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 580–81 (S.D.N.Y. 2011).  The Court has already found a breach.

### a.    Duty to Monitor

### I.    Conclusions of Law

"A person or entity that has the power to appoint, retain and/or remove a plan fiduciary from his position has discretionary authority or control over the management or administration of a plan and is a fiduciary to the extent that he or it exercises that power."  *In re Enron Corp. Sec., Derivative, & "ERISA" Litig.*, 284 F. Supp. 2d 511, 552 (S.D. Tex. 2003) (citing *Coyne & Delany Co. v. Selman*, 98 F.3d 1457, 1465 (4th Cir. 1996)); *see also Am. Fed'n of Unions Local 102 Health & Welfare Fund v. Equitable Life Assurance Soc'y of the U.S.*, 841 F.2d 658, 665 (5th Cir. 1988) (citing *Leigh I*, 727 F.2d at 135).  Although the Fifth Circuit has not spoken on

---

[22]There is some evidence regarding a potential buyer for BAI in 2005, H.I.G. Capital.  *See* D-201.  But the evidence related to that proposal was sketchy, and the structure of the proposal—which included little cash—was too dissimilar to give anyone comfort in Donnelly's valuations.

the issue, courts considering similar claims have found that liability for failure to monitor arises when the defendant knows or has reason to know of a breach. *E.g.*, *Liss v. Smith*, 991 F. Supp. 278, 311 (S.D.N.Y. 1998).

The Court agrees that this knowledge-based limitation is consistent with § 404's prudent-fiduciary standard, which is the basis of liability under ERISA for the failure to monitor. *See Leigh I*, 727 F.2d at 134–35 ("The fact that Engle and Libco had only limited fiduciary responsibilities does not mean that they had no responsibilities whatever. As the fiduciaries responsible for selecting and retaining their *close business associates* as plan administrators, Engle and Libco had a duty to monitor appropriately the administrators' actions." (emphasis added)).

ii.     Findings of Fact

Bruister failed to fulfill his responsibility. From the beginning, Smith believed she was unqualified to serve as a trustee. *See* P-146. But she appears to have been talked into the position. Even now, Smith lacks understanding of the methods Donnelly used to value the company. Bruister was aware of her concerns about her qualifications. Bruister also knew about Johanson's efforts to increase the independent valuation and was aware that Smith and Henry were eventually copied on that correspondence. An informed trustee would not have remained idle while the seller communicated directly with the ESOT's independent appraiser and financial advisor in an effort to elevate the price at the participants' expense. Bruister was aware of these breaches but did nothing as a member of BAI's board of directors to monitor the ESOT trustees.

b.      Co-Fiduciary Liability

Unlike the duty to monitor, ERISA contains an express provision creating co-fiduciary

liability.  29 U.S.C. § 1105.  Under that section:

> [A] fiduciary with respect to a plan shall be liable for a breach of fiduciary
> responsibility of another fiduciary with respect to the same plan in the following
> circumstances:
>
> > (1) if he participates knowingly in, or knowingly undertakes to
> > conceal, an act or omission of such other fiduciary, knowing such
> > act or omission is a breach;
> >
> > (2) if, by his failure to comply with section 1104(a)(1) of this title
> > in the administration of his specific responsibilities which give rise
> > to his status as a fiduciary, he has enabled such other fiduciary to
> > commit a breach; or
> >
> > (3) if he has knowledge of a breach by such other fiduciary, unless
> > he makes reasonable efforts under the circumstances to remedy the
> > breach.

*Id.* § 1105(a).  For the same reasons the Court finds a breach of prudence and a failure to

monitor, it likewise finds that Bruister, Henry, and Smith are liable as co-fiduciaries.

4.      BFLLC

Bruister controlled the BFLLC, and the Court finds that BFLLC is a party in interest

subject to equitable recovery under ERISA § 1132(a).  *See Harris Trust & Sav. Bank v. Salomon*

*Smith Barney, Inc.*, 530 U.S. 238, 241 (2000).

C.      Remedies

The remedies questions are more difficult than the liability questions.  As discussed later,

ERISA provides wide latitude in fashioning an appropriate equitable remedy, and the parties

offer several options.  First, Defendants argue that the amounts paid for the first and third

67

transactions were less than the FMV as determined by Plaintiffs' own experts, so no remedy

would be equitable as to those transactions.  Second, the Secretary argues that the Subject

Transactions should be rescinded and the fiduciaries should be surcharged.  Third, the *Rader*

Plaintiffs seek an award equal to the difference between the full contract price for each

transaction and the actual FMV on the date the transactions closed.  Fourth, Defendants argue

that if the contract price was inflated (which they deny), then they should pay only the difference

between what was actually paid and what should have been paid (*i.e.*, the award should not be

calculated based on the full contract price because it includes debt that was never repaid).

This Order takes these issues in turn and then examines prejudgment interest.  But given

the possibility of an appeal, the Court will provide alternative holdings to hopefully stem the

parties' already-staggering costs.

### 1.    Defendants' No-Loss Argument

Defendants contend that even assuming the accuracy of Plaintiffs' experts, the Plan

suffered no loss for the December 2004 and 2005 Transactions and only a small loss in

September 2005.  They compare Mercer and Messina's valuations for the transactions to the

amounts the ESOT actually paid toward the principal and conclude that Bruister received less

than what Plaintiffs' own experts said the stock was worth.

This question of fact is more easily followed using the example Defendants' gave when

arguing for directed verdict.  In the December 2004 Transaction, the ESOT purchased 20% of

BAI's outstanding stock.  But only $730,000 was paid in cash with the balance reflected in a

$5,970,000 note.  The stock associated with that note was held in a suspense account until the

ESOT paid sufficient principal to release a proportional number of shares.  *See* D-225 at 109.

68

Defendants argued that the principal payments plus the initial cash totaled roughly $3 million. They then observed that Messina's appraisal for that block of BAI stock was $3,085,177 (20% of Messina's total FMV), which was more money than Bruister received.   Mercer's numbers were essentially the same, *ergo* no loss.

The Court is not persuaded for two general reasons.  First, the argument compares apples to oranges.  Defendants start with the experts' valuations for *all* stock sold in the 2004 Transaction and compare that figure to the principal payments Bruister received.  But the ESOT never made enough payments to release the full block of BAI stock, so the payments represent the price for a smaller block of stock than the one the experts valued.  The better way to view the issue is to compare the price paid per share to the experts' price per share.  Donnelly set the price per share in December 2004 at $67.26, and that is what the ESOT paid.  Using Mercer as an example, he set the per-share price at $35.28.  So the ESOT overpaid by more than $30 each time it made a payment toward the release of shares.  Share for share, they paid too much.

Second, Defendants base their argument on the principal payments while ignoring the ESOT's substantial interest payments.  If the price per share was inflated, then so was the interest the ESOT paid.

In addition to these general findings, Defendants' argument has another problem unique to the December 2004 Transaction.  Defendants exclude from their calculations a $3.8 million payment the ESOT made on February 28, 2006, after receiving an equivalent Employer Contribution from BAI.  According to Defendants, BAI never repaid that amount to BFLLC as contemplated by the mirror loan created when the ESOT refinanced the 2004 note.  They posit that because BFLLC never received the funds, the ESOP suffered no loss.

69

That argument emphasizes the wrong issue.  The funds belonged to the Plan when BAI made the Employer Contributions to the ESOT.  When the ESOT used those funds to pay BAI, BAI should have released Pledged Stock from the suspense account.[23]  The fact that BAI did not pay BFLLC is of no moment.  Bruister controlled both BAI and BFLLC.  If, in his sound business judgment, Bruister elected to keep the $3.8 million in BAI, that would not alter the fact that the ESOP expended assets to release the shares.

        2.        The Proper Measure

              a.        Conclusions of Law

ERISA § 409(a) states that breaching fiduciaries are "personally liable to make good to such plan any losses to the plan resulting from each such breach."  29 U.S.C. § 1109(a).[24]  And ERISA § 1132(a) creates a cause of action for the Secretary and plan participants to seek relief under § 409, including "other appropriate equitable relief."  *Id.* § 1132(a)(2).[25]

---

[23]If the stock was not released as contractually required, the case for reimbursement would be even stronger.

[24]That section provides:

Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

29 U.S.C. § 1109(a).

[25]Section 1132(a)(2) states in relevant part:

(a) Persons empowered to bring a civil action

Although these remedies are equitable in nature, fiduciaries are analogous to trustees; thus, "money damages are available against a fiduciary for breach of duty." *Cent. States, Se. & Sw. Areas Health & Welfare Fund ex rel. Bunte v. Health Special Risk, Inc.*, No. 13-10705, 2014 WL 2853587, at *6 (5th Cir. June 23, 2014). And those same equitable remedies under § 1132(a) are permitted against a non-fiduciary party in interest like BFLLC. *Harris Trust & Sav. Bank*, 530 U.S. at 241.

"Neither section 409(a) nor any other section of ERISA discloses the methods which are to be used in measuring 'losses' for which breaching fiduciaries are to be held liable." *Kim v. Fujikawa*, 871 F.2d 1427, 1430 (9th Cir. 1989). But "[t]he reports of the various committees concerning this section of ERISA make it clear that Congress intended to provide the courts with broad remedies for redressing the interests of participants and beneficiaries when they have been adversely affected by breaches of a fiduciary duty." *Eaves v. Penn*, 587 F.2d 453, 462 (10th Cir. 1978); *see also Free v. Briody*, 732 F.2d 1331, 1337 (7th Cir. 1984) ("ERISA grants the courts the power to shape an award [under § 409] so as to make the injured plan whole.").

---

A civil action may be brought—

. . . .

(2) by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title;

(3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan . . . .

71

"Among the factors which the court may consider in selecting a remedy are:  (1) the purposes of the trust; (2) the relative pecuniary advantages to the trust estate of the various remedies; (3) the nature of the interest of each beneficiary; (4) the practical availability of the various remedies; and (5) the extent of the deviation from the terms of the trust required by the adoption of each of the remedies."  *Eaves*, 587 F.2d at 462–63.

"[O]nce the ERISA plaintiff has proved a breach of fiduciary duty and a prima facie case of loss to the plan or ill-gotten profit to the fiduciary, the burden of persuasion shifts to the fiduciary to prove that the loss was not caused by, or his profit was not attributable to, the breach of duty."  *Martin v. Feilen*, 965 F.2d 660, 671 (8th Cir. 1992).  And "[i]n determining the amount that a breaching fiduciary must restore to the [ERISA plan] as a result of a prohibited transaction, the court 'should resolve doubts in favor of plaintiffs.'"  *Kim*, 871 F.2d at 1430–31 (quoting *Leigh I*, 727 F.2d at 138–39); *accord Sec'y of U.S. Dep't of Labor v. Gilley*, 290 F.3d 827, 830 (6th Cir. 2002) ("[T]o the extent that there is any ambiguity in determining the amount of loss in an ERISA action, the uncertainty should be resolved against the breaching fiduciary.").

When, as here, the alleged breach is the payment of an inflated stock price, equitable restitution is often measured by "'the difference between the price paid and the price that should have been paid.'"  *Neil v. Zell*, 767 F. Supp. 2d 933, 944 (N.D. Ill. 2011) (quoting *Reich v. Valley Nat'l Bank of Ariz.*, 837 F. Supp. 1259, 1289 (S.D.N.Y. 1993), and collecting cases).

The amount overpaid is based on the FMV, which has generally been described in various contexts as "the price that a willing buyer would pay a willing seller, both having reasonable knowledge of all relevant facts and neither being under any compulsion to buy or sell."  *Caracci v. Comm'r*, 456 F.3d 444, 456 (5th Cir. 2006) (per curiam).  The "willing buyer and seller are

hypothetical persons rather than specific individuals or entities, and their characteristics are not necessarily shared by the actual seller or particular buyer." *Id*. Nevertheless, "the valuation method must take into account, and correspond to, the attributes of the entity whose assets are being valued." *Id.*; *see also Eyler*, 88 F.3d at 451 (applying test in ESOP context).

In addition to equitable restitution, courts have broad equitable authority to award a surcharge in the amount of rescinded transactions. *See Gearlds v. Entergy Servs., Inc.*, 709 F.3d 448, 451 (5th Cir. 2013) (holding that "'an award of make-whole relief' in the form of surcharge was within the scope of 'appropriate equitable relief' for purposes of § 502(a)(3)" (quoting *CIGNA Corp. v. Amara*, 131 S. Ct. 1866, 1880 (2011))). A plaintiff may seek surcharge even when it is not expressly mentioned in the complaint if—as in this case—the complaint includes the generic request for all equitable remedies. *Id.* at 452.

When considering equitable remedies, "only such damages should be awarded as will place the injured party in the situation it would have occupied had the wrong not been committed." *Whitfield v. Lindemann*, 853 F.2d 1298, 1305–06 (5th Cir. 1988). Windfalls are not equitable.

Finally, it has been "generally held that, [w]hile the district court may not determine damages by speculation or guess, it will be enough if the evidence show[s] the extent of the damages as a matter of just and reasonable inference, although the result be only approximate." *In re Liljeberg Enters., Inc.*, 304 F.3d 410, 447 (5th Cir. 2002) (alterations in original) (internal quotation marks omitted).

b.       Mixed Questions of Law and Fact

The first task is to determine whether to grant rescission/surcharge or award equitable

restitution against the fiduciaries and BFLLC based on the overpayment.  The Secretary makes an

appealing argument that rescission avoids difficult factual finding regarding BAI's true FMV at

the time the transactions occurred.  Though tempting, the Court concludes that a FMV can be

determined without "speculation or guess."  *Id*.  And because FMV is considerably less than the

$8.77-million surcharge that would apply, rescission/surcharge would reflect windfall.

In reaching this conclusion, the Court also has considered the purpose of the Plan, which

is set forth in the ESOP document**:**

> The purpose of the Plan is to enable participating Employees to share in the
> growth and prosperity of Bruister and Associates and to provide Participants with
> an opportunity to accumulate capital for their future economic security.  The
> primary purpose of the plan is to enable Participants to acquire stock ownership
> interests in Bruister and Associates.

J-120 at 20.  This is not a case where participants claim the fiduciaries mismanaged a portfolio or

otherwise caused the stock to lose value.  The few BAI ESOP Participants who testified

understood that the intent was to acquire BAI stock, which is now worthless.  But under the

ESOP, the Participants had a reasonable expectation of purchasing that stock at a fair price.  So

the correct measure of damages is the amount they overpaid, not the difference in purchase price

and current price (*i.e.*, zero).  *Cf.*, *Chesemore v. Alliance Holdings, Inc*., 948 F. Supp. 2d 928

(W.D. Wis. 2013) (rejecting prayer for rescission that would award difference between stock's

purchase price and worthless current value because plaintiffs failed to prove fiduciary breaches caused lost value).[26]

Finally, Defendants argued that no equitable remedy can be awarded because Defendants cannot pay it.  The Court has not heard sufficient evidence on that issue to conclude that they are indeed judgment proof.

c.      Factual Findings

Determining the amount of overpayment is difficult but not impossible.  As the Fifth Circuit aptly noted in *Cunningham*, "[a]ppraisal of closely-held stock is a very inexact science" with a "level of uncertainty inherent in the process."  716 F.2d at 1473.  The truth of that statement is evident.  Each appraiser in this case employed several valuation approaches that included different methods and models.  For example, Defendants' expert Gregory Range used an income approach (for which he employed a discounted-cash-flow method ("DCF")) and a market approach (for which he used a guideline-public-company method and a merger-and-acquisition method).  He also considered, but did not use, an asset approach.  *See* J-52 at 24–26.  Each method within the experts' valuations involved a large number of judgment calls.

Not surprisingly, the different experts used different methods or applied the methods differently.  And where the methods overlapped, the experts made different judgment calls on the necessary data.  In some cases, the appraisers ran a single method multiple times utilizing different judgment calls.  Mercer, for example, used three different models for his DCF analysis, each one following the same formula but applying different assumptions.

---

[26]Had the Court ordered a surcharge, it would have awarded no prejudgment interest because it would add to the windfall.

Though their methods and judgments varied, the experts had one thing in common—they all used multiple methods to generate several estimates of BAI's FMV on the transaction dates. They then either averaged or somehow weighted the results to reach their ultimate conclusion. This methodology tempered the outliers that some methods produced.

The Court will take the same approach and average the appraisals to arrive at the FMV. This is not a matter of simply splitting the difference. Like each expert in this case, the Court is taking a number of valuations under different methods and assumptions and then combining the results to arrive at a figure. In this way, the Court's sample pool is larger than those averaged or weighted by the individual experts.

Importantly, this approach would be inappropriate in some cases—for example, if one expert was more credible than another. But in this case, the experts appear to evenly offset each other. In whole, no expert was more reliable than the others. They all had strengths and weaknesses. As Mercer observed, judgment calls are just that, and though he and Messina differed with Range on many of them, the Court cannot say that any one result was better.

Many of those differences turned on whether the appraiser saw BAI as a growth company. The parties agreed that FMV should be determined based on what was known or knowable on the date Donnelly reported. Given that scope, Range concluded that BAI remained a growth company in 2004 and 2005. He reached that conclusion based in part on his interviews with Defendants about how they saw things at that time. But those interviews occurred years after the transactions and after suit was filed. The information provided was not entirely consistent with the record (especially the emails from that period) and overestimated the company's projected EBITDA margins and long-term prospects.

76

Offsetting Range's optimism are pessimistic projections from Mercer and Messina, both of whom saw a no-growth company.  Mercer and Messina seemed to undervalue BAI's substantial revenue history, leading the Court to question whether they were, on some level, influenced by knowledge of BAI's ultimate demise.  And Messina, though impressive, seemed to approach the task from a buyer's perspective.  Again, the issues offset.

So too, the methodologies were not clearly correct or incorrect.  For example, Range made large adjustments under his guideline-public-company method that Mercer criticized as proving the method was inappropriate for this particular appraisal.  Conversely, Messina's report for the Secretary started with the assumption that the BAI financial statements were unworkable. Messina used some BAI data but generally ignored most of it, recreating the numbers by looking to industry norms.  Defendants take great issue with that approach, and it was admittedly different than Range and Mercer.  But neither of these controverted approaches were necessarily incorrect.  They were just different ways to address the same ultimate issue, and their validity rests on the validity of the judgment calls they required.

Thus, the Court believes that the various reports were of similar value.  Some decisions on both sides were more justifiable than others, and, at the risk of appearing jaded, it was not surprising that Plaintiffs' experts achieved low values and Defendants' expert achieved a high value.  For the same reason it is appropriate for the appraisal community to collectively consider the differing results from various valuation methods, models, and assumptions, it is appropriate in this case for the Court to do likewise.  Averaging the results mitigates the impact of those valuations that seemed less valid *on both sides*.

Looking then to the results, Range did not provide a single number, electing instead to provided a range.  The Court will take his average for each year (as Messina did in P-226) and average that number with an average from Messina and Mercer.  The FMVs from Mercer and Messina were close, and in the Court's opinion these low-side numbers should be averaged to avoid skewing the results.  Donnelly's reports will not be included because they are not credible. Indeed, Defendants made no real effort to validate his work.

Those calculations render the following results:

| Trans-action | Donnelly valuation / price per share (rounded to nearest dollar) | Donnelly purchase price for shares purchased | Court valuation / price per share rounded to nearest dollar | Court purchase price for shares purchased | Difference (overpayment) / percent overpaid |
|---|---|---|---|---|---|
| 12/04 | 33,629,500/ 67.00 | 6,700,000 | 29,114,725/ 58.00 | 5,800,000 | 900,000 / 13.4% |
| 9/05 | 38,099,600/ 76.00 | 1,199,999.72 | 30,353,125/ 61.00 | 963,157.67 | 236,842.05/ 19.7% |
| 12/05 | 38,911,000/ 78.00 | 10,507,421.34 | 26,304,250/ 53.00 | 7,139,658.09 | 3,367,763.25 32.1% |
| Totals | | | | | $4,504,605.30 |

After running these numbers, the Court compared them to Donnelly's valuations to see whether the results matched the evidence.  They do.  As noted above, Donnelly was motivated to inflate the valuations and did so.  The Court's FMV numbers are consistently below Donnelly's final results.  And the margin by which the numbers were inflated grows with each transaction, which is also consistent with the record evidence.  Finally, the Court's FMV for December 2005

78

is within the ballpark of BEAR's initial report for that transaction using Donnelly's initial judgments. Thus, before Donnelly "tweaked" the numbers to further increase value, the Donnelly/BEAR FMV was a little higher than, but comparable to, the Court's FMV for that transaction, which is what one would expect.

It is easy to pick apart these appraisals due to the significant number of subjective decisions upon which they rest. The Court's findings may be equally vulnerable. But in the end, the Court assesses damages based on a preponderance of the evidence, and details aside, the undersigned is comfortable with this approach and the results.

        3.     Debt

Having determined a FMV, the Court must decide whether the true measure of damages is the difference between the full contract price and the Court's FMV for each transaction *or* the difference between the amounts the ESOT actually paid and what it should have paid. The former would include the balance on the Acquisition Loans for the December 2004 and December 2005 transactions (September 2005 was an all-cash transaction). Defendants assert that such damages would constitute a windfall.

As noted earlier, the December 2004 and 2005 transactions were financed with Transition Loans. When BFLLC agreed to sell stock, the ESOT received loans from BAI, the stock that was not purchased with cash was placed in a suspense account held by BAI (not the seller BFLLC), and BAI released a proportional share of stock at year's end when the ESOT paid down principal using Employer Contributions. *See* D-225 at 109. According to the loan documents, BFLLC received a security interest in the Pledged Stock as collateral for the loans, but *BFLLC no longer owned the stock*, an arrangement that created immediate tax benefits for BAI.

79

The Fifth Circuit has not yet addressed this issue, but "every court to consider it has rejected the argument that ESOP acquisition loans should be discounted below face value for purposes of calculating damages because the debt is unlikely to be repaid." *Chesemore*, 948 F. Supp. 2d at 943; *see Henry v. U.S. Trust Co. of Cal., N.A.*, 569 F.3d 96, 100 n.4 (2d Cir. 2009) (rejecting argument that ESOP-acquisition loan should be deducted from plan losses because company later forgave loan and repurchased stock as part of ESOP termination); *Neil*, 767 F. Supp. 2d at 941–42 (holding, in case where stock was purchased but held in suspense account pending repayment of loan from seller, that "[t]he fact that the money to purchase the [now worthless] stock was borrowed does not mean that money was not lost"); *Valley Nat'l Bank of Ariz.*, 837 F. Supp. at 1287 (counting lost loan amounts in damages because purchase of the stock was an intended benefit under the plan).

The present case raises the same concerns.  The ESOT took on an obligation and under the various contracts expected to obtain Pledged Stock at a fair price.  In addition to those issues, the loans in this case were from BAI, not the seller BFLLC.  Whether the ESOT ever repaid its loans to BAI should not affect the fact that the ESOT purchased Pledged Stock from BFFLC at an inflated price.  If a buyer finances a purchase and pays a fraudulently inflated price, it will be entitled to the amount overpaid whether or not the buyer has repaid the original loan to a third party.  The same is basically true here.

Despite that analogy, which is consistent with that applied by other courts, the issue remains unclear and one that the Fifth Circuit might view differently.  Still, the Court holds that the full purchase price should be used to calculate damages.  That amount is $4,504,605.30.[27]

        4.      Prejudgment Interest

Plaintiffs seek prejudgment interest; Defendants claim that it was never requested and is not appropriate.

        a.      Conclusions of Law

Contrary to Defendants' argument, the *Rader* Plaintiffs seek prejudgment interest in their Second Amended Complaint.  *See* No. 3:13cv1081-DPJ-FKB, Docket Entry [343] at 27.  The Secretary's Second Amended Complaint is less specific but seeks "such . . . relief as may be equitable, just and proper."  Second Am. Compl. [286] at 24.  The Fifth Circuit has held that a similar blanket request "suffices to plead a claim for prejudgment interest."  *Fed. Sav. & Loan Ins. Corp. v. Tex. Real Estate Counselors, Inc.*, 955 F.2d 261, 270 (5th Cir. 1992).  And both the Secretary and the *Rader* Plaintiffs seek "appropriate legal and equitable relief" in the Pretrial Order.  Pretrial Order [604] at 3.

"The determination of whether prejudgment interest should be awarded requires a two-step analysis:  does the federal act creating the cause of action preclude an award of prejudgment interest, and if not, does an award of prejudgment interest further the congressional policies of the federal act."  *Carpenters Dist. Council of New Orleans & Vicinity v. Dillard Dep't Stores, Inc.*, 15 F.3d 1275, 1288 (5th Cir. 1994).  The Fifth Circuit has held that ERISA satisfies

---

[27]If the full contract price should not have been used, then the Court would order damages based on the amount overpaid on principal and interest ($1,394,268.34) plus prejudgment interest, explained *infra*, for a total of $2,009,598.07.

these inquiries.  *See Hansen v. Cont'l Ins. Co.*, 940 F.2d 971, 984 n.11 (5th Cir. 1991), *abrogated*

*on other grounds by CIGNA Corp. v. Amara*, 131 S. Ct. 1866 (2010).

When available, prejudgment interest "is not awarded as a penalty, but as compensation

for the use of funds." *Whitfield*, 853 F.2d at 1306.  The decision to award prejudgment interest

"is within the [district c]ourt's discretion." *Firman v. Life Ins. Co. of N. Am.*, 684 F.3d 533, 546

n.63 (5th Cir. 2012).  "Prejudgment interest is not granted 'according to a rigid theory of

compensation for money withheld, but is given in response to considerations of fairness.'"  *Id.*

"[W]hen awarding prejudgment interest in an action brought under ERISA, it is

appropriate for the district court to look to state law for guidance in determining the rate of

interest." *Hansen*, 940 F.2d at 983–84.  Under Mississippi law, a prejudgment interest rate of

8% per annum compounded annually has been held appropriate.  *See Baptist Mem'l Hosp.-*

*DeSoto, Inc. v. Crain Auto., Inc.*, No. 2:05CV166-SA, 2008 WL 4191737, at * 9 (N.D. Miss.

Sept. 9, 2008) (citing *Exxon Corp. v. Crosby-Miss. Res., Inc.*, 40 F.3d 1474 (5th Cir. 1995) (per

curiam); *Fred's Stores of Miss., Inc. v. M&H Drugs, Inc.*, 725 So. 2d 902, 921 (Miss. 1998) ("An

award of prejudgment interest is normally left in the discretion of the trial judge.  We find that

the trial court did not err in assessing interest at 8% . . . ." (citation omitted)).

Defendants do not suggest an alternative rate of prejudgment interest, and the Court

concludes that 8% is an appropriate rate under Mississippi law.  *Cf.* Miss. Code Ann. § 75-17-1

(setting 8% per annum rate for claims on "notes, accounts and contracts").  Prejudgment interest

will begin with the date the first suit was filed.  *See id.* § 75-17-7 (establishing that prejudgment

interest begins on "date determined by such judge to be fair but in no event prior to the filing of

the complaint"); *see also Sw. Recreational Indus., Inc. v. FieldTurf, Inc.*, No. 01-50073, 2002

WL 32783971, at *9 (5th Cir. Aug. 13, 2002) (holding that district court erred by failing to

follow prejudgment-interest accrual date in state statute).  Finally, the Court may take judicial

notice of the calculations necessary for prejudgment interest.  *Resolution Trust Corp. v. First Am.*

*Bank*, 155 F.3d 1126, 1129 (9th Cir. 1998).

> b.    Factual Findings

Prejudgment interest is appropriate in this case to fully compensate the ESOP

Participants.  It shall run from January 27, 2010, so the total award ($4,504,605.30) plus interest

($1,988,008.67) is $6,492,613.97.  That said, Defendants Smith and Henry are not required to

pay interest because neither received any of the funds.

> 5.    Injunctive Relief

The Court also grants injunctive relief prohibiting all Defendants from acting in the future

as fiduciaries or service providers to ERISA-covered plans, as they have engaged in egregious

misconduct.  *See Martin*, 965 F.2d at 672.

> 6.    Joint and Several Liability

The Court finds that the individual defendants are jointly and severally liable for the

overpayment pursuant to 29 U.S.C. § 1109(a).  BFLLC is jointly and severally liable with the

other Defendants for the amounts it received as a matter of equitable restitution under

§ 502(a)(3).  *See Cunningham v. Dun & Bradstreet Plan Servs., Inc.*, 105 F.3d 655, No. 95-

60416, 1996 WL 762915, at *1 (5th Cir. Dec. 19, 1996) ("A grant of equitable restitution . . . is

warranted only when the defendant has profited unjustly at the plaintiff's expense.").

The amount for which BFLLC shares liability is $885,065.25.  This figure represents the

overpayment on amounts actually received by BFLLC and does not include the overpayment on

the $3.8 million that the ESOP paid to BAI but BAI never paid to BFLLC.[28]   BFLLC is liable for prejudgment interest on this amount ($390,604.12) for a total $1,275,669.37.

> 7.     Attorneys' Fees

After judgment is entered, attorneys' fees will be addressed upon motion.  29 U.S.C. § 1132(g); *see also Ray Haluch Gravel Co. v. Cent. Pension Fund of Int'l Union of Operating Eng'rs & Participating Emp'rs*, 134 S. Ct. 773, 777 (2014) ("[T]he pendency of a ruling on an award for fees and costs does not prevent, as a general rule, the merits judgment from becoming final for purposes of appeal.").

## III.   Conclusion

For the reasons stated, the Court finds that Defendants Bruister, Smith, and Henry are jointly and severally liable in the amount of $4,504,605.30.

Defendant Bruister is also liable for $1,988,008.67 in prejudgment interest.

Defendant BFLLC is jointly and severally liable with all Defendants for $885,065.25 in equitable restitution, and jointly and severally liable with Defendant Bruister for $390,604.12 in prejudgment interest.

These awards shall be paid to the benefit of the Plan.

**SO ORDERED AND ADJUDGED** this the 16th day of October, 2014.

s/ *Daniel P. Jordan III*
UNITED STATES DISTRICT JUDGE

---

[28]Plaintiffs did not attempt to establish that receipt of the funds by BAI amounted to receipt by BLFFC under an alter-ego theory, but if the record had supported such a finding, the restitution amount for which BFLLC would have been liable would equal $1,394,265.25.