IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

THOMAS E. PEREZ, Secretary of
the United States Department of Labor                                                    PLAINTIFF

v.                                                                   CIVIL ACTION NO. 3:13cv1001-DPJ-FKB

HERBERT C. BRUISTER, et al.                                                            DEFENDANTS

consolidated with

JOEL D. RADER and VINCENT SEALY
                                                                                                    PLAINTIFFS

v.                                                                   CIVIL ACTION NO. 3:13cv1081-DPJ-FKB

HERBERT C. BRUISTER, et al.                                                            DEFENDANTS

ORDER

This ERISA action is before the Court on the following motions:  (1) Defendants' Motion to Stay Enforcement of Judgments [722]; (2) the Secretary of Labor's Motion for Contempt [726]; (3) Defendants' Motion for Relief from Injunction [747]; and (4) Defendants' Motion for Disqualification, for Protective Order, and to Claw-Back Improperly Acquired Communications and Information [810].  Having fully considered the premises, the Court concludes that the motion to stay [722] should be granted in part; the motion for contempt [726] should be denied without prejudice to refiling; the motion for relief [747] should be denied; and the motion for "claw back" and disqualification [810] should be denied.

I.      Background

This Order is primarily written for the benefit of the parties and the record.  It assumes familiarity with the general facts of the underlying case and the more specific facts related to the present motions.  In general terms, Defendants appealed the judgments, but never posted a

supersedeas bond. As a result, Plaintiffs began aggressive collection efforts while also defending their judgments on appeal. Early in that process, Plaintiffs obtained a restraining order that froze Defendant Herb Bruister's assets due to apparent efforts to hide or otherwise encumber those assets. As discovery and collection efforts continued, they spawned further dispute, ultimately resulting in the four pending motions. The first three motions were the subject of a three-day evidentiary hearing, follow-up telephonic conferences, and other communications with counsel. The final motion has a distinct procedural history that will be addressed later.

II.     Analysis

   A.     Motion to Stay Enforcement of Judgments [722]

In this motion, Defendants[1] seek an order lifting the freeze on Mr. Bruister's assets and staying execution of the judgments pending appeal. While they invoke various rules of procedure, it seemed clear after the hearing that the only viable argument flows from Rule 62(d) of the Federal Rules of Civil Procedure. The rule states that "[i]f an appeal is taken, the appellant may obtain a stay by supersedeas bond . . . . The bond may be given upon or after filing the notice of appeal or after obtaining the order allowing the appeal. The stay takes effect when the court approves the bond." Fed. R. Civ. P. 62(d).

In *Poplar Grove Planting & Refining Co. v. Bache Halsey Stuart, Inc.*, the Fifth Circuit explored the relevant issues and explained Rule 62(d)'s policy goals:

---

[1] Two of the original defendants have now settled, leaving Herbert Bruister as the only individual defendant along with other entities. While all remaining defendants brought this motion, the focus is on Mr. Bruister.

> The purpose of a supersedeas bond is to preserve the status quo while protecting the non-appealing party's rights pending appeal.  A judgment debtor who wishes to appeal may use the bond to avoid the risk of satisfying the judgment only to find that restitution is impossible after reversal on appeal.  At the same time, the bond secures the prevailing party against any loss sustained as a result of being forced to forgo execution on a judgment during the course of an ineffectual appeal.

600 F.2d 1189, 1190–91 (5th Cir. 1979).

These dueling goals are present in this case.  Plaintiffs seek to enforce judgment by taking real and personal property that could not be restored if Defendants prevail on appeal.  At the same time, the Court is now convinced that Defendants took steps post-judgment to frustrate collection efforts.  Accordingly, the ruling on this matter must maintain the status quo without jeopardizing the potential for ultimate recovery.

Normally, these goals are accomplished by posting full security.  *Id.* at 1191.  But discretion exists.

> The predecessor to present Fed. R. Civ. P. 62(d), originally Civil Rule 73(d), had directed that the amount of the bond be computed by the district court to include "the whole amount of the judgment remaining unsatisfied, costs on the appeal, interest, and damages for delay, *unless the court after notice and hearing and for good cause shown fixes a different amount or orders security other than the bond*." Although the present rule does not by its terms precisely define the amount and conditions of a supersedeas bond, it has been read consistently with the earlier rule.

*Id.* (emphasis added).  Thus, when the judgment debtor shows that "posting of a full bond would impose an undue financial burden, the court . . . is free to exercise a discretion to fashion some other arrangement for substitute security through an appropriate restraint on the judgment debtor's financial dealings, which would furnish equal protection to the judgment creditor." *Id.*

3

Bruister contends that he cannot afford to post bond, and after three days of evidence, the Court would agree. As an initial matter, the judgments in these consolidated cases now exceed $10 million, and it does not appear that Bruister has assets anywhere near that amount. In a 2011 financial statement, Bruister and his wife appeared to have a combined net worth of $7.1 million. *See* Ex. P-19 at 2. But Mr. Bruister's personal net worth was listed at $921,400. And those were better times; the numbers included considerable assets that either no longer exist or are now in Plaintiffs' hands.

As for Bruister's financial condition today, Plaintiffs' counsel has conducted tedious discovery and believes Bruister's assets total somewhere between $2 and $4 million. But those figures reflect assets, not net worth, and again they include assets that are held by Mr. Bruister with others (primarily his wife). They also include assets exempt from execution.[2]

Having heard the testimony, the Court is left with the impression that other than assets already under Plaintiffs' control, there are few viable assets that could be liquidated to post a bond. In fairness though, Bruister was at times unable to give concrete answers to many of Plaintiffs' questions. Bruister has also made clumsy attempts to avoid judgment and has not fully complied with discovery. To further complicate matters, Bruister has had a substantial number of business dealings, many of which appear to have been based on nothing more than a handshake. Others involved complicated, lawyer-driven structures. So while he testified under oath that he is not aware of any additional assets, question lingers whether all assets have been disclosed.

---

[2]There is a significant question whether collection should fall under the Federal Debt Collection Procedures Act or under Mississippi law. Either would exempt certain property from execution.

The Court will address that concern when discovery resumes, but concludes for now that other evidence supports Bruister's contention that he cannot post a bond of any meaningful amount. First, there are emails in the record where one of Bruister's friends chastised him for having his assets in his own name. *See* Ex. P-17. This at least suggests that before judgment the assets were not hidden. Second, there is no dispute that his primary source of income is now defunct and that he is unemployed. Third, he and his wife testified that they are behind on their taxes. Fourth, there seems to be no dispute that Bruister is in default on certain loans and may lose his property to foreclosure. Fifth, his wife sold her mother's home (which would be exempt from judgment) in order to pay their bills. Sixth, they have borrowed $25,000 from a friend to stay afloat. It is unlikely the Bruisters would take these steps if they indeed held the funds necessary to pay their bills, much less post a bond. Accordingly, the Court will fashion security that maintains the status quo protecting real and personal assets while also protecting Plaintiffs' ability to collect whatever is collectable after appeal.

To begin, it appears that the injunction freezing Bruister's assets has been effective in maintaining the status quo and that Plaintiffs would not be protected without it. The freeze remains in place. Second, Bruister will be required to offer substitute security consistent with the security he offered in his motion and in post-hearing communications. The security is as follows:

- Life Insurance Maturity Contracts (Viaticals)- Perhaps the most significant asset available is the portfolio of policies the parties have referred to as viaticals. This asset could be worth several million dollars, but it could also be worth far less depending on how it is managed. Regardless, there is already an agreed order [757] that allows Plaintiffs to sell the policies with funds to be paid in part into the Court. That agreement is incorporated herein by reference and preserves Plaintiffs' interests.

- Mr. and Mrs. Bruister's Home- The parties dispute whether the home would be exempt.  As security, Bruister shall toll all arguments related to the property and otherwise preserve Plaintiffs' rights to assert any arguments regarding this property at a later date.

- Other Real Property- Bruister will execute quitclaim (or equivalent) deeds regarding real property and provide them to the Court.  If Plaintiffs ultimately prevail, the Court will release the deeds to Plaintiffs to be recorded.  If Mr. Bruister ultimately prevails, the deeds will be returned to him.  The property includes:  (1) Mr. Bruister's 50% interest in two lots identified as Lots 32 and 33, Fernwood Subdivision; and (2) Mr. Bruister's 1/3 interest in real property located in Alabama.

- Timber Proceeds- Any proceeds from timber that may be cut in Alabama will be deposited into the registry of the Court.

- Life Insurance- Bruister shall assign and surrender one of his two life-insurance policies to Plaintiffs.  If Plaintiffs elect to sell the policy, the proceeds would be deposited into the registry of the Court pending the outcome of the appeal.  Likewise, death benefits would be paid to the registry of the Court if applicable.  Bruister is not permitted to sell the other policy absent further Court order or agreement of the parties.

- Carpet Mart Warehouse- Bruister has an interest in a warehouse, but it appears that he is in arrears and foreclosure is likely.  He is prepared to offer his interest, such that it is, as security.  The Court orders that the interest in the warehouse should be offered as security, and the parties may elect the best means for accomplishing that goal.

- "Mom B's House"- Bruister has an interest in his mother's home and proposes that it be immediately placed on the market with net proceeds paid into the registry of the Court.  Alternatively, he offers to transfer the deed to Plaintiffs in exchange for a fixed credit against the Judgments.  The Court orders that the interest in the home should be offered as security, and the parties may elect the best means for accomplishing that goal.

- Potential Claims- Bruister may have potential claims for reimbursement from Quicksilver, Mike Bruce, and Brad Jones.  It seems unlikely that much if anything could come from these claims.  But to the extent there are potential claims, they will be offered as security, and Bruister is expressly directed to assist Plaintiffs in pursuing those claims.  Any proceeds will be deposited into the registry of the Court.

- Vehicles- In his motion, Bruister agreed to offer four vehicles as security, a 1978 truck, a 2000 Lexus, a 2004 Lexus, and a 2008 Mercedes. Those vehicles will be part of the security and will be transferred to Plaintiffs should they ultimately prevail.

Having heard the testimony, the Court believes that these assets represent the bulk of the readily available funds and that these provisions coupled with the continuation of the order freezing assets will maintain the status quo.[3] Accordingly, Bruister is given 14 days to comply with this order. Thereafter, an order will be entered staying the proceedings under Rule 62(d).

B. Motion for Contempt [726]

Plaintiff the Secretary of Labor seeks an order holding Bruister in contempt for not paying the judgments within 14 days after they were entered. The Secretary relies primarily on Rule 62(a), which states that "[e]xcept as stated in this rule, no execution may issue on a judgment, nor may proceedings be taken to enforce it, until 14 days have passed after its entry." According to Plaintiff, this rule, coupled with the Court's judgments, created an affirmative duty to pay the judgments 14 days after they were entered.

The Court is not convinced that Rule 62(a) functions this way or that a clear order has been issued directing Bruister to pay the judgments by a date certain. Nevertheless, the issue is now moot because the stay would impact the opportunity to purge the contempt. In addition, if Plaintiffs ultimately prevail, the security that has been offered would immediately fall into their hands and constitute a good first step toward satisfying the judgments. This would be consistent

---

[3] During the hearing, Plaintiffs suggested that Bruister could assign his potential malpractice claims to them and that this constituted an asset that should be considered with respect to his ability to post bond. Bruister did not rule out an assignment, but would not do so absent a settlement of all outstanding claims. The Court believes it would be improvident to inject itself into this issue.

with initial efforts to purge contempt anyway. Accordingly, the motion is denied without prejudice.[4]

      C.      Motion for Relief from Injunction [747]

Defendants seek relief from the order freezing their assets as it relates to the Carpet Mart Warehouse. The motion was based on certain representations about what the lender would be willing to do, but those representations proved false. The motion is therefore denied. That said, the interest in this property has been offered as security, and the parties may explore and decide upon the best handling of the property.

      D.      Motion to Claw-Back and Disqualify [810]

In very general terms, Defendants contend that Plaintiffs improperly obtained privileged documents from their former jointly represented co-defendant Jonda C. Henry. They now seek return of those documents and broad disqualification of Plaintiffs' counsel.

On October 7, 2015, the Court issued a partial ruling on Defendants' Motion. *See* Oct. 7, 2015 Order [834]. In it, the Court concluded that if Henry assigned her claims to Plaintiffs, then she was free to produce her documents. But the Court expressed concern that Henry may have produced documents before the assignment occurred. Accordingly, the Court conferred with all counsel and entered a second Order [835] directing Henry and her former counsel Thomas Bittick to explain when the documents were produced. The Court also directed Plaintiffs to

---

[4]Plaintiff also contends that Bruister has attempted to frustrate execution and has not been diligent regarding execution-related discovery. While these latter arguments are not the basis of Plaintiff's motion, the Secretary contends that they are probative of a lack of good faith. The Secretary has a legitimate point, which is why Bruister's assets remain frozen. If Plaintiffs ultimately prevail, any holes in discovery will be immediately addressed.

provide both the Court and Defendants electronic copies of the documents Henry produced. Finally, the Court withheld its ruling on the motion to disqualify.[5]

           1.       Receipt of Confidential Information

Having now reviewed the additional information, the Court has little trouble finding that no confidential information was shared before Plaintiffs obtained an assignment of Henry's claims against Defendants. The original concern grew from Plaintiffs' request that Henry make a "proffer" before a settlement was reached. There has never been any evidence that she actually produced any documents in response to that request, and Henry now makes clear that she did not. According to her affidavit, Henry was uncomfortable making a proffer before obtaining a solid agreement. *See* Henry Aff. ¶ 2.[6] She stated, "On the advice of Mr. Bittick, I did not provide the Plaintiffs' [sic] with any information or documents prior to the time the agreement was finalized." *Id.* ¶ 5. She concluded, "I never shared any type of confidential information or documents with the Plaintiffs prior to us having a final agreement and I am not aware of anyone else sharing any such information on my behalf." *Id.* ¶ 8.

Henry's statements are consistent with those from Plaintiffs' counsel and Bittick. First, during the telephonic conference, Plaintiffs' counsel Charles Yezbak represented that Henry

---

[5]The Court's initial Order summarily rejected Defendants' other arguments made in response to Plaintiffs' assignment analysis. For clarity in the record, those arguments included: (1) Plaintiffs relied on non-binding authority; (2) a valid wavier did not occur because "there is no litigation pending between Mrs. Henry and Defendants"; and (3) Plaintiffs' counsel coerced Henry to settle. *See* Defs.' Reply [827] at 7–8. None of these were legally supported, and the third has now been repudiated in Henry's affidavit. *See* Henry Aff. ¶ 4.

[6]Plaintiffs were previously instructed to file the affidavits, but it appears that they were merely served. Plaintiffs should therefore file the Henry and Bittick affidavits in the record if they have not done so.

pushed back when asked for a proffer and did not provide documents or substantive information until the ink was dry.  Similarly, Bittick states in his affidavit, "To the best of my knowledge Mrs. Henry never provided any information, either by way of document productions or communications with the Plaintiffs, until after her agreement with the Plaintiffs was finalized." Bittick Aff. ¶ 10.  And nothing in the documents that have now been submitted would suggest that Henry produced them before the parties' agreement.  Accordingly, the evidence does not support a finding that Henry produced anything before she assigned her claims to Plaintiffs.  The claw-back motion and the motion for protective order are denied.

Finally, although the Court has already ruled that the assignment of claims allowed Henry to produce her documents, a review of what she produced shows that privilege either never attached or would have been otherwise waived as to a large number of the communications.  It is true that many emails passed between Defendants and their joint counsel.  But a significant number did not.  Some were between Henry and the other Defendants without copies to counsel.  Others were exclusively between Henry and individually retained attorneys. And many more were shared with various third parties, including Plaintiffs' counsel.

       2.       Disqualification

Defendants argue that even assuming a valid assignment, Plaintiffs' counsel should be disqualified.  *See* Defs.' Mem. [811] at 13.  They rely primarily on *Wilson P. Abraham Construction Corp. v. Armco Steel Corp.*, though that case is readily distinguishable.  559 F.2d 250, 253 (5th Cir. 1977).

In *Abraham Construction*, an attorney represented one of several companies facing a grand-jury investigation and attended meetings with those eventual co-defendants.  *Id.* at 252.

Later, that same attorney was asked to represent the plaintiffs in a civil action against his former client's co-defendants. *Id.* The Fifth Circuit ruled that the attorney was disqualified, holding that the prohibition against representation adverse to a former client in "substantially related" matters applied to the client's co-defendants. *Id.* at 253.

> Just as an attorney would not be allowed to proceed against his former client in a cause of action substantially related to the matters in which he previously represented that client, an attorney should also not be allowed to proceed against a co-defendant of a former client wherein the subject matter of the present controversy is substantially related to the matters in which the attorney was previously involved, and wherein confidential exchanges of information took place between the various co-defendants in preparation of a joint defense.

*Id.*

As the Fifth Circuit explained, there is an expectation that a co-defendant's counsel will not obtain information based on a common legal interest and then use it against the former client or a co-defendant. *Id.* at 252. Such maneuvering would raise obvious conflicts of interest. But that is not what happened in the present case. None of the Plaintiffs' attorneys ever represented Bruister, Henry, Smith, or any other defendant, so they have never had a duty of loyalty to them. Moreover, they have not taken information gained through a joint defense and then represented some third-party based on that information. Instead, they have stepped into Henry's shoes and now pursue her claims. The expectations of confidentiality are different when joint defendants are concerned. This is simply not the same conflict of interest that *Abraham Construction* addressed. The motion is therefore denied.

III.     Conclusion

The Court has considered all of the parties' argument.  Those not specifically addressed would not have changed the outcome.  For the foregoing reasons, the motion to stay [722] is granted to the extent execution is stayed but denied to the extent it seeks an order lifting the freeze; the motion for contempt [726] is denied without prejudice to refiling; the motion for relief [747] is denied; and the motion for "claw back" and disqualification [810] is denied.

**SO ORDERED AND ADJUDGED** this the 5th day of February, 2016.

s/ *Daniel P. Jordan III*
UNITED STATES DISTRICT JUDGE