# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

May 3, 2016

Lyle W. Cayce
Clerk

No. 14-60811

THOMAS E. PEREZ, SECRETARY, DEPARTMENT OF LABOR,

Plaintiff - Appellee Cross-Appellant

v.

HERBERT BRUISTER,

Defendant - Appellant Cross-Appellee

*************************************************************************
cons/w No. 14-60816

THOMAS E. PEREZ, SECRETARY, DEPARTMENT OF LABOR,

Plaintiff

v.

HERBERT BRUISTER,

Defendant

*******************************

VINCENT SEALY,

Plaintiff - Appellee

v.

HERBERT C. BRUISTER; BRUISTER FAMILY L.L.C.,

Defendants - Appellants

No. 14-60811
cons/w No. 14-60816

_____

Appeals from the United States District Court
for the Southern District of Mississippi

_____

Before JOLLY, JONES, and BENAVIDES, Circuit Judges.

EDITH H. JONES, Circuit Judge:

This appeal raises numerous issues involving the sale of closely-held stock from a corporation's owner to its tax-preferred Employee Stock Ownership Plan. "The . . . dispute is whether individual Defendants breached fiduciary duties under ERISA when [allegedly] acting as trustees for an Employee Stock Ownership Trust ("ESOT") that purchased company stock for an Employee Stock Ownership Plan ("ESOP"). Plaintiffs claim Defendants paid too much for the stock."[1] *Perez v. Bruister*, 54 F. Supp.3d 629, 637 (S.D. Miss. 2014). There are also numerous valuation and remedies issues, over which the parties have fought bitterly. We largely affirm the district court's thorough and conscientious opinion under a clearly erroneous standard of review, but also clarify some of the legal issues surrounding leveraged ESOP sales presented by this case.

## BACKGROUND

The lengthy briefs and voluminous record obscure that relatively simple facts are germane to each issue on appeal. We first provide a general background and elaborate on the facts as necessary in the following sections. This foreshortening is made easier by the comprehensive opinion of the district

_____

[1] This case actually involves two complementary ERISA plans: the Bruister & Associates Employee Stock Ownership Plan and the Bruister & Associate Eligible Individual Account Plan. Both plans were operated through a single trust. Throughout the litigation, the parties and the district court referred to the plans and the trust collectively as the "ESOP." We follow that convention.

2

No. 14-60811
cons/w No. 14-60816

court, to which we make repeated reference. *Perez v. Bruister*, 54 F. Supp.3d 629 (S.D. Miss. 2014). We have given a sketch of a typical ESOP in an earlier case:

> An employer desiring to set up an ESOP will execute a written document to define the terms of the plan and the rights of beneficiaries under it. 29 U.S.C. § 1102(a) (1976). The plan document must provide for one or more named fiduciaries "to control and manage the operation and administration of the plan." *Id.*, § 1102(a)(1). A trust will be established to hold the assets of the ESOP. *Id.*, § 1103(a). The employer may then make tax-deductible contributions to the plan in the form of its own stock or cash. If cash is contributed, the ESOP then purchases stock in the sponsoring company, either from the company itself or from existing shareholders. Unlike other ERISA-covered plans, an ESOP may also borrow in order to invest in the employer's stock. In that event, the employer's cash contributions to the ESOP would be used to retire the debt.

*Donovan v. Cunningham*, 716 F.2d 1455, 1459 (5th Cir. 1983).

Bruister and Associates, Inc. ("BAI"), was a Mississippi-based Home Service Provider ("HSP") that installed and serviced satellite-television equipment for its sole client, DirecTV. It set up an ESOP conforming to the above sketch for its employees. In a three-year period from 2002 to 2005, BAI's owner Herbert C. Bruister ("Bruister") sold 100% of his BAI shares (also representing 100% of BAI's outstanding shares) to BAI's employees through a series of transactions with the ESOP. In all, five transactions occurred, but the first two are time-barred and no longer in dispute. Bruister personally owned the stock sold in these two transactions. The final three transactions closed on December 21, 2004, September 13, 2005, and December 13, 2005. Bruister had by this time transferred his BAI stock to the Bruister Family LLC ("BFLLC"), which he and his wife controlled each as 50% members. The ESOP

3

No. 14-60811
cons/w No. 14-60816

bought BAI stock from BFLLC for a mix of cash and notes. The following table summarizes the subject transactions, *see Perez*, 54 F. Supp.3d at 638-39:

| Table 1 | | | | |
|---|---|---|---|---|
| Transaction | Contract Price (Donnelly Price) | Cash Down Payment from ESOP | Amount of Note Issued by ESOP | Total Cash Eventually Paid by ESOP (Down plus Principal & Interest Payments on Notes) |
| 12/21/2004 (100,000 shares, 20% outstanding BAI stock) | $6,700,000 ($67.00/share) | $730,000 | $5,970,000 | $6,815,876.95 |
| 9/13/2005 (789.47 shares, 3.16% outstanding BAI stock) | $1,199,999.72 ($76.00/share) | $1,199,999.72 | N/A | $1,199,999.72 |
| 12/13/2005 (134,710.53 shares, 26.94% outstanding BAI stock) | $10,507,421.34 ($78.00/share) | N/A | $10,507,421.34 | $761,823.63 |

Bruister, Amy O. Smith ("Smith"), and Jonda C. Henry ("Henry") served as named trustees of the ESOP. Bruister owned BAI and ran it, Smith worked for BAI, and Henry was BAI's outside CPA. *Perez*, 54 F. Supp.3d at 637-38. All three were named defendants in the district court, but Henry was voluntarily dismissed during the pendency of this appeal. BFLLC is an

4

No. 14-60811
cons/w No. 14-60816

interested party and is a named Defendant on appeal. Bruister, Smith and BFLLC are collectively described as "Defendants," unless the context indicates otherwise.

The trustees set the sales price for each transaction based on valuations of BAI's fair market value ("FMV") performed by Matthew Donnelly ("Donnelly"). The parties dispute whether Donnelly was truly independent and whether the trustees' reliance on his valuations was reasonably justified. The plaintiffs' basic claim is that the valuations were inflated, which caused the ESOP, and therefore BAI's employees, to pay too much for the BAI stock it bought from BFLLC. *Perez*, 54 F. Supp.3d at 639. BAI suffered serious business reverses and went out of business in August 2008.

The Secretary of the Department of Labor ("Secretary") brought a civil action on April 29, 2010, raising claims for breach of fiduciary duty under ERISA § 404(a)(1)(A); for engaging in prohibited transactions under ERISA § 406; for failure to monitor (against Bruister in his capacity as a corporate director of BAI) under ERISA § 404(a)(1)(A); and co-fiduciary liability under ERISA § 405. Two plan participants, Joel D. Rader[2] and Vincent Sealy ("Sealy"), filed a civil action raising generally the same claims as the Secretary and seeking relief on behalf of the ESOP as a whole. The cases were consolidated and the district court conducted a 19-day bench trial during which it considered the testimony of 13 live witnesses, 390 exhibits, and 42 depositions of 18 different witnesses. It ruled in favor of the Secretary and/or Sealy on all claims. *Perez*, 54 F. Supp.3d at 648-81. It awarded $4,504,605.30 in "equitable restitution," or damages, which is the amount it calculated the

---

[2] Rader is not a party on appeal as his standing was challenged post-trial and the district court did not enter judgment in his favor.

No. 14-60811
cons/w No. 14-60816

Defendants caused the ESOP to overpay for the BAI stock, computed as follows, *id.* at 678-79:

| Table 2 | | | | |
|---|---|---|---|---|
| Transaction | Contract Price (Donnelly Price) | Court FMV (Fair Price) | Overpayment (Dollars) | Overpayment (Percent) |
| 12/21/2004 | $6,700,000.00 | $5,800,000.00 | $900,000.00 | 13.4% |
| 9/13/2005 | $1,199,999.72 | $963,157.67 | $236,842.05 | 19.7% |
| 12/13/2005 | $10,507,421.34 | $7,139,658.09 | $3,367,763.25 | 32.1% |
| Totals | | | $4,504,605.30 | |

It also held Bruister alone liable for $1,988,008.67 in prejudgment interest. *Id.* at 679-81. Of these amounts, the district court held BFLLC jointly and severally liable for $885,065.25 in damages and $390,604.12 in prejudgment interest, or $1,275,669.37 total. *Id.* at 681. Defendants timely appealed each case, the Secretary cross-appealed on the remedy, and all appeals were consolidated in this Court.

## DISCUSSION

## I. Sealy's Standing to Sue on Behalf of the ESOP

ERISA § 409(a), 29 U.S.C. § 1109(a), provides that a fiduciary who breaches a duty "shall be personally liable to make good to such plan any losses to the plan resulting from each such breach . . . and shall be subject to such other equitable or remedial relief as the court may deem appropriate." Both the Secretary and plan beneficiaries like Sealy are authorized to bring a civil action "for appropriate relief under [ERISA § 409]." ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2). The Defendants assert that the district court erred by allowing Sealy to pursue a claim on behalf of the ESOP and its beneficiaries without seeking class certification or the court's affording other safeguards for

No. 14-60811
cons/w No. 14-60816

the absent beneficiaries' interests.[3]  This has been characterized as an issue of
Sealy's standing to sue.  *See Bendadoud v. Hodgson,* 578 F.Supp.2d 257, 263-
68 (D.Mass. 2008).  We review the legal question of standing *de novo* and the
underlying fact issues for clear error.  *Metzler v. Graham,* 112 F.3d 207, 209
(5th Cir. 1997).

    Sealy's claims fully overlap those brought by the Secretary, thus Sealy's
individual standing will not affect issues of liability or remedy.   The
Defendants are, however, laying the groundwork to attack Sealy's attorneys'
fee claim, *see* ERISA § 502(g), 29 U.S.C. § 1132(g), based on the extent of his
contribution to the lawsuit's prosecution and whether the recovery is for him
or for the entire plan and all beneficiaries.  That attack is premature[4] and the
contentions raised by Defendants to Sealy's prosecution of his suit are
groundless on the facts of this case.  The Supreme Court has held that claims
for relief under ERISA § 502(a)(2) must inure to the benefit of the plan as a
whole, not to individual beneficiaries.  *Mass. Mutual Life Ins. Co. v. Russell,*
473 U.S. 134, 139-44, 105 S. Ct. 3085, 3088-91 (1985).  But the Court expanded
on this statutory interpretation by affording a remedy to a defined contribution
plan participant to recoup the impaired value of plan assets "in a participant's
individual account [when] caused by fiduciary breach."  *LaRue v. DeWolff,*
*Boberg & Assocs.,* 551 U.S. 248, 256, 128 S. Ct. 1020, 1022-23 (2008).  In this
case, the "loss[] to the plan" is the amount that the ESOP overpaid for BAI
stock.  Consequently, the losses suffered by the participants in the ESOP are
coterminous with those of the plan, and Sealy's individual claim is proportional

---

[3] The district court allowed Rader to do so as well, but he is not a party to this appeal.

[4] We do not speculate on the extent to which dual prosecution of this by both Sealy
and the Secretary, the latter of whom is a public entity charged with using public resources
to protect the public, may or should affect Sealy's entitlement to attorneys' fees.

7

No. 14-60811
cons/w No. 14-60816

to the claims and losses of fellow participants.  The district court found as a
fact that Sealy has "consistently advanced the interests of the Plan as a whole
and make[s] no claim for individual recovery."  *Perez,* 54 F. Supp.3d at 650.
Sealy is seeking a plan remedy for alleged breaches of duty to the ESOP as a
whole.

The theoretically difficult question raised by the Defendants is whether
Sealy was required to sue as a class representative, or the court was required
to impose safeguards to ensure that all class members are notified, fairly
treated, and not disadvantaged by self-interested prosecution of the claims.
Although the district court here imposed no such safeguards, this court has
implicitly approved the use of class actions to obtain relief for alleged ERISA
plan-wide violations.  *See, e.g., Bussian v. RJR Nabisco, Inc.,* 223 F.3d 286,
293, 308 (5th Cir. 2000) (ERISA plan beneficiary filed class action to challenge
trustees' plan termination arrangements).  The Second Circuit has grappled
with, but ultimately did not have to decide, the scope of the courts' and would-
be plan representatives' duties to absent plan members in ERISA fiduciary
duty cases.  *See Coan v. Kaufman,* 457 F.3d 250, 259-62 (2d Cir. 2006).  *Coan*
drew from principles of trust law that underlie ERISA and FED. R. CIV. P. 23
prerequisites to discuss adequacy of representation, proper proceeds
distribution in the event of a favorable recovery, prevention of self-dealing by
the group representative, and the correct application of *res judicata*.  If Sealy,
with only one or two other participants, had pursued this case independently,
we would have to confront these issues.  In theory, there is no difference
between plan participants and class members vis-à-vis the need to protect
absentees' rights in representative litigation.  As it is, the Secretary's
participation here, and the joinder of the cases for trial and judgment,
eliminates concerns about protecting the absent participants' interests.

No. 14-60811
cons/w No. 14-60816

## II.    Liability

The plaintiffs pursued liability under two direct theories:  breach of the duty of loyalty, ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), and engaging in prohibited transactions, ERISA § 406, 29 U.S.C. § 1106.  ERISA imposes liability on "[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries." ERISA § 409(a), 29 U.S.C. § 1109(a).  Bruister, however, raises a threshold question whether he was a fiduciary with respect to the challenged transactions.  We review this question first, followed by the liability issues. "[T]he question whether [Defendants] are ERISA fiduciaries is a mixed question of fact and law," with the factual components reviewed for clear error and the legal conclusions drawn therefrom reviewed de novo.  *Reich v. Lancaster*, 55 F.3d 1034, 1044-45 (5th Cir. 1995).  Regarding liability, "[w]e review the district court's [other] factual findings and inferences under a clearly erroneous standard and its [other] legal conclusions de novo." *Metzler*, 112 F.3d 207, 209 (5th Cir. 1997).

### A. Bruister as a Fiduciary

A person assumes fiduciary status in three ways under ERISA: first, as a named fiduciary in the instrument establishing the employee benefit plan, ERISA §§ 402(a)(1)-(2), 29 U.S.C. §§ 1102(a)(1)-(2); second, by becoming a named fiduciary pursuant to a procedure specified in the plan instrument, ERISA § 402(a)(2), 29 U.S.C. § 1102(a)(2); third, as a "functional fiduciary" under the broad authority, control, or advice provisions of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).  *Jordan v. Fed. Express Corp.*, 116 F.3d 1005, 1014 n.16 (3rd Cir. 1997).  Unlike in trust law, ERISA does not prevent persons with "conflicting loyalties"—such as a financial interest adverse to that of the ESOP beneficiaries—from serving as a trustee or named fiduciary of the plan.  *See*

9

No. 14-60811
cons/w No. 14-60816

*Martinez v. Schlumberger, Ltd.*, 338 F.3d 407, 412 (5th Cir. 2003). "To assist in resolving this potential conflict, the Supreme Court created the 'two hats' doctrine, which acknowledges that the [fiduciary] is subject to fiduciary duties under ERISA only 'to the extent' that" he performs fiduciary functions as identified by Congress. *Id.* at 412; *see Pegram v. Hedrich*, 530 U.S. 211, 225-26, 120 S. Ct. 2143, 2152-53 (2000) ("In every case charging breach of ERISA fiduciary duty, then, the threshold question is . . . whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint."). Relevant here, a named fiduciary performs fiduciary functions "to the extent he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i); *see Pegram*, 530 U.S. at 225-26, 120 S. Ct. at 2152-53; *see also Martinez*, 338 F.3d at 412-13 (listing other fiduciary functions identified by Congress).

Bruister was a named fiduciary of the ESOP, but he abstained from all votes relating to the subject transactions. The district court correctly applied the two hats doctrine to determine whether, notwithstanding his abstention, "Bruister exercise[d] any authority or control respecting management or disposition of [the ESOP's] assets" and thus served as a functional fiduciary. *Perez*, 54 F. Supp.3d at 651.[5] The court found that Bruister "exercised

_____

[5] The Secretary argues that *Donovan v. Cunningham*, 716 F.2d 1455, 1468 (5th Cir. 1983), requires a named trustee claiming abstention to "remove himself completely" from all fiduciary decision-making. This is not so in all cases. In *Donovan*, the plan document itself provided that interested fiduciaries could not vote or participate in the decision. The fiduciary's participation in setting the purchase price even though he abstained from voting caused him to breach the terms of the plan document, and therefore his fiduciary duty, but this does not establish a rule of law that a fiduciary must always "remove himself completely." Rather, the two hats doctrine is the proper test.

No. 14-60811
cons/w No. 14-60816

fiduciary authority," *Perez*, 54 F. Supp.3d at 651-53,[6] by: (1) firing the first appraiser for being too thorough, (2) hiring Donnelly to replace him, (3) influencing the outcome of Donnelly's valuations, (4) making his personal preferences known to Smith and Henry, and (5) actively participating in all of the meetings related to the subject transactions.  Further, the findings show that David Johanson ("Johanson"),[7] Bruister's personal lawyer, influenced the ESOP's decisionmaking through emails Johanson wrote to Donnelly (without copying the ESOP's counsel) indicating that Donnelly needed to "tweak" his findings in order to get a higher price for Bruister after Johanson reviewed Donnelly's initial valuations (without providing them to the ESOP's counsel).[8] *See Perez*, 54 F. Supp.3d at 654-58.

---

[6] Bruister argues, based on *Schloegel v. Boswell*, 994 F.2d 266, 271-72 (5th Cir. 1992), that to satisfy the "authority or control" element of the two hats doctrine, the Plaintiffs must demonstrate that Bruister caused trustees Smith and Henry to relinquish their independent discretion in purchasing BAI stock for the plan.  *Schloegel* is inapposite as that case examined whether an outside expert advising a profit-sharing plan became a fiduciary by providing investment advice to the plan.  994 F.3d at 271-72.  The facts there indicated that the plan's trustees made the final investment decisions and that the outside expert did not exercise authority or control over them.  *Id.*  (The defendant "made an investment *proposal*, not an investment decision." (emphasis in original)).  That is not what the district court found here.

[7] Johanson plays multiple roles in the story of this litigation.  In addition to being Bruister's personal attorney, he was counsel for BAI and represented both in numerous legal engagements.  *Perez*, 54 F. Supp.3d at 652.  He "was clearly the driving force behind the ESOP and each transaction, and he became deeply involved with Bruister's personal finances and various business interests."  *Id.*  His heavy involvement with all of the ESOP transactions led to his being a material witness in the case.  Yet he also served as lead trial counsel and is Defendants' sole counsel of record on appeal.  These conflicts have apparently been waived.  *See id.* at 653 n.13.  The reader may judge the prudence of Johanson's "multiple hats" service, and whether different counsel may have helped Bruister avoid the trouble he is now in.

[8] Johanson was adamant at oral argument that he did not tweak anything, but we are bound by the record before us.  Our review of the record does not indicate the district court's interpretation of the emails is clearly erroneous.

No. 14-60811
cons/w No. 14-60816

The district court applied the law correctly[9] and did not clearly err in finding that Bruister was a fiduciary of the ESOP because he exercised "authority or control respecting management or disposition of its assets." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

### B. Fiduciary Liability

Bruister and Smith were found to have breached the duties of loyalty and prudence in their conduct with respect to the stock sales and to have engaged in prohibited transactions.  We affirm these findings but do not approve, and do not rely on, the additional, derivative liability theory that Bruister failed to monitor the other trustees under ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A).[10]  Co-fiduciary derivative liability under ERISA § 405(a), 29 U.S.C. § 1105(a), was found by the district court, *see Perez*

---

[9] Bruister also challenges the district court's expressed "trouble" with the lack of independent or professional fiduciaries on the ESOP, and observes correctly they are not required under ERISA. But this is precisely why the two hats doctrine is applied to the potentially "conflicting loyalties" of a non-independent fiduciary. *Martinez*, 338 F.3d at 412. This doctrine also negates his argument that the district court erred by casting *any* seller activity in an ESOP transaction as fiduciary in nature.  The two hats doctrine is applied to determine *which* seller activity is considered fiduciary.

[10] The district court held Bruister individually liable for failure as a BAI board member to monitor the other ESOP trustees (Smith and Henry) when he appointed them and knew they breached their duties of loyalty and care.  *Perez*, 54 F. Supp.3d at 671-72. The court cited *In re Enron Corp. Sec., Derivative, & ERISA Litigation*, 284 F. Supp. 2d 511, 552 (S.D. Tex. 2003), and *Liss v. Smith*, 991 F. Supp 278, 311 (S.D.N.Y. 1998).

The Fifth Circuit has never recognized this theory of ERISA fiduciary liability.  Courts have erroneously construed as an endorsement of the theory one statement that "[l]iability for the failure to adequately train and supervise an ERISA fiduciary arises where the person exercising supervisory authority was in a position to appoint or remove plan administrators and monitor their activities." *Am. Fed'n of Unions Local 102 Health & Welfare Fund v. Equitable Life Assurance Soc'y of the U.S.*, 841 F.2d 658, 665 (5th Cir. 1988) (citations omitted); *see, e.g., In re Enron Corp.*, 284 F. Supp. at 552.  This statement, however, was made while discussing "non-fiduciary respondeat superior liability," *Am. Fed'n of Unions*, 841 F.2d at 664.  The statement has no relation to the fiduciary liability at issue here.  We do not approve the district court's "failure to monitor" holding in this case, but it is immaterial to liability.

No. 14-60811
cons/w No. 14-60816

54 F. Supp.3d at 672, and applies as a matter of course. We discuss each theory in turn.

### 1. Breach of the Duty of Loyalty

"[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." ERISA § 404(a)(1)(A), 29 U.S.C. § 1109(a)(1)(A). We have observed that this language "imposes upon fiduciaries a duty of loyalty" to the plan beneficiaries. *Donovan v. Cunningham*, 716 F.2d 1455, 1464 (5th Cir. 1983); *see also Metzler*, 112 F.3d 207, 212-13 (5th Cir. 1997). The duty of loyalty "requires that fiduciaries keep the interests of beneficiaries foremost in their minds, taking all steps necessary to prevent conflicting interests from entering into the decision-making process." *Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286, 298 (5th Cir. 2000) (citing *Metzler*, 112 F.3d at 213). In other words, conflicts of interest must be shunned.

Applying these principles to the trustees, the district court did not clearly err in finding that "[t]he duty of loyalty was breached from start to finish." *Perez*, 54 F. Supp.3d at 654. Among other things, the court found that Bruister: (1) fired the ESOP's counsel ("the seller . . . terminated the buyer's independent counsel," *id.*); (2) caused Johanson to influence Donnelly's supposedly independent valuations to get the highest selling price he could for himself; (3) caused Donnelly to send "valuation drafts to the seller [Bruister] *before* sending them to the buyers [ESOP trustees] to whom he owed his sole allegiance," *id.* at 655; (4) cut the ESOP's counsel out of all communications regarding valuation; (5) adjusted assumptions and figures used by Donnelly to obtain a higher valuation; and (6) generally did not "speak up for the ESOP

13

No. 14-60811
cons/w No. 14-60816

Participants." *Id.* at 654-59. The district court also cited Smith's and Henry's testimony that they were always concerned with Bruister's interests despite being ESOP trustees, and that Smith actually made decisions by determining what "was best for everyone, including Bruister." *Id.* at 659. The court, as was its prerogative, did not fully accept the trustees' self-serving testimony. The court concluded that the trustees were affected by Bruister's self-interest and thus failed to act solely in the interest of the ESOP's beneficiaries and participants.

Bruister's and Smith's arguments challenge the court's findings, but they are far from sufficient to demonstrate clear error. These Defendants contend that since Donnelly's valuations (and thus the price the ESOP ultimately paid) were not inflated compared to the fair market value ("FMV") calculated by the Defendants' expert at trial, and since the district court partially accepted their trial expert's valuation in setting damages, the Defendants did not breach their duty of loyalty by relying on Donnelly's valuations.[11] This "all's well that ends well" argument ignores that for liability under ERISA, the critical question is whether there was a conflict of interest, and whether it was avoided because the trustees' decisions were "'made with an eye single to the interests of the participants and beneficiaries.'" *Metzler*, 112 F.3d at 213 (quoting *Donovan v. Bierwirth,* 680 F.2d 263, 271 (2d Cir. 1982) (Friendly, J.), *cert. denied,* 459 U.S. 1069, 103 S. Ct. 488 (1982)). The trustees did not separate Bruister's personal interests from Donnelly's valuation process so as to avoid a conflict of interest. Their breach of the duty of loyalty turns on their failure to place the interests of participants and beneficiaries

---

[11] We discuss the valuation arguments in much greater detail below.

No. 14-60811
cons/w No. 14-60816

first and foremost, not on Donnelly's qualifications or conclusions. The district court did not err in finding the Defendants breached their duty of loyalty.

### 2. Engaging in a Prohibited Transaction

ERISA forbids a fiduciary to "cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . . sale or exchange . . . of any property between the plan and a party in interest." ERISA § 406(a)(1)(A), 29 U.S.C. § 1106(a)(1)(A). The sale of BAI stock from BFLLC to the ESOP was such a transaction, but the prohibited transaction rule does not apply if the sale "is for adequate consideration." ERISA § 408(e)(1), 29 U.S.C. § 1108(e)(1).[12] This means that "[a]n ESOP may acquire employer securities in circumstances that would otherwise violate Section 406 if the purchase is made for 'adequate consideration.'" *Donovan*, 716 F.2d at 1465. The fiduciaries have the burden to prove this affirmative defense. *Id.* at 1467-68; *id.* at 1467 n.27. Where, as here, the subject security has no generally recognized market, ERISA defines "adequate consideration" as "the fair market value of the asset as determined in good faith by the trustee or named fiduciary pursuant to the terms of the plan and in accordance with regulations promulgated by the Secretary." ERISA § 3(18), 29 U.S.C. § 1002(18).[13]

---

[12] Two additional requirements for the exception are that no commission is charged and the plan must be an eligible plan. ERISA §§ 408(e)(2)-(3), 29 U.S.C. §§ 1108(e)(2)-(3). Neither is at issue here.

[13] There is no regulation regarding "adequate consideration." The Secretary proposed, but never finalized, regulations requiring that the value assigned must reflect the stock's fair market value, *and* the value assigned "must be the product of a determination made by the fiduciary in good faith." Proposed Regulation Relating to the Definition of Adequate Consideration, 53 Fed. Reg.17,632, 17,633 (proposed May 17, 1988) (to be codified at 29 C.F.R. pt. 2510). The proposed regulation went on to define how each of the two parts are satisfied. *Id.* at 17,637. Proposed regulations are, of course, not binding. *Teweleit v. Hartford Life and Accident Ins. Co.*, 43 F.3d 1005, 1009-10 (5th Cir. 1995). Though this regulation was never finalized, its proposed test is often ostensibly used by other courts to determine

15

No. 14-60811
cons/w No. 14-60816

This court holds that "ESOP fiduciaries will carry their burden to prove that adequate consideration was paid by showing that they arrived at their determination of fair market value by way of a prudent investigation in the circumstances then prevailing." *Donovan*, 716 F.2d at 1467-68 (footnotes omitted).[14] This requirement must be interpreted, "so as to give effect to the Section 404 duties" applicable to fiduciaries, in particular the duty of care embodied by the statutory "prudent man rule." *Id.* at 1467; *see* ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B) ("[A] fiduciary shall discharge his duties with respect to a plan . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."). Thus, in this circuit, the ERISA § 408(e) adequate consideration exemption "is expressly focused upon the *conduct* of the fiduciaries" and is "read in light of the overriding duties" in ERISA § 404, particularly the duty of care. *Donovan*, 716 F.2d at 1467 (emphasis in original). In focusing on conduct, the reviewing court does not redetermine fair market value de novo. *Id.*

The district court noted as "[c]rucial to this case" that "fiduciaries may point to an expert's guidance as evidence of a good faith investigation." *Perez*,

---

adequate consideration. *See Henry v. Champlain Enters., Inc.*, 445 F.3d 610, 618-19 (2d Cir. 2006) (Sotomayor, J.) (collecting cases and apparently adopting the test). Despite citing and ostensibly applying the Secretary's proposed conjunctive two-part test, most courts actually apply some form of the duty of care test. *See, e.g., Henry*, 445 F.3d at 619 (Sotomayor, J.) ("Although fair market value and good faith are often stated as distinct requirements, they are closely intertwined."). None of the courts "adopting" the Secretary's test actually apply its specifically enumerated substantive requirements. *E.g.* 53 Fed. Reg. at 17,637, § 2510.3-18(b)(3)(ii) (fiduciary did not act in good faith unless *all* specifically listed conditions are met).

[14] It appears *Donovan* was the Labor Department's impetus for proposing the regulation. *See* 53 Fed. Reg. at 17,633 (citing *Donovan* and noting that the opinion encourages the Department to adopt regulations defining adequate consideration).

No. 14-60811
cons/w No. 14-60816

54 F. Supp.3d at 660 (citing *Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286, 300-01 (5th Cir. 2000)).  It then framed its analysis around three "*Bussian* factors:" a "fiduciary must (1) investigate the expert's qualifications, (2) provide the expert with complete and accurate information, and (3) make certain that reliance on the expert's advice is reasonably justified under the circumstances." *Bussian*, 223 F.3d at 301.[15]  This focus happens to be dispositive of the present case, but it oversimplifies the analysis and overlooks that *Bussian* itself (citing a wide range of case law) made other statements emphasizing the breadth of the inquiry.  *E.g. id.* at 300 ("The relevant inquiry in any case is whether the fiduciary, in structuring and conducting a thorough and impartial investigation . . . carefully considered such factors and any others relevant under the particular circumstances it faced at the time of decision."); *id.* at 301 ("A determination whether a fiduciary's reliance on an expert advisor is justified is informed by many factors, including the expert's reputation and experience, the extensiveness and thoroughness of the expert's investigation, whether the expert's opinion is supported by relevant material, and whether the expert's methods and assumptions are appropriate to the decision at hand.").  In particular, care must be taken to avoid any identified conflicts of interest.  *Id.* at 300.

*Bussian's* discussion reflects that ERISA's § 404 duty of care requires an inquiry into whether the fiduciaries "arrived at their determination of fair market value by way of a prudent investigation in the circumstances then prevailing."  *Donovan*, 716 F.2d at 1467-68; ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).  This might include reliance on outside experts, but need not

---

[15] The district court thus made the same mistake we identified earlier, *see supra* note 13, as it cited the Department of Labor's proposed regulation as the ostensible test then actually applied a different test.  *See Perez*, 54 F. Supp.3d at 660-61.

No. 14-60811
cons/w No. 14-60816

necessarily do so, and reliance on outside experts does not alone indicate that fiduciaries have satisfied their duty of care. *See Bussian*, 223 F.3d at 300-01; *Donovan*, 716 F.2d at 1474 ("An independent appraisal is not a magic wand that fiduciaries may simply wave over a transaction to ensure that their responsibilities are fulfilled. It is a tool and, like all tools, is useful only if used properly."). The open-endedness of the inquiry into whether a fiduciary acted with care makes sense because the nature of a fiduciary's responsibility is itself open-ended. *See* FRANK H. EASTERBROOK & DANIEL FISCHEL, THE ECONOMIC STRUCTURE OF CORPORATE LAW 91 ("The only promise that makes sense in such an open-ended relation is to work hard and honestly. In other words, the corporate contract makes managers the agents . . . but does not specify the agents' duties. To make such an arrangement palatable . . . managers must pledge their careful and honest services.").

The district court's narrow focus on the "*Bussian* factors," *Perez*, 54 F. Supp.3d at 660-71, erred as a matter of law because the duty of care inquiry is more open-ended. Nevertheless, the court's extensive findings of fact satisfy a more capacious inquiry, and in any event, Bruister's and Smith's challenge to its findings is perfunctory. *Id.*[16] The court found, *inter alia,* that the trustees (1) conducted insufficient investigation into Donnelly's background and qualifications; (2) overlooked communications in which "Donnelly and Johanson were obviously working together to increase the value," *id.* at 662; (3) failed to inform Donnelly of significant information and risk factors for the company that should have influenced his valuation; (4) and failed to double-check or significantly review Donnelly's ultimate conclusions. The court's summary is accurate: "the factual picture as a whole leaves little

---

[16] Notably, the Defendants' brief rarely even cites the trial record when it attempts to address specific findings by the trial court.

No. 14-60811
cons/w No. 14-60816

doubt that the trustees were not reasonably justified in their reliance on Donnelly," *id.* at 671. The trustees' actions were not those of prudent men.

Aside from re-arguing the facts, the Defendants make two more pointed arguments. First, the district court's findings relating to inaccurate projections substituted its "20/20 hindsight" for Smith's reasonable views at the time of the transactions. Second, because the district court partially accepted their trial expert's valuation of the BAI stock when setting damages, and the expert's value exceeded Donnelly's valuation at the time of the sales, the sales were therefore made for "adequate consideration."

The first argument does not cast doubt on the judgment. The test for adequate consideration is "expressly focused upon the *conduct* of the fiduciaries" in determining the fair market value. *See Donovan,* 716 F.2d at 1467(emphasis in original). The court relates a number of significant deficiencies in addition to the only two actually contested by Bruister and Smith—the trustees' unreasonable evaluation of business risks concerning Hurricane Katrina and DirecTV's evolving policies. Bruister's and Smith's attack on individual findings hardly overcomes the other particular findings that demonstrate Donnelly was not provided complete and accurate information for his valuation. Moreover, these Defendants make no attempt to show how the court erred in its critique of their insufficient due diligence in reviewing Donnelly's valuations. In sum, the Defendants' *conduct* was lacking in the care necessary to enable them to rely reasonably on Donnelly's valuations. *See Perez*, 54 F. Supp.3d at 662-68.

The second argument fails for several reasons. Principally, it overlooks the court's finding that even the Defendants made no effort at trial to validate Donnelly's work, and the district court described his work as "not credible." *Perez,* 54 F. Supp. 3d at 678. The flawed valuation process, in other words, led

19

No. 14-60811
cons/w No. 14-60816

to an insupportable fair market value calculation, notwithstanding that it coincidentally fell within a range later estimated by reliable methodology during the *damages* portion of the case. Second, the existence of this coincidence does not satisfy the Defendants' burden to prove the adequate consideration *affirmative defense* under the test we have just laid out.[17] Third, the very premise of this argument is questionable, because the district court did not fully accept the Defendants' trial expert's fair market value calculation that overlapped Donnelly's but merged it with those of the plaintiffs' experts.

The Defendants did not carry their burden to qualify for the ERISA § 408(e) adequate consideration affirmative defense, hence the transactions between the ESOP and BFLLC were prohibited by ERISA § 406(a)(1)(A).

## III.   The Equitable Restitution Remedy

The district court noted that "[t]he remedies questions are more difficult than the liability questions." *Perez*, 54 F. Supp.3d at 672. A fiduciary who breaches a duty "shall be personally liable to make good to such plan any losses to the plan resulting from each such breach . . . and shall be subject to such other equitable or remedial relief as the court may deem appropriate." ERISA § 409(a), 29 U.S.C. § 1109(a); *see also* ERISA §§ 502(a)(2)-(3), 29 U.S.C. §§ 1132(a)(2)-(3) (authorizing "other equitable relief" for violations). ERISA does not define "losses," but the term includes money damages (called "equitable restitution" in ERISA cases). *See Donovan v. Bierwith*, 754 F.2d 1049, 1052 (2d Cir. 1985). Fifth Circuit cases have recognized in passing, but never granted, rescission of the transaction as an authorized ERISA remedy.

---

[17] Bruister and Smith do not expressly raise the "hypothetical prudent fiduciary" concept, which posits that a breach of the duty of prudence may be overcome if their ultimate decision would have been accepted by a "hypothetical prudent fiduciary." *See Bussian,* 223 F.3d at 300. To the extent that Donnelly's valuation may have been vindicated in the court's ultimate findings here, this would affect damages, not liability.

No. 14-60811
cons/w No. 14-60816

*See Provident Life & Accident Ins. Co. v. Sharpless*, 364 F.3d 634, 639-40 (5th Cir. 2004); *Sommers Drug Stores Co. Emp. Profit Sharing Trust v. Corrigan Enters., Inc.*, 793 F.2d 1456, 1463 (5th Cir. 1986).

The district court denied rescission of the BAI stock sales but granted equitable restitution in the amount the ESOP overpaid. *Perez*, 54 F. Supp.3d at 675. The court's basic approach was to estimate the FMV of the BAI stock at the time of each transaction and deduct it from the higher amount the ESOP actually paid. *Id.* at 676-78. This is the approach generally used by courts to compute overpayments. *See Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 420 (6th Cir. 2002); *Donovan v. Bierwirth*, 754 F.2d 1049, 1055 (2d Cir. 1985); *Cheesemore v. Alliance Holdings, Inc.*, 948 F. Supp.2d 928, 942-43 (W.D. Wis. 2013); *Neil v. Zell*, 767 F. Supp.2d 933, 944 (N.D. Ill. 2011) (collecting earlier district court opinions).

The Defendants and the Secretary challenge the district court's methodology in numerous ways. We review *de novo* the legal issues (such as the conceptual availability of a certain type of remedy like rescission or equitable restitution) and factual issues involving the computation of damages for clear error. *Streber v. Hunter*, 221 F.3d 701, 730 (5th Cir. 2000); *see also Metzler v. Graham*, 112 F.3d 207, 209 (5th Cir. 1997). We review the district court's denial of rescission, when available, for abuse of discretion. *See Eaves v. Penn*, 587 F.2d 453, 463 (10th Cir. 1978).

A. *Rescission as a Possible Remedy*

The Secretary urges on cross-appeal that rescinding the transactions is the preferred remedy in this case to the extent that the FMV of the BAI stock at the time of the sales cannot be determined with certainty. This fallback remedy seems to be argued on the assumption that the court's assessment of FMV was flawed, as the Secretary also contends. Rescission is intended to

No. 14-60811
cons/w No. 14-60816

restore the parties to the pre-transactions' status quo by returning the entire purchase price paid by the ESOP. The Secretary cites only one case in which rescission was ordered. *See Eaves v. Penn*, 587 F.2d 453, 462-63 (10th Cir. 1978).[18]

In any case, the Secretary's goal of returning the parties to the position they occupied *prior* to the transactions is dubious. The proper focus should instead be on "losses to the plan resulting from" the Defendants' breaches of fiduciary duties. ERISA § 409(a), 29 U.S.C. 1109(a). "[I]t is hornbook law that only such damages should be awarded as will place the injured party in the situation it would have occupied had the wrong not been committed." *Whitfield v. Lindemann*, 853 F.2d 1298, 1305 (5th Cir. 1988). The wrong found here is that the ESOP overpaid for the BAI stock. The FMV of the stock includes a discount for future risks, including the risk that the stock will later become worthless. *Cf. id.* (recognizing that appraisal accounted for projected future losses so they could not be recovered a second time); *see also Reich v. Valley Nat. Bank of Ariz.*, 837 F. Supp. 1259, 1274 (S.D.N.Y. 1993) ("Like any source of financing, ESOPs are subject to the inherent risk of stock ownership."). The district court properly recognized this transactional element by noting, "the Participants had a reasonable expectation of purchasing [BAI] stock at a fair price. So the correct measure of damages is the amount they overpaid, not the difference in purchase price and current price (*i.e.*, zero)." *Perez*, 54 F. Supp.3d at 676. This was not in error. *See Whitfield*, 853 F.2d at 1306 ("Had the properties been evaluated properly when they were transferred, the same operating losses would have occurred. To allow recovery for those losses . . . is

---

[18] The Secretary cites additional cases under the common law of trusts and other federal laws that simply discuss general principles of rescission.

No. 14-60811
cons/w No. 14-60816

to place the Plan in a better position than it would have occupied had the wrong not occurred.").

Further, as will be discussed below, the district court's computation of the FMV of the BAI stock is not so inherently flawed as to compel rescission in lieu of equitable restitution damages. The district court valued the BAI stock with reasonable certainty. There may be some cases in which rescission is the proper recovery or FMV cannot easily be determined, but this is not one. The district court did not abuse its discretion in denying rescission. [19]

### B. Computation of Fair Market Value

"Appraisal of closely held stock is a very inexact science" involving a "level of uncertainty inherent in the process and [a] variety of potential fact patterns." *Donovan,* 716 F.2d at 1473. The district court here concurred that "[d]etermining the amount of overpayment is difficult but not impossible." *Perez*, 54 F. Supp.3d at 676. The court first calculated the FMV of the BAI stock at the time of each subject transaction. Defendants, the Secretary, and Sealy each offered expert valuation witnesses. Range testified for the Defendants, Messina for the Secretary, and Sealy offered Mercer. Each expert used different valuation methods, different assumptions, different estimates, and reached different conclusions. Each expert then averaged his results to arrive at an ultimate valuation (Range provided a range of valuations rather

---

[19] Though the Secretary's argument rests primarily upon the indeterminacy of the BAI stock's FMV, he also contends that rescission is appropriate here because the transactions between the ESOP and BFLLC were prohibited transactions under ERISA § 406(a), 29 U.S.C. § 1106(a). While ERISA § 406(a) imposes a general duty upon fiduciaries to avoid prohibited transactions, ERISA's remedial statute provides that a fiduciary "who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries" must restore "any losses to the plan" and is also "subject to such other equitable or remedial relief as the court may deem appropriate." ERISA § 409(a), 29 U.S.C. § 1109(a). Because ERISA's equitable remedies are not cabined by the type of violation, the court did not err in choosing the remedy deemed most appropriate to the facts.

No. 14-60811
cons/w No. 14-60816

than an exact figure).  The district court found the experts equally credible, so it, too, averaged their valuations.  For each of the three subject transactions, the court elected to assign Range's range a 50% weight, while Mercer's and Messina's much lower valuations were each assigned a 25% weight.[20]  The court disregarded, as "not credible," Donnelly's valuations made at the time of the transactions.  Finally, the court found additional support for its FMV determination from other evidence in the record.  *See Perez*, 54 F. Supp.3d at 676-78.  The parties take issue with several aspects of the court's approach.

### 1.  Consideration of "Hypothetical" Expenses

Messina, the Secretary's expert, considered BAI's financial statements unreliable because they did not conform to Generally Accepted Accounting Principles ("GAAP").  To account for this asserted deficiency, Messina used the actual revenue numbers reported on BAI's financial statements but employed industry average numbers for comparable companies to estimate BAI's expenses and, therefore, profits.  *See Perez*, 54 F. Supp.3d at 677.  The Defendants argue that the court should not have relied on Messina's valuation derived from "hypothetical" expense figures instead of the actual expenses BAI reported on its financial statements.  This was not clear error.

The Defendants first rely on their expert Range's opinion that Messina's methodology is unreliable, but Messina, also a duly qualified expert, testified that his valuation method is acceptable in the absence of reliable financial statements.  Citing only *Estate of Jameson v. Comm'r*, 267 F.3d 366 (5th Cir. 2001)—for the general proposition that valuations must be based on sound economic principles—adds nothing to the Defendants' argument. The district court was entitled to credit Messina's methodology.

---

[20] The district court averaged Messina's and Mercer's very similar figures together to avoid overweighing them.  *Perez*, 54 F. Supp.3d at 678.

No. 14-60811
cons/w No. 14-60816

Second, the Defendants' expert himself used a guideline public company valuation method in preparing one of his valuations. *Perez*, 54 F. Supp.3d at 676. "The guideline public company method (GPC) is used to calculate the fair value of a business on the basis of comparison to publicly traded companies in similar lines of business." *Kardash v. Comm'r*, 109 T.C.M. (CCH) 1234 at *6, *adhered to on reconsideration*, T.C.M. (RIA) 2015-197 (2015). Just as Messina used "hypothetical" expense figures, in other words, Range also used *comparable* expense figures from other companies.[21]

Third, Range, like Messina, cautioned in his expert report that BAI's financial statements contain "known accounting inaccuracies" and "are meant to provide context, and not necessarily actual economic results." *Perez*, 54 F. Supp.3d at 663. Range apparently found a different solution for the perceived unreliability of the financial reports, but it was not necessarily incorrect for Messina to address non-GAAP accounting as he did, nor was it clear error for the district court to have relied on his conclusions. *See id.* at 677 ("[N]either of these controverted approaches were necessarily incorrect. They were just different ways to address the same ultimate issue.").

Most important, the effect of any problem in Messina's methodology was blunted by the district court's averaging of the experts' valuations. The district court fully explained that "[a]veraging the results mitigates the impact of those valuations that seemed less valid *on both sides*." *Id.* at 678 (emphasis in original). "We may not view the evidence differently as a matter of choice, or substitute our judgment for a plausible assessment by the trial judge." *Reich*, 55 F.3d at 1051.

---

[21] On a related note, *all* valuation methods use projections of future income in some form, which would necessarily be "hypothetical" and not actual information. It is not wrong to rely on these sorts of projections if they are done correctly and have a sound basis.

25

No. 14-60811

cons/w No. 14-60816

### 2. Consideration of BAI Debt

The Defendants argue that the court erred in failing to make a finding as to BAI's outstanding debt at the time of each subject stock sale. The three expert witnesses used dramatically different debt numbers in reaching the FMV of BAI at those points in time. The Defendants contend that Range alone based BAI's figures on evidence in the record, whereas Messina and Mercer arrived at their figures for BAI's debt by looking only at Donnelly's valuations. Since the district court found Donnelly's valuations "not credible," *Perez*, 54 F. Supp.3d at 678, the court clearly erred, the Defendants argue, in accepting Mercer's and Messina's inherently flawed valuations. *See Estate of Jameson v. Comm'r*, 267 F.3d 366, 372 (5th Cir. 2001) (internally inconsistent assumptions fatally flawed Tax Court's valuation decision); *Reich*, 55 F.3d at 1045.

Our review of the record and each expert's valuation report indicates that Messina and Mercer did not impermissibly rely on Donnelly in arriving at their debt figures. Rather, the record indicates that Mercer used BAI's debt as reported on its financial statements and Messina adjusted the debt shown on them. Range instead used BAI's debt amortization schedules. None of these approaches was necessarily incorrect, much less superior. Moreover, the differences in methodology were accounted for by the court's averaging process. The district court accordingly rendered a "plausible assessment" among them.[22] *See Reich*, 55 F.3d at 1051.

---

[22] The district court was not required to make a separate factual finding concerning the debt figures as long as the district court's findings "afford the reviewing court a clear understanding of the factual basis for the trial court's decision." *Reich*, 55 F.3d at 1057 (citation omitted). The district court met this standard generally, although on this point a separate factual finding would have greatly assisted our review of the record.

No. 14-60811
cons/w No. 14-60816

3. Averaging Expert Valuations

Both the Defendants and the Secretary challenge the keystone of the court's approach, its averaging of the experts' valuations, while Sealy defends the decision.

The Defendants argue this was error because the district court's ultimate average valuation was "not presented in evidence." Apparently, the Defendants would have had the district court accept only one expert's valuation (presumably Range's) rather than an average. This argument is meritless. "It is well-settled that the district court is only required to determine the extent of the damages as a matter of just and reasonable inference and that the result need only be approximate." *In re Liljeberg Ents., Inc.*, 304 F.3d 410, 457 (5th Cir. 2002). As with any testimony, this court does not reweigh evidence and must defer to the trial court's assessment of the credibility of witnesses. *See Reich*, 55 F.3d at 1045. Prior cases have frequently accepted an average of expert valuations or estimates falling within a range of evidence offered. *See, e.g., In re Liljeberg Ents*, 304 F.3d at 457; *Laird v. United States*, 556 F.2d 1224, 1241 (5th Cir. 1977); *Lake Charles Harbor & Terminal Dist. v. Henning*, 409 F.2d 932, 937 (5th Cir. 1969) (averaging expert valuations while applying state law); *Anderson v. Comm'r*, 250 F.2d 242, 249 (5th Cir. 1957) ("It is not necessary that the value arrived at by the trial court be a figure as to which there is specific testimony, if it is within the range of figures that may properly be deduced from the evidence.").

The Secretary does not criticize averaging of valuations in all cases, but instead asserts that it is inappropriate here because it "reconcile[s] greatly divergent estimates" among the experts. *Lake Charles*, 409 F.2d at 936 n.7 (citation omitted). The heart of the Secretary's argument is that Range's assumption that BAI was a growth company at the time of the transactions

27

No. 14-60811
cons/w No. 14-60816

was seriously wrong and conflicts with the district court's findings that the
Defendants concealed pessimistic business prospects from Donnelly when he
was making his initial valuations for the sales. *See Perez*, 54 F. Supp.3d at
662-68.    The Secretary's argument fails because it simply quarrels with
Range's expert opinion, which was based on his evaluation of all of the relevant
information about BAI. As the district court explained, "[t]he parties agreed
that FMV should be determined based on what was known *or knowable* on the
date Donnelly reported. *Given that scope*, Range concluded BAI remained a
growth company in 2004 and 2005." *Perez*, 54 F. Supp.3d at 677 (emphasis
added). The district court knew how Range reached his assumption and was
free to credit or discredit his testimony accordingly. The district court realized
Range's assumption might be overly optimistic, though not completely
incredible. *See id.* ("Offsetting Range's optimism are pessimistic projections
from Mercer and Messina, both of whom saw a no-growth company."). This is
not clear error. *See Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573-
74, 105 S. Ct. 1504, 1511 (1985) ("If the district court's account of the evidence
is plausible in light of the record viewed in its entirety, the court of appeals
may not reverse it.").

Finally, the Secretary takes issue with the court's decision to weigh
Range's values at 50% and Messina's and Mercer's at 25% each. *See id.* at 58-
59. This was done because "[t]he FMV's from Mercer and Messina were close,
and in the Court's opinion these low-side numbers should be averaged to avoid
skewing the results." *Perez*, 54 F. Supp.3d at 678. The district court carefully
delineated its findings, explained their basis in the record, correctly noted that
its approach would be improper if, *e.g.*, one expert was more credible than
another, and arrived at a reasonable average supported by evidence in the

28

No. 14-60811
cons/w No. 14-60816

record.  *Perez*, 54 F. Supp.3d at 676-78.  Its thoughtful approach to a complex question was founded in established valuation methodology.[23]

### C. Computation of Price

The district court measured the ESOP's recovery as the difference between the price paid by the ESOP for the stock in the challenged transactions and the company's FMV on each of those dates.  Having discussed the FMV computation, we now turn to issues raised about the price.  One might think that the sales price is objectively knowable, but the Defendants pose two fairly sophisticated claims of error.

### 1.  Consideration of Debt Owed by the ESOP but not yet Paid

The December 2004 and December 2005 transactions were each financed with a mix of cash and a loan from BAI to the ESOP.  *Perez*, 54 F. Supp.3d at 679.[24]  The BAI stock was placed in a suspense account and released as the ESOP paid off the loans.  *Id.*  The contract price is thus higher than the cash the ESOP actually paid for the down payment and loan payments.  *See id.*  The Defendants argue the damages calculation should exclude the ESOP's unpaid debt.  The following table illustrates the difference in the two measures for the December 2005 transaction:[25]

---

[23] Both the Defendants and the Secretary note that Range's expert valuation was higher than Donnelly's initial valuations that the district court rejected, *see Perez*, 54 F. Supp.3d at 677-78, yet draw opposite conclusions from it.  The Defendants argue extensively that because the district court accepted Range's testimony as credible in the averaging, they have satisfied their burden of proof on the "good faith" requirement of the ERISA § 408(e) adequate consideration defense.  We have already rejected this argument.  The Secretary argues that because Range's valuations are higher than Donnelly's, it was clear error for the district court not to reject them as it did Donnelly's.  Once it was convinced that Range, unlike Donnelly, reached his conclusions on the basis of all available evidence, the court was entitled to employ Range's figures in the averaging process.

[24] The September 2005 transaction was all cash.

[25] This table combines the two tables in the district court's opinion, *see Perez*, 54 F. Supp.3d at 638-39, 678.

No. 14-60811
cons/w No. 14-60816

| Table 3 | | | | |
|---|---|---|---|---|
| **A** | **B** | **A-B = C** | **D** | **{D-B : D-B > 0}** |
| Contract Price/Donnelly Price (100% debt financed) | Court FMV | Court Damages | Cash Payments of Principal & Interest by the ESOP | Defendant's Damages |
| $10,507,421 | $7,139,658 | $3,367,658 | $761,823 | $0 |

The Defendants argue that because the ESOP only made cash payments of principal and interest totaling $761,823 on the $10,507,421 loan, it would be a windfall for the ESOP to receive any damages until the ESOP had paid at least $7,139,658, *i.e.*, the price equivalent to the court's computed FMV.[26]

Every court to consider this question has rejected the Defendants' contention that the proper measure of recovery excludes the debt that remains unpaid or is later forgiven. *See Henry v. U.S. Trust Co. of Cal., N.A.*, 569 F.3d 96, 98-100 (2d Cir. 2009); *Cheesemore v. Alliance Holdings, Inc.*, 948 F. Supp.2d 928, 943-45 (W.D. Wis. 2013); *Neil v. Zell*, 767 F. Supp.2d 933, 945-46 (N.D. Ill. 2011); *Reich v. Valley Nat. Bank of Ariz.*, 837 F. Supp. 1259, 1274 (S.D.N.Y. 1993). Particularly instructive is the Second Circuit's decision in *Henry*, in which the ESOP obtained $60M of the employer's stock by issuing a $51M note to the selling shareholders and a $9M note to the employer. 569 F.3d at 97. Subsequent litigation determined that the stock was worth only $51M instead of $60M. *Id.* By this time, the ESOP had repaid a total of $45.5M on the notes, leaving a balance of $14.5M outstanding. *Id.* at 99 n.2. This debt was subsequently forgiven. *Id.* at 98. The district court reasoned, as the

---

[26] Though left unsaid, presumably the Defendants mean until the ESOP has paid at least this much just in principal on the acquisition loan, not principal and interest.

Defendants do here, that awarding any damages to the ESOP would be a windfall where the ESOP only repaid $45.5M in debt for stock later valued at $51M. *Id.* The Second Circuit reversed and remanded, holding that the debt cancellation should not "be construed as having reduced, *post facto*, the purchase price . . . and thus to have reduced any loss for which damages should be awarded." *Id.* at 99; *see id.* at 99 n.4 ("[T]he assumption of indebtedness has immediate legal and economic consequences even before the borrower begins to repay the debt."). Had the ESOP not incurred debt for over-priced BAI stock, it could have made other, more fruitful investments. That the debt was eventually not paid off does not properly offset the damage done, nor should the Defendants benefit from this circumstance.

2. Consideration of "Mirror Loans"

The December 2004 transaction had a purchase price of $6,700,000. It was consummated with a mix of a cash down payment from the ESOP to BFLLC ($730,000) and a note issued from the ESOP payable to BFLLC ($5,970,000). *Perez*, 54 F. Supp.3d at 638. A year later, the note was restructured into two "mirror loans." The original note from the ESOP to BFLLC was cancelled. A new note was issued from the ESOP to BAI in the amount of the outstanding principal ("internal loan"), and a second new note issued from BAI to BFLLC in the same amount ("external loan"). *Id.* at 638-39. The economics of the transaction did not change—the ESOP still ultimately was indebted by the same amount and BFLLC ultimately still owed the same amount—but BAI was now a middleman.

This restructuring had a favorable tax impact for BAI. BAI contributed $3.8M to the ESOP, which immediately repaid $3.8M of the internal loan to BAI on February 28, 2006. *Perez*, 54 F. Supp.3d at 673. BAI never made a corresponding $3.8M payment to BFLLC on the external loan. Neither BAI's

No. 14-60811
cons/w No. 14-60816

nor the ESOP's cash positions changed as a result of the transaction, but the internal loan balance was $3.8M smaller. The main benefit derived from the tax-deductibility to BAI of the $3.8M contribution. *See* I.R.C. § 404(a)(9), 26 U.S.C. § 404(a)(9). The Defendants assert that this transaction materially benefitted the ESOP because the tax deduction made BAI more valuable, and the ESOP by this time owned 100% of BAI. Since this transaction made the ESOP better off, they argue, it was error for the district court to include the $3.8M payment in its damages calculation.

It is possible that the ESOP was made better off, at least temporarily, after this transaction because BAI incurred a lower tax liability and the stock retained a correspondingly higher value. The district court, for its part, seemed to "emphasize[] the wrong issue," as it focused on the fact that BAI did not repay BFLLC on the external loan, rather than the argument that the ESOP was made better off due to the tax benefits derived from BAI's contribution to the ESOP. *Perez*, 54 F. Supp.3d at 674.

We nonetheless reject the Defendants' argument. Even if the $3.8M payment on the internal loan temporarily made the ESOP economically better off, the theory of harm is that the ESOP overpaid for the BAI stock. The focus should be on these "losses to the plan." ERISA § 409(a), 29 U.S.C. § 1109(a). The ESOP loses when it pays an inflated price, regardless of immediate tax benefits to the sponsor, because it must repay too much debt.[27] Moreover, the extent to which the tax savings on the deductibility of BAI's contribution to the

---

[27] "[T]he employer's cash contributions to the ESOP" that are used "to retire the debt," *Donovan v. Cunningham*, 716 F.2d 1455, 1459 (5th Cir. 1983), are too great because the price is inflated, and this hurts the ESOP that owns the employer's stock even if the employer can deduct the contributions from its taxes. The employer's tax deduction for the amount of the contribution attributable to the inflated purchase price is less beneficial to the ESOP than never having to repay the excess debt at all, as would be the case were the price not inflated.

No. 14-60811
cons/w No. 14-60816

ESOP translated into dollar-for-dollar savings to BAI, or to the ESOP's investment, is dubious. The consequences of one deduction are too remote, given the complexity of today's tax code, to translate into a measurable effect on damages. We thus reject the Defendants' argument and hold that the district court did not clearly err by refusing to exclude the $3.8M internal loan payment from the Defendants' liability based on its alleged tax benefits to BAI.

## IV. BFLLC's Joint & Several Liability

ERISA plan participants may assert a cause of action "to obtain other appropriate equitable relief (i) to redress [ERISA violations] or (ii) to enforce any provisions of this subchapter." ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3). This provision authorizes suits against a non-fiduciary "party in interest" to a prohibited transaction barred by ERISA § 406(a), 29 U.S.C. § 1106(a). *See Harris Trust and Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 245-54, 120 S. Ct. 2180, 2186-91 (2000). There is no dispute that the sale of BAI stock from BFLLC to the ESOP was a transaction between the plan and a party in interest. As a non-fiduciary party in interest, BFLLC is subject to liability even though it had no duty to the plan under substantive ERISA provisions. *See id.* at 245, 2186-87; *ACS Recovery Servs., Inc. v. Griffin*, 723 F.3d 518, 524-525 (5th Cir. 2013) (en banc); *Bombardier Aerospace Emp. Welfare Benefits Plan v. Ferrer, Poirot and Wansbrough*, 354 F.3d 348, 353-54 (5th Cir. 2003).

The district court held BFLLC jointly and severally liable with the other Defendants in the amount of $885,065.25 for overpayments plus $390,604.12 in prejudgment interest,[28] or a total of $1,275,669.37. *Perez*, 54 F. Supp.3d at

---

[28] The district court did not indicate how it computed BFLLC's joint and several liability for prejudgment interest, but it clearly was computed by dividing BFLLC's joint and several share of liability ($885,065.25) by the total liability/overpayment ($4,504,605.30, see Table 2, *supra*) and multiplying the resulting fraction by its total award of prejudgment interest ($1,988,008.67).

No. 14-60811
cons/w No. 14-60816

681.  The court explained that "[t]his figure represents the overpayment on amounts actually received by BFLLC and does not include the overpayment on the $3.8 million that the ESOP paid to BAI but BAI never paid to BFLLC."  *Id.*  In other words, BFLLC is jointly and severally liable for the cash payments it received from the ESOP that are attributable to the inflated price.  Though the district court was not clear on how it calculated these figures, the following table reconciles it, *see Perez*, 54 F. Supp.3d at 638, 678:

| Table 4 | | | |
|---|---|---|---|
| | **A** | **B** | **C** | **(A-B) x C** |
| Transaction | Total Cash Payments made by ESOP (Down/Cash Payments, Principal, and Interest) | Adjustment for Amounts Paid by ESOP not Received by BFLLC | Percentage of Payments Attributable to Inflated Price (Also Percent Sales Price was Inflated)[29] | Cash Received by BFLLC Attributable to Inflated Price |
| 12/2004 | $6,815,876.95 | $3,800,000 | 13.4% | $404,127.51 |
| 9/2005 | $1,199,999.72 | N/A | 19.7% | $236,399.94 |
| 12/2005 | $761,823.63 | N/A | 32.1% | $244,545.39 |
| **Total** | | | | **$885,072.84**[30] |

The Defendants argue the district court made two errors.

### A. Consideration of Debt Owed by the ESOP but not yet Paid

In a rehash of an argument we have rejected, the Defendants challenge any relief against BFLLC for the December 2004 and December 2005

---

[29] See Table 2, *supra*, for details on how these percentages were computed.

[30] The immaterial $7.59 difference between our computations and the district court's order is due to rounding in the percentages.

No. 14-60811
cons/w No. 14-60816

transactions. They contend that because BFLLC actually received less cash than the contracted-for sales price for each transaction (owing to unpaid ESOP debt), it would be inequitable and/or a windfall for the plaintiffs to recover anything against BFLLC. That BFLLC is a non-party does not affect the damages calculation, however. Further, contrary to the Defendants' contention, BFLLC's joint and several liability effects no windfall because the ESOP is not getting anything extra, such as a double recovery.[31] The district court did not clearly err in its allocation of BFLLC's share of the damages award.

### B. Consideration of Interest Paid by the ESOP

The Defendants argue that the district court erred by including interest payments made by the ESOP to BFLLC in its award against BFLLC. They first argue that *all* interest payments received by BFLLC should be excluded from the computation of the award. This argument is clearly wrong, as interest paid on debt is recoverable as damages to the extent that it was wrongly paid due to an inflated purchase price. They alternatively argue that, if *all* interest is not excluded, then only the *excess* interest attributable to the inflated purchase price should be included in the joint and several liability award. We agree: only the interest payments (indeed, *any* payments, including principal) attributable to the inflated purchase price should be recoverable. *Cf. Atkinson v. Anadarko Bank and Tr. Co.*, 808 F.2d 438, 442 (5th Cir. 1987) (awarding damages as the difference between the interest wrongly charged and that

---

[31] The Defendants attempt to reframe the windfall argument in their reply brief by arguing the windfall is another judgment debtor to execute against, not the award of damages itself. This court will not consider arguments raised for the first time in a reply brief. *Wright v. Excel Paralubes*, 807 F.3d 730, 736 (5th Cir. 2015). In any case, the presence of another judgment debtor to execute against is not a windfall.

No. 14-60811
cons/w No. 14-60816

which should have been charged).  The parties simply overlook that the district court's methodology correctly took this principle into account.

Take as an example the December 2005 transaction, which was 100% debt-financed.  The harm to the ESOP is that it overpaid for the BAI stock.  It incurred too much debt.  The district court found that $7,139,658.09 was the FMV, or proper purchase price, for the BAI stock at issue in that transaction. *Perez*, 54 F. Supp.3d at 678.   Instead, the inflated purchase price was $10,507,421.34, resulting in an overpayment of $3,367,763.25.  *Id.*  The ESOP took on $3,367,763.25 in excess debt.  Only the interest payments attributable to this excess debt are properly included in the joint and several liability award against BFLLC.  If the ESOP had paid the FMV as computed by the district court, it would have incurred $7,139,658.09 in debt anyway, so it is correct to exclude interest payments (indeed, *all* payments, including principal) attributable to that portion of the debt from the computation of damages.  *C.f. Whitfield v. Lindemann*, 853 F.2d 1298, 1306 (5th Cir. 1988) ("Had the properties been evaluated properly when they were transferred, the same operating losses would have occurred.  To allow recovery for those losses, as the district court has done, is to place the Plan in a better position than it would have occupied had the wrong not occurred.").  The district court, however, accounted for this by multiplying the overpayment percentage[32] on each transaction by the amount of cash that BFLLC actually received, including interest payments.  *See Perez*, 54 F. Supp.3d at 678, 681.  A portion of each dollar received as an interest payment is attributable to the excess debt, and multiplying by the overpayment percentage properly accounts for that.  The court did not clearly err in allocating BFLLC's share of excess interest.

---

[32] *See supra* Table 2.

36

No. 14-60811
cons/w No. 14-60816

## V.     Other Equitable Remedies

### A. Prejudgment Interest

This court reviews the decision to award prejudgment interest, the interest rate selected, and other computations for abuse of discretion. *See Hansen v. Cont'l Ins. Co.*, 940 F.2d 971, 983-85 (5th Cir. 1991), *abrogated on other grounds by CIGNA Corp. v. Amara*, 563 U.S. 421, 131 S. Ct. 1866 (2011). Prejudgment interest is available in ERISA cases. *See id.* at 984 n.11. "It is not awarded as a penalty, but as compensation for the use of funds." *Whitfield v. Lindemann*, 853 F.2d 1298, 1306 (5th Cir. 1988). The court awarded no prejudgment interest against Smith, who received no money from the transactions, but it awarded interest against Bruister for his entire liability and against BFLLC for the actual sum it received. Bruister and BFLLC challenge both the propriety and amount of prejudgment interest.

Because there is no ERISA law setting prejudgment interest rates, courts look to state law for that purpose. *See Hansen*, 940 F.2d at 984-85. Mississippi's statutory rate of interest on notes, accounts, and contracts is 8% per annum, "calculated according to the actuarial method," and running from the date of filing the complaint. MISS. CODE. ANN. §§ 75-17-1(1), 75-17-7. The district court applied Mississippi's rate,[33] compounded annually.[34] *Perez*,

---

[33] At oral argument, we pressed Johanson, the Defendants' counsel, on whether this rate was appropriate given that prevailing interest rates in the general economy were much lower during the relevant timeframe (2010-2014), a fact of which we take judicial notice. He conceded that it was. *C.f. Perez*, 54 F. Supp.3d at 680 ("Defendants do not suggest an alternative rate."). Still, we are disturbed that the interest rate assessed is so much higher than general interest rates were, as the excess interest appears more like a forbidden penalty than as compensation for the use of funds. *See Whitfield*, 853 F.2d at 1306. We thus leave open whether it is appropriate to apply the statutory rate in all cases presenting similar economic circumstances.

[34] As a general rule prejudgment interest awards are simple interest awards, not compound interest awards. *See Whitfield*, 853 F.2d at 1306. However, a prior panel opinion of this circuit has interpreted the Mississippi statute that calls for interest to be calculated

No. 14-60811
cons/w No. 14-60816

54 F. Supp.3d at 680.  The Defendants, in another iteration of this argument, contend that the court abused its discretion because the ESOP did not repay all of the acquisition loans it used to acquire the BAI stock.  They argue that only $885,065.25 can be fairly used as principal for computation of prejudgment interest because that is all BFLLC (and by extension, Bruister) received.  *Id.*  We have already rejected this argument based on the opportunity cost incurred by the ESOP in making its choice to invest in BAI stock rather than alternatives;  prejudgment interest compensates for those lost opportunities.  The district court's award and calculation of prejudgment interest were not an abuse of discretion.

    *B. Fiduciary Bar*

    The district court "grant[ed] injunctive relief prohibiting all Defendants from acting in the future as fiduciaries or service providers to ERISA-covered plans, as they have engaged in egregious misconduct."  *Perez*, 54 F. Supp.3d at 681 (citing *Martin v. Feilin*, 965 F.2d 660, 672 (8th Cir. 1992)).  There is authority in this circuit for permanently barring fiduciaries who breached their duties from ever serving as an ERISA fiduciary again.  *Reich v. Lancaster*, 55 F.3d 1034, 1054 (5th Cir. 1995).

    The Defendants contend that because the amount the ESOP actually overpaid on the BAI stock sales is relatively small (less than a million dollars on each multi-million dollar transaction), they should not incur this injunction. It is not the magnitude of the losses to the ESOP, however, but the nature of the fiduciary (mis)conduct that should principally undergird an injunction.  *See Reich*, 55 F.3d at 1054 ("The district court concluded in the present case that

---

"according to the actuarial method" as having a technical meaning calling for compound interest.  *Stovall v. Ill. Cent. Gulf. R. Co.*, 722 F.2d 190, 191-92 (5th Cir. 1984) (interpreting MISS. CODE ANN. § 75-17-1(1)).

No. 14-60811
cons/w No. 14-60816

[the defendants] had committed significant violations of their ERISA fiduciary duties."). Without focusing on the amount of the loss to the ESOP, the court here described the Defendants' conduct as "egregious." *Perez*, 54 F. Supp.3d at 681. Under the totality of circumstances, the district court did not abuse its discretion in barring the Defendants from serving as ERISA fiduciaries in the future.

## VI.    Concurrent Judgments

The district court entered identical judgments in each consolidated case. The Defendants argue this subjects them to a potential double recovery, and that it was reversible error for the district court to have issued concurrent judgments without specifying that recovery under one offsets the amount owed under the other.[35] To alleviate any misconception and avert double recovery, we modify the concurrent judgments in each consolidated case into a single judgment that disposes of them together. *See* 28 U.S.C. § 2106; *Harcon Barge Co., Inc. v. D&G Boat Rentals, Inc.*, 746 F.2d 278, 287-88 (5th Cir. 1984).

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's judgment, but **MODIFY** its concurrent judgments into a single judgment that disposes of each consolidated case together.

---

[35] The Secretary and Sealy respond by pointing to the Second Circuit's decision in *Beck v. Levering*, 947 F.2d 639, 642 (2d Cir. 1991) (per curiam). That case is not quite on point. It dealt with an argument that *res judicata* prevents private plaintiffs and the Secretary from recovering monetary damages, holding that it does not because of the possibility that private plaintiffs (or plan trustees) may not pursue recovery of a judgment entered in their favor. *Id.* In such cases, allowing the Secretary to pursue a concurrent action ensures that private plaintiffs cannot preclude the Secretary from pursuing an action in the public interest. *Id.* Every case citing *Beck* has cited it for this proposition. *E.g., Herman v. S.C. Nat. Bank*, 140 F.3d 1413, 1424 (11th Cir. 1998). We have also held *res judicata* does not prevent the Secretary from pursuing an action when a private plaintiff has settled his action. *See Donovan v. Cunningham*, 716 F.2d 1455, 1462 (5th Cir. 1983).